# ORIGINAL

1  Jay Earl Smith, Esq.
   Nevada Bar No. 1182
2  Jennifer D'Agostino, Esq.
   Nevada Bar No. 7668
3  SMITH LARSEN & WIXOM
   Hills Center Business Park
4  1935 Village Center Circle
   Las Vegas, Nevada 89134
5  Tel: (702) 252-5002
   Fax: (702) 252-5006
6
7
8  Attorneys for Defendant
   Wells Fargo Investments, LLC



9

## UNITED STATES DISTRICT COURT

10

### DISTRICT OF NEVADA

11

12  NEVWEST SECURITIES CORPORATION          CV-S-03-1333-KJD-RJJ
    a Nevada corporation,
13

14          Plaintiff,

15  v.                                    )    **NOTICE OF REMOVAL OF ACTION**
                                          )    **(28 U.S.C. § 1441(a),(b) and**
16  BRIAN MICHAEL VOLMER; 20/20           )    **(c)-Federal Question)**
    NETWORKS, INC., a Nevada corporation; )
17  EDWARD GALLAGHER, individually;       )
    WERNER GREIDER, individually;         )
18  CHARLES SMITH, individually; STEVEN   )
    Y. ONOUE, individually; MEHRHAD       )
19  ALBORZ, individually; CLAUDIA         )
    ZAMAN; MICHAEL ZAMAN;                 )
20  SIGNATURE STOCK TRANSFER, INC.,       )
    a Texas corporation; WELLS FARGO      )
21  INVESTMENTS, LLC, a Delaware limited  )
    liability company; DEPOSITORY TRUST   )
22  AND CLEARING CORPORATION, a New       )
    York Corporation; DOES I through X,   )
23  inclusive; ROE CORPORATIONS XX        )
    through XXX, inclusive;               )
24                                        )
                                          )
25          Defendants.                   )
                                          )
26  _____   )

27

28

## FILED SEPARATELY

*(left margin, vertical text)* SMITH LARSEN & WIXOM · ATTORNEYS · HILLS CENTER BUSINESS PARK · 1935 VILLAGE CENTER CIRCLE · LAS VEGAS, NEVADA 89134 · TEL. (702) 252-5002 · FAX (702) 252-5006

SMITH LARSEN & WIXOM
A T T O R N E Y S
HILLS CENTER BUSINESS PARK
1935 VILLAGE CENTER CIRCLE
LAS VEGAS, NEVADA 89134
TEL. (702) 252-5002 • FAX (702) 252-5006

1    TO THE CLERK OF THE ABOVE-ENTITLED COURT:

2         PLEASE TAKE NOTICE that Defendants Wells Fargo Investments, LLC ("Wells

3    Fargo") and Depository Trust and Clearing Corporation (herein, "DTC")[1], through their undersigned

4    counsel, hereby remove to this Court the State Court action described below.

5         1.    This is a civil action of which the Court has original jurisdiction under 28

6    U.S.C. § 1331 (federal question), and is one which may be removed to this Court by Defendants

7    pursuant to 28 U.S.C. § 1441(a), (b) and (c), in that it is a civil action in which the United States

8    District Courts have original exclusive jurisdiction and is founded on a claim arising under the

9    Constitution, laws, or treaties of the United States. Further, this Court would have supplemental

10   jurisdiction over other claims. See, 28 U.S.C. § 1367(a) and § 1441(c).

11        2.    On September 23, 2003, the action was commenced by the filing of a

12   Complaint in the District Court, Clark County, Nevada, as case number A474001. Wells Fargo was

13   not a named defendant in the initial complaint.

14        3.    On October 14, 2003, Plaintiff's First Amended Complaint ("Amended

15   Complaint") was filed in District Court, naming Wells Fargo as a defendant for the first time. A

16   copy of the Amended Complaint is attached hereto as Exhibit K.

17        4.    Plaintiff's claims allegedly arise under the Securities Exchange Act of 1934

18   (15 U.S.C § 78(a) et seq.), of which the district courts of the United States have exclusive

19   jurisdiction; and Rule 10b-5 (17 C.F.R. 240.10B-5) as more fully set forth in the Amended

20   Complaint.[2] The Court has original exclusive federal question jurisdiction over such claims. 28

21   U.S.C. § 1331; 15 U.S.C. § 78(aa). Further state claims have been raised for alleged conversion,

22   negligence, breach of contract, declaratory relief, fraud, and injunctive relief. Because the claims

23   are transactionally related to the asserted federal claims, the Court has federal court supplemental

24   jurisdiction. 28 U.S.C. § 1367 and § 1441(c).

25        5.    Wells Fargo first became aware of this action on Friday, October 17, 2003,

26   [1]

27   DTC is not waiving its special limited appearance in this matter for purposes of objecting to personal
     jurisdiction by joining this notice of removal.

28

     [2]Plaintiff also raises claims under the Securities Act of 1933 (15 U.S.C. § 77(a) et seq).

after Plaintiff served via facsimile Wells Fargo's resident agent on Thursday, October 16, 2003, the Amended Complaint and the Application for Temporary Restraining Order and Motion for Preliminary Injunction. Wells Fargo did not have notice of the action against it until service was made on Wells Fargo's resident agent. A copy of the Certificate of Service by Fax of Wells Fargo is attached hereto as Exhibit P. A copy of the relevant Application for Temporary Restraining Order and Motion for Preliminary Injunction is attached hereto as Exhibit L.

6. DTC was served with the Amended Complaint on October 16, 2003 via facsimile and federal express.

7. Signature Stock Transfer, Inc. (herein, "Signature") was served via facsimile and federal express on October 16, 2003. Signature has not made an appearance in this matter.[3]

8. The first defendant served with the Complaint was 20/20 Networks, Inc. (herein, "TWNK"), which was served on September 24, 2003. TWNK has made an appearance in this action, by virtue of a Notice of Appearance, filed on October 22, 2003.[4]

9. This Notice of Removal of Action is submitted to the United States District Court for the District of Nevada subject to the Federal Rules of Civil Procedure, and is signed pursuant to Rule 11. Copies of all process, pleadings, and orders served on any defendant to this action have been attached hereto, and they include: the Complaint (Exhibit A); Plaintiff's (First) Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction (Exhibit B); Certificate of Counsel in Support of Ex Parte Application for Temporary Restraining Order (Exhibit C); Plaintiff's Initial Appearance Fee Disclosure (Exhibit D); Notice of Posting Bond Concerning Temporary Restraining Order (Exhibit E); Summons to 20/20 Networks, Inc. (Exhibit

[3]

Signature and any other defendants which have been served as of the date of this Notice and have not made an appearance have not been contacted for purposes of joinder in this notice of removal. The parties will be contacted following appearance to request joinder in this notice of removal.

[4]

An attempt was made on October 23, 2003 to contact counsel for TWNK, but at the time of submitting this paper, counsel for TWNK had not returned the call.

3

SMITH LARSEN & WIXOM
ATTORNEYS
HILLS CENTER BUSINESS PARK
1935 VILLAGE CENTER CIRCLE
LAS VEGAS, NEVADA 89134
TEL. (702) 252-5002 • FAX (702) 252-5006

F); Plaintiff's Supplement in Support of Motion for Preliminary Injunction (Exhibit G); Order Granting Preliminary Injunction (Exhibit H); Notice and Judgment of Dismissal of Defendant Depository Trust and Clearing Corporation (Exhibit I); Notice of Entry of Order Granting Preliminary Injunction (Exhibit J); Plaintiff's First Amended Complaint (Exhibit K); Plaintiff's (Second) Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction (Exhibit L); Affidavit of Harold P. Gewerter, Esq. in Support of Order Shortening Time (Exhibit M); Certification of Counsel in Support of Plaintiff's Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction (Exhibit N); Order Shortening Time Concerning Application for Temporary Restraining Order (Exhibit O); Certificate of Service by Fax of Wells Fargo Investments, LLC (Exhibit P); Certificate of Service by Fax and Federal Express of Signature Stock Transfer, Inc. and Depository Trust and Clearing Corporation (Exhibit Q)[5].

DATED this 23 day of October, 2003.

SMITH LARSEN & WIXOM                                    **JOINED BY:**

Jay Earl Smith, Esq.                                   William E. Cooper, Esq.
Nevada Bar No. 1182                                    Nevada Bar No. 2213
Jennifer D'Agostino, Esq.                              COOPER LAW OFFICES
Nevada Bar No. 7668                                    601 E. Bridger Ave
Hills Center Business Park                             Las Vegas, Nevada 89101
1935 Village Center Circle                             Attorneys for Defendant
Las Vegas, Nevada 89134                                Depository Trust and Clearing
Attorneys for Defendant                                Corporation
Wells Fargo Investments, LLC

---

[5]

The following documents are not available for copying as of the date of this Notice: Proof of Service on Wells Fargo Investments, LLC; Amended Summons; and Notice of Appearance regarding 20/20 Networks, Inc. This Notice will be supplemented as soon as the documents are available.

SMITH LARSEN & WIXOM
ATTORNEYS
HILLS CENTER BUSINESS PARK
1935 VILLAGE CENTER CIRCLE
LAS VEGAS, NEVADA 89134
TEL. (702) 252-5002 • FAX (702) 252-5006

4

SMITH LARSEN & WIXOM
A T T O R N E Y S
HILLS CENTER BUSINESS PARK
1935 VILLAGE CENTER CIRCLE
LAS VEGAS, NEVADA 89134
TEL (702) 252-5002 • FAX (702) 252-5006

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# CERTIFICATE OF SERVICE BY MAIL

I HEREBY CERTIFY that on this $\underline{23}$ day of October, 2003, a true copy of the foregoing **Notice of Removal of Action ( 28 U.S.C. § 1441(a), (b), and (c)-Federal Question)** was mailed, postage prepaid, to the  following:

> Harold P. Gewerter, Esq.
> Wendy E. Miller, Esq.
> HAROLD P. GEWERTER, ESQ., LTD.
> 5440 West Sahara Avenue, Suite 202
> Las Vegas, NV 89146
> Attorneys for Plaintiff

> William E. Cooper, Esq.
> COOPER LAW OFFICES
> 601 E. Bridger Avenue
> Las Vegas, NV  89101
> Attorneys for Defendant Depository Trust
> and Clearing Corporation

> Thomas C. Cook, Esq.
> 4955 S. Durango Drive
> Suite 214
> Las Vegas, NV 89113
> Attorney for Defendant
> 20/20 Networks, Inc

an employee of Smith Larsen & Wixom

5

**EXHIBIT A**

*18*

# ORIGINAL

COMP
HAROLD P. GEWERTER, ESQ.
Nevada Bar #499
WENDY E. MILLER
Nevada Bar #6064
HAROLD P. GEWERTER, ESQ., LTD.
228 S. Fourth Street, Suite 101
Las Vegas, Nevada 89101
Telephone No.: (702) 382-1714
Facsimile No.: (702) 382-1759
Attorneys for Plaintiff

FILED

SEP 23   4 08 PM '03

*[signature]*
CLERK

## DISTRICT COURT

## CLARK COUNTY, NEVADA

* * * * *

NEVWEST SECURITIES CORPORATION, a Nevada Corporation*

Plaintiff,

vs.

BRIAN MICHAEL VOLMER; 20/20 NETWORKS, INC., a Nevada corporation; EDWARD GALLAGHER, individually; WERNER GREIDER, individually; CHARLES SMITH, individually; STEVEN Y. ONOUE, individually; MEHRHAD ALBORZ, individually; SIGNATURE STOCK TRANSFER, INC., a Texas corporation; DEPOSITORY TRUST AND CLEARING CORPORATION, a New York Corporation; DOES I through X, inclusive; ROE CORPORATIONS XX through XXX, inclusive;

Defendants.

CASE NO.: *A474001*
DEPT NO.: *I*

PLAINTIFF'S COMPLAINT FOR:

1. SECURITIES FRAUD;
2. CONVERSION
3. NEGLIGENCE
4. DECLARATORY RELIEF;
5. FRAUD
6. INJUNCTIVE RELIEF

**ARBITRATION EXEMPT:
EXTRAORDINARY RELIEF
REQUESTED**

COMES NOW, Plaintiff NEVWEST SECURITIES CORPORATION, a Nevada corporation, by and through its attorneys, HAROLD P. GEWERTER, ESQ., and WENDY E. MILLER, ESQ., and for its Complaint, complains and alleges as follows:

### GENERAL ALLEGATIONS

1.   Plaintiff NEVWEST SECURITIES CORPORATON is a Nevada corporation doing business in Clark County, Nevada.

1

2.  Defendant BRIAN MICHAEL VOLMER (hereinafter "VOLMER") is a resident of the State of California doing business in Clark County, Nevada.

3.  Defendant 20/20 NETWORKS, INC. (hereinafter "TWNK") is a Nevada corporation doing business in Clark County, Nevada.

4.  Defendant SIGNATURE STOCK TRANSFER, INC., (hereinafter "SIGNATURE") is a Texas corporation.

5.  Upon information and belief, Defendant EDWARD GALLAGHER (hereinafter "GALLAGHER") is a resident the State of California, doing business in Clark County, Nevada.

6.  Upon information and belief, Defendant WERNER GREIDER (hereinafter "GREIDER") is a resident of the State of California, doing business in Clark County, Nevada.

7.  Upon information and belief, Defendant STEVEN Y. ONOUE (hereinafter "ONOUE") is a resident of the State of California, doing business in Clark County, Nevada.

8.  Upon information and belief, Defendant MEHRHAD ALBORZ (hereinafter "ALBORZ") is a resident of the State of California, doing business in Clark County, Nevada.

9.  At all times relevant hereto, Defendant DEPOSITORY TRUST AND CLEARING CORPORATION (hereinafter "DTC") was a New York corporation doing business in Clark County, Nevada.

10. The true names of Defendants DOES I through X, inclusive, and ROE CORPORATIONS XX through XXX, inclusive, whether individual, corporate, associate or otherwise are unknown to Plaintiff, who therefore sues such defendants by fictitious names. Plaintiff is informed and thereupon alleges that each of the defendants designated herein as a DOE or ROE CORPORATION is in some way responsible for the damages claimed by Plaintiff herein Plaintiff will ask leave of this Court to amend this Complaint to insert the true names and capacities of Defendants DOES I through X, inclusive and ROE CORPORATIONS XX through XXX, inclusive, when the identities have been ascertained, to formulate appropriate allegations, and to join such Defendants in this action.

11. Plaintiff is a licensed member firm of the National Association of Securities Dealers (NASD). Plaintiff is a broker/dealer headquartered in Las Vegas, Nevada.

2

12. Upon information and belief, on or about June 19, 2003, Defendant VOLMER and Defendant TWNK entered into an Independent Contractor/Consultant agreement whereby Defendant VOLMER would be issued 100,000 free-trading shares of common stock of Defendant 20/20 in exchange for providing certain consulting services to Defendant TWNK. The shares were registered in an S-8 filing with the Securities and Exchange Commission on June 24, 2003.    Upon information and belief, Defendant TWNK, and Defendants GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ, the officers and directors of Defendant TWNK, hired Defendant VOLMER, a known stock touter, to pump up the price of Defendant TWNK stock through illegal trades, via an account held with Plaintiff, in violation of applicable securities laws.

13. Plaintiff is informed and believes that at all times relevant hereto, Defendants GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ were shareholders, officers, and directors of Defendant TWNK and treated Defendant TWNK and its finances as a mere shell, instrumentality, and conduit through which each of the Defendants carried on business in name only, exercising control and dominance of such business to such an extent that any individuality or separateness of Defendant TWNK did not exist, and to maintain the fiction of a separate business entity would promote fraud and sanction injustice, such that the Defendant TWNK and Defendants  GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ should be treated as the alter egos of one another.

14. On or about June 26, 2003, Defendant VOLMER deposited with Plaintiff the certificate number 1469 dated June 24, 2003 representing 100,000 shares of 20/20 Networks, Inc. (CUSIP No. 90137B 10 2) in the name of Defendant VOLMER.    The certificate was free of any restrictive legend and, as such, constituted good delivery for deposit in a securities account.

15. On July 1, 2003, Plaintiff forwarded to its securities clearing firm, Wells Fargo Investments (WFI) at their St. Louis office, a stock power to clear the 100,000 shares of Defendant TWNK; WFI received the stock power on July 2nd and forwarded the stock power to WFI Minneapolis Security Processing.

16. On July 1, 2003, Defendant VOLMER instructed Plaintiff to journal 5,000 shares of

3

1 Defendant TWNK from Defendant VOLMER's account to account 052-8758-8217, Wells
2 Capital, which was completed on July 10, 2003.

3    17. On July 7, 2003, Wells Fargo Investments, LLC. (hereinafter "WFI"), acting in the
4 clearing firm capacity for Plaintiff, received the certificate number 1469 and recorded 100,000
5 shares of Defendant TWNK as a fully paid and segregated securities position in the account
6 number 052-8594-3619 in the name of Brian M. Volmer.  In accordance with applicable rules
7 and industry standards, WFI forwarded the certificate number 1469 to Defendant SIGNATURE,
8 Defendant TWNK's transfer agent, via Defendant DTC for transfer into "street name."

9    18. On July 7, 2003, Defendant VOLMER instructed Plaintiff to journal 8,500 shares of
10 Defendant TWNK from Defendant VOLMER's account to account 052-8236-6469, John R.
11 Switzer, which was completed on July 10, 2003.

12    19. On July 8, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day
13 order to sell 15,000 shares of Defendant TWNK from the Defendant VOLMER account at $0.90
14 per share.  The trade was executed at $0.90 a share.

15    20. On July 8, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day
16 order to buy 1,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.25
17 per share.  The trade was executed at $1.25 a share.

18    21. On July 8, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day
19 order to sell 2,500 shares of Defendant TWNK from the Defendant VOLMER account at $1.15
20 per share.  The trade was executed at $1.15 a share.

21    22. On July 9, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day
22 order to buy 500 shares of Defendant TWNK for the Defendant VOLMER account at $1.20 per
23 share.  The trade was executed at $1.19 a share.

24    23. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day
25 order to buy 2,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.20
26 per share.  The trade was executed at $1.20 a share.

27

28

4

24. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.20 per share. The trade was executed at $1.20 a share.

25. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.30 per share. The trade was executed at $1.30 a share.

26. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.30 per share. The trade was executed at $1.30 a share.

27. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.30 per share. The trade was executed at $1.30 a share.

28. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 500 shares of Defendant TWNK for the Defendant VOLMER account at $1.40 per share. The trade was executed at $1.40 a share.

29. On July 11, 2003, Defendant VOLMER instructed Plaintiff to wire all available funds ($4,430.00) to a bank account in California.

30. On July 14, 2003, Defendant VOLMER instructed Plaintiff to electronically transfer 70,000 shares of Defendant TWNK from his personal account, to an account held by Titan Group, LLC at Fiserv Investor Services.  Plaintiff executed this transfer on the same day.

31. On July 17, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to sell 7,090 shares of Defendant TWNK from the Defendant VOLMER account at $0.35 per share. The trade was executed at $0.35 a share.

32. On August 7, 2003, Defendant VOLMER instructed Plaintiff to wire all available funds ($1,645.00) to a bank account held by Defendant VOLMER in California.

33. On August 11, 2003 Defendant DTC informed WFI of a stop transfer placed on the certificate through the transfer agent by Defendant TWNK.  This was the first time WFI was informed of any alleged impropriety pertaining to these securities.

5

34. On August 13, 2003, WFI first informed Plaintiff of the stop transfer via e-mail and emailed Plaintiff a stop release letter. This was the first time Plaintiff was notified of any alleged impropriety pertaining to these securities.

35. On September 22, 2003 Defendant DTC debited WFI for the full 100,000 shares. Since then WFI has indicated that it expects to debit Plaintiff in turn, forcing Plaintiff to replace these 100,000 shares by purchasing same in the open market under inflated and fraudulent conditions as a consequence of overt market manipulation.

36. At no time, prior to or concurrent with the legitimate and bonafide sales made at the direction of an entitlement order, was Plaintiff or WFI notified of any adverse claim affecting the Defendant TWNK stock in the Defendant VOLMER account, including but not limited to any claim that Defendant TWNK certificate no. 1469 presented for deposit by the customer had concerning any impediment on its transferability. Plaintiff and WFI were never apprised of any adverse claim until well after the sales and transfer occurred. At no time prior to the sales and transfer of the Defendant TWNK stock did anyone notify Plaintiff or WFI of any violation of any claimant(s)' right arising from Plaintiff's and WFI's sale or transfer of the TWNK stock which sales and transfer occurred at the direction of the customer under a bonafide entitlement order.

37. On September 22, 2003, Defendant SIGNATURE informed Plaintiff, via fax, that the Stop Transfer order could only be lifted by court order or by the issuer.

38. Plaintiff has demanded that Defendant TWNK lift the stop-transfer order, but Defendant TWNK refuses to lift the stop-transfer order.

39. As a result of the above actions, Defendant DTC has debited the account of WFI for the 100,000 shares of TWNK. If the stop-transfer order is not released immediately, WFI will require Plaintiff to purchase 100,000 shares of Defendant TWNK on the open market to replace the 100,000 shares that have been debited by Defendant DTC.

40. Upon information and belief, Defendant TWNK, and Defendants GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ, the officers and directors of Defendant TWNK, have intentionally stopped transfer of the certificate in order to illegally force Plaintiff to buy 100,000 shares of Defendant TWNK on the open market, in order to further drive up the price of

6

TWNK stock.

## FIRST CAUSE OF ACTION

### (Securities Fraud- Against Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ)

41. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 40, above, as if fully set forth herein.

42. Plaintiff is a purchaser of TWNK securities, pursuant to UCC §8-116 and NRS §104.8116.

43. The Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ, by the use and means of instrumentalities of interstate commerce and of the mails, directly or indirectly and knowingly or with reckless disregard committed the following acts:

      a.      employed a device, scheme and artifice to defraud;

      b.      obtained money and property by means of untrue statements of material facts and of omission to state material facts necessary in order to make the statements made in light of the circumstances under which they are made, not misleading; and

      c.      engaged in transactions, practices and a course of conduct which operated as a fraud and deceit on the Plaintiff, all with reference to the facts, acts and omissions set forth in this Complaint.

44. Specifically, Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE issued TWNK Stock Certificate No. 1469 to Defendant VOLMER for the illegal purpose of stock price manipulation. Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ then agreed to deposit Certificate No. 1469 with Plaintiff. Plaintiff reasonably relied on Defendants' false representations that the certificate was a valid certificate for 100,000 shares of free trading TWNK stock. These representations were material to Plaintiff becoming a purchaser of TWNK stock, as set forth in NRS 104.8116. That these representations were false is evidenced by the fact that Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ refuse to release transfer of the certificate to Plaintiff, even though Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ have no legal reason to

7

stop transfer of the securities. Defendants made these material misrepresentations in order to induce Plaintiff to deposit Certificate 1469 in Defendant VOLMER's account and permit Defendant VOLMER to transfer the securities evidenced by Certificate 1469.

45. The actions of Defendants constitute violations of NRS §90.570, the Securities Act of 1933, the Securities Exchange Act of 1934, Rule 10b-5 of the General Rules and Regulations as promulgated by the Securities and Exchange Commission, codified at 15 U.S.C. §78j, and the Rules and Regulations of the New York Stock Exchange and the National Association of Securities Dealers. Defendants GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ are "control persons" under section 20(a) of the Securities Exchange Act, and are therefore liable to Plaintiff for any fraud committed by Defendant TWNK.

46. As a direct and proximate result of the securities fraud as set forth above, Plaintiff has sustained damages in an amount to be shown according to proof at the time of trial. Additionally, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

47. As a further direct and proximate result of the securities fraud as set forth above, Plaintiff has been required to retain the services of an attorney to prosecute this action and is entitled to an award of reasonable attorney's fees and costs incurred herein.

<div align="center">

### SECOND CAUSE OF ACTION

**(Conversion—against Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ)**

</div>

48. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 47, above, as if fully set forth herein.

49. As a result of the acts complained of above, Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ have wrongfully converted to their own use more than 100,000 shares of TWNK stock from Plaintiff's account with WFI.

50. As a direct and proximate result of the conversion as set forth above, Plaintiff has sustained damages in a sum in excess of $10,000 in an amount to be shown according to proof at the time of trial. Additionally, Plaintiff is entitled to an award of punitive damages in an amount

<div align="center">8</div>

to be determined at trial.

51. As a further direct and proximate result of Defendants' conversion, as set forth above, Plaintiff has been required to retain the services of an attorney to prosecute this action and is entitled to an award of reasonable attorney's fees and costs incurred herein.

### THIRD CAUSE OF ACTION

**(Negligence—Against Defendants SIGNATURE STOCK TRANSFER, INC.,**

**TWNK AND DTC)**

52. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 51, above, as if fully set forth herein.

53. Defendants SIGNATURE STOCK TRANSFER, INC., and DTC are Securities Intermediaries, as defined at NRS §104.8102(1)(n).

54. Plaintiff and WFI are Entitlement Holders of TWNK Certificate No. 1469, as defined at NRS §104.8102(1)(h). Plaintiff and WFI are also Protected Purchasers of Certificate No. 1469, as defined at NRS §104.8033.

55. Defendants DTC and SIGNATURE STOCK TRANSFER, INC., breached their legal and fiduciary duties to Plaintiff and WFI when they honored Defendant TWNK's adverse claim to Plaintiff's and WFI's rights as Protected Purchasers of TWNK Certificate No. 1469.

56. Defendant TWNK breached its duty to Plaintiff and WFI under NRS §104.8401 to register the transfer of Certificate No. 1469 to WFI when the certificate was presented to Plaintiff's transfer agent.

57. Defendants' breaches of their respective legal duties, as set forth above, constitute negligence. As a result of Defendants' negligence, Plaintiff has incurred damages in excess of $10,000, in an amount to be determined at trial.

58. As a further direct and proximate result of Defendants' negligence, as set forth above, Plaintiff has been required to retain the services of an attorney to prosecute this action and is entitled to an award of reasonable attorney's fees and costs incurred herein.

9

## FOURTH CAUSE OF ACTION

### (Declaratory Relief—Against all Defendants)

59. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 58, above, as if fully set forth herein.

60. Plaintiff brings this claim pursuant to NRCP Rule 57. A case of actual controversy exists between Plaintiff and Defendants.

61. As set forth above, as a result of the wrongful refusal to transfer stock certificate number 1469 to WFI, for the benefit of Plaintiff, Plaintiff's account with WFI will be debited 100,000 shares of Defendant TWNK stock.

62. Plaintiff is entitled to an order from the Court declaring the rights and relationships between Plaintiff and Defendants, and further declaring that Plaintiff is the protected purchaser of Stock certificate number 1469 of Defendant TWNK, and Defendant TWNK had no legal authority to stop transfer of Certificate 1469, and that Defendants SIGNATURE STOCK TRANSFER and DTC, pursuant to UCC Article 8, the DTCC rules, and applicable New York and Federal law, cannot honor any claims adverse to Plaintiff's ownership of TWNK stock certificate no. 1469.

## FIFTH CAUSE OF ACTION

### (Fraud—Against Defendants VOLMER, TWNK, GALLAGHER,
### GREIDER, SMITH, ONOUE and ALBORZ)

63. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 62, above, as if fully set forth herein.

64. As set forth above, Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE issued TWNK Stock Certificate No. 1469 to Defendant VOLMER for the illegal purpose of stock price manipulation. Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ then agreed to deposit Certificate No. 1469 with Plaintiff. Plaintiff reasonably relied on Defendants' false representations that the certificate was a valid certificate for 100,000 shares of free trading TWNK stock. These representations were material to Plaintiff becoming a purchaser of TWNK stock, as set forth in NRS 104.8116. That these representations

10

were false is evidenced by the fact that Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ refuse to release transfer of the certificate to Plaintiff, even though Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ have no legal reason to stop transfer of the securities. Defendants made these material misrepresentations in order to induce Plaintiff to deposit Certificate 1469 in Defendant VOLMER's account and permit Defendant VOLMER to transfer the securities evidenced by Certificate 1469.

65. As a direct and proximate result of the fraud as set forth above, Plaintiff has sustained damages in excess of $10,000, in an amount to be shown according to proof at the time of trial. Additionally, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

66. As a further direct and proximate result of the fraud as set forth above, Plaintiff has been required to retain the services of an attorney to prosecute this action and is entitled to an award of reasonable attorney's fees and costs incurred herein.

## SIXTH CAUSE OF ACTION

### (Injunctive Relief--- Against all Defendants)

67. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 66, above, as if fully set forth herein.

68. As set forth above, as a result of the wrongful refusal to transfer stock Defendant TWNK stock certificate number 1469 to WFI, for the benefit of Plaintiff, Plaintiff's account with WFI will be debited 100,000 shares of Defendant TWNK stock.

69. Plaintiff has no adequate remedy at law for this injury.

70. Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ have conspired to manipulate the price of Defendant TWNK stock such that it presumptively trades at $.80 per share, although because of the lack of shares currently trading, the price could easily rise to more than $4 per share. This means that to cover this debit wrongfully assigned to Plaintiff, Plaintiff would have to come up with more than $250,000 to cover this debit. Plaintiff would be in substantial violation of net capital requirements and at the end of that trading day. In order to offset this position, Plaintiff's clearing company, WFI, would

11

abscond with all of Plaintiff's assets held at WFI, effectively putting Plaintiff out of business.

71. Plaintiff is entitled to a Court order preventing Defendant TWNK and its control persons from wrongfully stopping transfer of the stock certificate at issue.

72. Plaintiff is further entitled to a Court order preventing Defendant DTC from honoring adverse claim to Stock Certificate 1469 from Defendant TWNK. Additionally, Plaintiff is entitled to a Court order preventing Defendant DTC respectively, from posting a short position against WFI as to the shares of Defendant TWNK deposited by Plaintiff with WFI.

WHEREFORE, Plaintiff prays for judgment against Defendants, for the following:

1.  For a decree that Plaintiff is the protected purchaser of TWNK certificate number 1469;

2.  For a decree that Defendants TWNK and SIGNATURE STOCK TRANSFER, INC., had no legal authority to stop transfer of TWNK stock certificate 1469, and that Defendant DTC, pursuant to UCC Article 8, the DTCC rules, and applicable New York and Federal law, cannot honor any claims adverse to Plaintiff's ownership of certificate 1469;

3.  For an order that Defendant TWNK and its control persons are enjoined from stopping transfer of the stock certificate at issue.

4.  For an order that Defendant DTC is enjoined from posting a short position against WFI as to the shares of Defendant TWNK deposited by Plaintiff with WFI;

5.  For general damages in excess of ten thousand dollars;

6.  For special damages as proven;

7.  For punitive damages;

8.  For reasonable attorney fees;

9.  For costs of suit; and

10. For any such other relief as the Court may deem just and proper.

DATED this 23 day of September, 2003.

HAROLD P. GEWERTER, ESQ.
Nevada Bar No. 499
5440 West Sahara Avenue, Suite 202
Las Vegas, NV 89146
Attorney for Plaintiff

12

**EXHIBIT B**

# ORIGINAL

*(handwritten left margin, rotated):* HEARING REQUIRED  Date: October 6, 2003  Time: 9:00 AM

**FILED**

2003 SEP 24  P 12:36

*(signature)*
CLERK

0009
HAROLD P. GEWERTER, ESQ.
Nevada Bar #499
WENDY E. MILLER
Nevada Bar #6064
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Avenue, Suite 202
Las Vegas, Nevada 89146
Telephone No.: (702) 382-1714
Facsimile No.: (702) 382-1759
Attorneys for Plaintiff

### DISTRICT COURT

### CLARK COUNTY, NEVADA

\* \* \* \* \*

NEVWEST SECURITIES CORPORATION, a Nevada Corporation

Plaintiff,

vs.

BRIAN MICHAEL VOLMER; 20/20 NETWORKS, INC., a Nevada corporation; EDWARD GALLAGHER, individually; WERNER GREIDER, individually; CHARLES SMITH, individually; STEVEN Y. ONOUE, individually; MEHRHAD ALBORZ, individually; SIGNATURE STOCK TRANSFER, INC., a Texas corporation; DEPOSITORY TRUST AND CLEARING CORPORATION, a New York Corporation; DOES I through X, inclusive; ROE CORPORATIONS XX through XXX, inclusive;

Defendants.

CASE NO.: A474001
DEPT NO.:   I

PLAINTIFF'S EX PARTE APPLCATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION; AFFIDAVIT OF ANTONY MICHEL SANTOS

Date of Hearing: *October 6, 2003*

Time of Hearing: *9:00 AM*

COMES NOW, Plaintiff NEVWEST SECURITIES CORPORATION, a Nevada corporation, by and through its attorneys, HAROLD P. GEWERTER, ESQ., and WENDY E. MILLER, ESQ., and files its Ex-Parte Application for Temporary Restraining Order and Motion or Preliminary Injunction. This Motion is based on the pleadings and papers on file herein, the

///

*(left margin stamp):* RECEIVED  SEP 24 2003  COUNTY CLERK

1

1  Points and Authorities below, the Affidavit of Antony Michel Santos, and any such oral

2  argument as may be permitted at the time for hearing of this matter.

3  Dated this 24 day of September 2003.

HAROLD P. GEWERTER, ESQ.
Nevada Bar # 499
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Ave., Suite 202
Las Vegas, Nevada 89149
Attorney for Plaintiff

## NOTICE OF MOTION

TO: All Parties and Their Counsel of Record:

        YOU AND EACH OF YOU WILL PLEASE TAKE NOTICE that the

undersigned will bring the above and foregoing Motion for Preliminary Injunction on for hearing

before the Court at the Courtroom of the above-entitled Court on the _6th_ day of

_October_, 2003, at _9:00_ A_.m of said day in Department _I_ of said Court.

        Dated this 24 day of September 2003.

HAROLD P. GEWERTER, ESQ.
Nevada Bar # 499
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Ave., Suite 202
Las Vegas, Nevada 89149
Attorney for Plaintiff

2

## POINTS AND AUTHORITIES

## INTRODUCTION

This lawsuit is the result of Plaintiff, a securities broker/dealer, getting caught in the middle of a fishy transaction between a shell corporation, 20/20 Networks Inc., ("TWNK"), and a known stock touter, Brian Michael Volmer ("Volmer"), who was issued a stock certificate by TWNK in exchange for performing certain "telecommunications consulting services." Volmer deposited said stock certificate with Plaintiff, and then proceeded to sell and transfer the shares from his account with Plaintiff.   Now, TWNK, with the complicity of its transfer agent, Signature Stock Transfer, Inc., illegally refuses to release the securities to Plaintiff, which has placed Plaintiff in the untenable position of having to replace these 100,000 shares of TWNK stock by buying 100,000 shares on the open market, in a transparent effort by TWNK to further inflate the price of TWNK stock.   Rather than succumb to the attempted extortion by TWNK, Plaintiff filed the instant action.

## STATEMENT OF FACTS

Plaintiff NevWest Securities Corporation is a licensed member firm of the National Association of Securities Dealers (NASD).   Plaintiff is broker/dealer headquartered in Las Vegas, Nevada. On or about June 19, 2003, Defendant Volmer and Defendant TWNK entered into an Independent Contractor/Consultant agreement whereby Defendant Volmer would be issued 100,000 free-trading shares of common stock of Defendant TWNK in exchange for providing certain consulting services to Defendant TWNK. The shares were registered in an S-8 filing with the Securities and Exchange Commission on June 24, 2003.[1] The prior year, the Securities and Exchange Commission had obtained a favorable decision from the Ninth Circuit Court of Appeals upholding a judgment against Defendant Volmer and his partner, John Switzer, for touting stocks on the Internet without disclosing commissions received from the issuing companies.[2]   According to the S-8, Defendant TWNK hired Defendant Volmer as a consultant with expertise in the telecommunications industry.

---

[1] A copy of the S-8 registration statement is attached hereto as Exhibit "1."

[2] A copy of the SEC litigation release, dated June 10, 2002 is attached hereto as Exhibit "2."

3

On or about March 26, 2003, Defendant Volmer had opened an account with Plaintiff. Defendant Volmer's partner, John Switzer, had opened an account with Plaintiff two days earlier. On or about June 26, 2003, Defendant Volmer deposited with Plaintiff the certificate number 1469 dated June 24, 2003 representing 100,000 shares of 20/20 Networks, Inc. (CUSIP No. 90137B 10 2) in the name of Defendant Volmer.[3] The certificate was free of any restrictive legend and, as such, constituted good delivery for deposit in a securities account.

On July 1, 2003, Plaintiff forwarded to its securities clearing firm, Wells Fargo Investments (WFI) at their St. Louis office, a stock power to clear the 100,000 shares of Defendant TWNK; WFI received the stock power on July 2nd and forwarded the stock power to WFI Minneapolis Security Processing.

On July 1, 2003, Defendant Volmer instructed Plaintiff to journal 5,000 shares of Defendant TWNK from Defendant Volmer's account to account 052-8758-8217, Wells Capital, which was completed on July 10, 2003.

On July 7, 2003, WFI, acting in the clearing firm capacity for Plaintiff, received the certificate number 1469 and recorded 100,000 shares of Defendant TWNK as a fully paid and segregated securities position in the account number 052-8594-3619 in the name of Brian M. Volmer. In accordance with applicable rules and industry standards, WFI forwarded the certificate number 1469 to Defendant SIGNATURE STOCK TRANSFER, INC., Defendant TWNK's transfer agent, via Defendant DTC for transfer into "street name."

On July 7, 2003, Defendant Volmer instructed Plaintiff to journal 8,500 shares of Defendant TWNK from Defendant Volmer's account to account 052-8236-6469, John R. Switzer, which was completed on July 10, 2003.

On July 8, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to sell 15,000 shares of Defendant TWNK from the Defendant Volmer account at $0.90 per share. The trade was executed at $0.90 a share.

---

[3] A copy of this certificate is attached hereto as Exhibit "3."

4

On July 8, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant Volmer account at $1.25 per share. The trade was executed at $1.25 a share.

On July 8, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to sell 2,500 shares of Defendant TWNK from the Defendant Volmer account at $1.15 per share. The trade was executed at $1.15 a share.

On July 9, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to buy 500 shares of Defendant TWNK for the Defendant Volmer account at $1.20 per share. The trade was executed at $1.19 a share.

On July 10, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to buy 2,000 shares of Defendant TWNK for the Defendant Volmer account at $1.20 per share. The trade was executed at $1.20 a share.

On July 10, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant Volmer account at $1.20 per share. The trade was executed at $1.20 a share.

On July 10, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant Volmer account at $1.30 per share. The trade was executed at $1.30 a share.

On July 10, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant Volmer account at $1.30 per share. The trade was executed at $1.30 a share.

On July 10, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant Volmer account at $1.30 per share. The trade was executed at $1.30 a share.

On July 10, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to buy 500 shares of Defendant TWNK for the Defendant Volmer account at $1.40 per share. The trade was executed at $1.40 a share.

5

On July 11, 2003, Defendant Volmer instructed Plaintiff to wire all available funds ($4,430.00) to a bank account in California.

On July 14, 2003, Defendant Volmer instructed Plaintiff to electronically transfer 70,000 shares of Defendant TWNK from his personal account, to an account held by Titan Group, LLC at Fiserv Investor Services.  Plaintiff executed this transfer on the same day.

On July 17, 2003, Defendant Volmer instructed Plaintiff to enter an unsolicited day order to sell 7,090 shares of Defendant TWNK from the Defendant Volmer account at $0.35 per share. The trade was executed at $0.35 a share.

On August 7, 2003, Defendant Volmer instructed Plaintiff to wire all available funds ($1,645.00) to a bank account held by Defendant Volmer in California.

On August 11, 2003 Defendant DTC informed WFI of a stop transfer placed on the certificate through the transfer agent by Defendant TWNK.  This was the first time WFI was informed of any issue pertaining to these securities.

On August 13, 2003, WFI first informed Plaintiff of the stop transfer via e-mail and emailed Plaintiff a stop release letter. This was the first time Plaintiff was notified of any issue pertaining to these securities.

On August 20, 2003, WFI informed Plaintiff via E-Mail that they needed a Stop Release Letter executed by Defendant Volmer so as to remedy this matter otherwise WFI would force Plaintiff to buy in the stock at market prices or otherwise take Plaintiff's assets on account with WFI for the buy in.

On September 22, 2003 Defendant DTC debited WFI for the full 100,000 shares. Since then WFI has indicated that it expects to debit Plaintiff in turn, forcing Plaintiff to replace these 100,000 shares by purchasing same in the open market under inflated and fraudulent conditions as a consequence of overt market manipulation. The fact of the matter is that this is likely to cost Plaintiff hundreds of thousand of dollars if not millions of dollars to acquire this stock due to the market manipulation caused by one or more of these defendants and the fact that TWNK is a thinly traded microcap stock of suspect ownership and control.

6

Neither Plaintiff nor WFI were ever notified of any adverse claim affecting the Defendant TWNK stock in the Defendant Volmer account until well after the sales and transfer occurred. On September 22, 2003, Defendant Signature Stock Transfer, Inc. informed Plaintiff, via fax, that the Stop Transfer order could only be lifted by court order or by the issuer.

Plaintiff has demanded that Defendant TWNK lift the stop-transfer order, but Defendant TWNK refuses to lift the stop-transfer order. On September 22, employees and officers of Plaintiff met with counsel for Defendant TWNK in order to try and persuade Defendant TWNK to release the stop-transfer; however, Plaintiff's efforts were fruitless. At the meeting, TWNK was represented by Marcus Luna, Esq., and Mike Zaman, an individual who has been permanently enjoined by the SEC from participating in any broker/dealer activities because of having participated in illegal stock price manipulation.[4]

As a result of the above actions, Defendant DTC has debited the account of WFI for the 100,000 shares of TWNK. If the stop-transfer order is not released immediately, WFI will require Plaintiff to purchase 100,000 shares of Defendant TWNK on the open market to replace the 100,000 shares that have been debited by Defendant DTC. Upon information and belief, Defendant TWNK, and Defendants GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ, the officers and directors of Defendant TWNK, have intentionally stopped transfer of the certificate in order to illegally force Plaintiff to buy 100,000 shares of Defendant TWNK on the open market, in order to further drive up the price of TWNK stock.

<u>ARGUMENT</u>

Plaintiff seeks an order enjoining Defendant TWNK from stopping the transfer of TWNK stock certificate No. 1469 to WFI, for the benefit of Plaintiff. Plaintiff also seeks an order enjoining Defendant DTC from debiting the WFI account for the 100,000 TWNK shares wrongfully withheld from WFI. NRCP 65 and N.R.S. 33.010 govern preliminary injunctions. NRCP 65 provides, in part:

(a) Preliminary injunction.

(1) Notice.

---

[4] See SEC release, attached hereto as Exhibit "4."

No preliminary injunction shall be issued without notice to the adverse party.

(2) Consolidation of hearing with trial on merits.

Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial. This subdivision (a)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury.

(b) Temporary restraining order; notice; hearing; duration.

A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required. Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 15 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if he does not do so, the court shall dissolve the temporary restraining order. On 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

(c) Security.

No restraining order or preliminary injunction shall issue except upon the giving

8

of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the State or of an officer or agency thereof.

The provisions of Rule 65.1 apply to a surety upon a bond or undertaking under this rule.

(d) Form and scope of injunction or restraining order.

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

NRS 33.010 states:

An injunction may be granted in the following cases:

1. When it shall appear by the complaint that the Plaintiff is entitled to the relief demanded, and such relief or any part thereof consists in restraining the commission or continuance of the acts complained of either for a limited period or perpetually.
2. When it shall appear by the complaint or affidavit that the commission or continuance of some act, during the litigation, would produce great or irreparable injury to the Plaintiff.
3. When it shall appear, during the litigation, that the Defendant is doing or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the Plaintiffs' rights respecting the subject of the action, and tending to render the judgment ineffectual.

Nevada Courts require three showings before a preliminary injunction will issue: (1) no complete and adequate remedy at law; (2) a prima facie case sufficient to establish a probability of success on the merits; and (3) immediate and irreparable injury, loss, or damage will result to the plaintiff if the preliminary injunction is not issued. Czipott v. Fleigh, 87 Nev. 496, 498, 489 P.2d 681 (1971); Pickett v. Comanche Construction, Inc., 108 Nev. 422, 426, 836 P.2d 42 (1992); Thirteen South Ltd. v. Summit Village, Inc., 109 Nev. 1218, 1220, 26 P.2d 257 (1993).

Here, Plaintiff is able to establish all three requirements necessary for a preliminary injunction. First, as set forth above, Plaintiff has no adequate remedy at law. If Defendants are

9

1  not required to transfer the securities to Plaintiff, Plaintiff will likely be forced out of business.

2  Money damages are therefore an inadequate remedy. For this reason, Plaintiff has demonstrated

3  that it will suffer irreparable injury if the preliminary injunction is not issued because it will be

4  forced to purchase 100,000 shares of TWNK stock on the open market. Because there is no real

5  market for TWNK stock, Plaintiff will be required to pay a premium for the stock, far in excess

6  of the offering price listed on the OTCBB.

7      The final issue whether Plaintiff can establish a probability of success on the merits. As

8  will be argued below, Plaintiff has an absolute right to delivery of the stock, free of any claims

9  by Defendant TWNK, because it is a protected purchaser of the stock.

10     Pursuant to NRS §104.8102(1)(n)(2), Plaintiff is a securities intermediary, because

11  Plaintiff is "A person, including a bank or broker, that in the ordinary course of its business

12  maintains securities accounts for others and is acting in that capacity." As a securities

13  intermediary, Plaintiff became a purchaser for value of the TWNK stock when it deposited the

14  certificate in the account of Defendant Volmer. NRS §104.8116 provides:

15     A securities intermediary that receives a financial asset and establishes a
   security entitlement to the financial asset in favor of an entitlement holder is a
16  purchaser for value of the financial asset. A securities intermediary that acquires a
   security entitlement to a financial asset from another securities intermediary
17  acquires the security entitlement for value if the securities intermediary acquiring
   the security entitlement establishes a security entitlement to the financial asset in
18  favor of an entitlement holder.
19  Furthermore, as set forth above, and in the attached Affidavit of Antony Michel Santos,

20  Plaintiff took the stock with no notice of any adverse claim to the stock by Defendant TWNK;

21  therefore, pursuant to NRS §104.8303, Plaintiff is a protected purchaser who acquired interest in

22  the stock free of any adverse claim to the stock:

23      § 104.8303. Protected purchaser

24      1. "Protected purchaser" means a purchaser of a certificated or
25  uncertificated security, or of an interest therein, who:

26      (a) Gives value;

27      (b) Does not have notice of any adverse claim to the security; and
28
       (c) Obtains control of the certificated or uncertificated security.

10

2. In addition to acquiring the rights of a purchaser, a protected purchaser also acquires its interest in the security free of any adverse claim.

Therefore, Plaintiff has an absolute right to delivery of the stock.

Defendant TWNK contends that the transfer to Defendant Volmer is invalid because Defendant Volmer misrepresented his qualifications as a telecommunications expert; however, the evidence in this matter, both direct and circumstantial, shows that Defendant TWNK knew that it was hiring Defendant Volmer as a stock promoter, not as a consultant, in blatant violation of Regulation S of the Securities Act. First, there is the fact that Defendant Volmer is a known stock promoter; in fact, Volmer maintains a website called Titanstocks.com.[5] Secondly, the stock was issued to Defendant Volmer free of any restrictions, and in advance of Volmer performing any consulting services. Finally, several of the individuals associated with Defendant TWNK, including its corporate counsel, Claudia Zaman, her former husband, Mike Zaman, and the president of its transfer agent, Signature Stock Transfer, Inc., have been previously sued by investors for stock price manipulation and violations of Regulation S registration rules.[6]

## CONCLUSION

Based on the above, Plaintiff has clearly demonstrated the lack of an adequate remedy at law, a likelihood of prevailing on the merits, and that irreparable injury will result if Plaintiff's Motion for Preliminary injunction is not granted. The amount of any bond required under NRCP 65(c) should be minimal, because Defendants will suffer no harm if the injunction is granted.

WHEREFORE, Plaintiff respectfully requests that this honorable Court order Defendants Signature Stock Transfer, Inc., and 20/20 Networks, Inc., to immediately transfer Stock Certificate Number 1469 to Plaintiff. Furthermore, Plaintiff respectfully requests that this Honorable Court order Defendant DTC to refrain from debiting the account of WFI for the

---

[5] A printout of the disclosure page from the website is attached hereto as Exhibit "5."

[6] See Dietrich v. Richard Bauer et al., Case No. 95 Civ 7051 (SDNY), in which Michael Zaman, Claudia Zaman, and Kathleen Bogutski (a principal of Defendant Signature Stock Transfer, Inc.) were defendants in a class-action lawsuit alleging violations of various securities laws, including the illegal issuance of S-8 stock. For a summary of the facts alleged by the Plaintiff see Exhibit "6" attached hereto.

11

1   100,000 shares of TWNK stock evidenced by Certificate No. 1469 pending the outcome of this

2   litigation.

3          DATED this 2Y day of September, 2003.

4

5                                                              HAROLD P. GEWERTER, ESQ.
                                                             Nevada Bar No. 499
6                                                             5440 West Sahara Avenue, Suite 202
                                                             Las Vegas, NV 89146
7                                                             Attorney for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# AFFIDAVIT OF ANTHONY MICHAEL SANTOS

STATE OF NEVADA )
                )ss:
COUNTY OF CLARK )

ANTHONY MICHAEL SANTOS, being first duly sworn, deposes and says:

1. I am an officer and principal of Plaintiff NevWest Securities Corporation ("NevWest"), a corporation organized under the laws of the State of Nevada. I am competent to testify to all matters herein on personal knowledge, except as to those matter stated on information and belief, and as to those matters I believe them to be true. I make this Affidavit in support of Plaintiff's Motion for Preliminary Injunction and Application for Temporary Restraining Order.

2. The principal address of NevWest Securities Corporation is 5440 W. Sahara Avenue, Suite 202, Las Vegas, Nevada 89146.

3. NevWest is a licensed member firm of the National Association of Securities Dealers (NASD). It is a broker/dealer headquartered in Las Vegas, Nevada.

4. It is my understanding that NevWest is the victim of a fraudulent, financial and securities-related scheme perpetrated by an enterprise known to federal authorities. Specifically, it is our understanding that significant fraudulent and manipulative practices have transpired and further financial and securities-related fraud may be perpetrated on the public by an issuer, 20/20 Networks, Inc. (TWNK), one or more of its shareholders including Mr. Brian Volmer, and individuals I believe to be TWNK's primary control person(s), Claudia and Mike Zaman. Mr. Volmer and Mr. Zaman were the subject of two prior separate SEC suits for securities fraud and manipulation. I believe that the Zamans may be the primary control persons of 20/20 Networks.

5. Certain action(s), which have been taken by several parties subject to this application for injunctive relief, are certain to result in irreparable harm to NevWest forcing it to shut down entirely. These parties include Signature Stock Transfer, Inc., (SST) the securities transfer agent, TWNK and Depository Trust Corporation (DTC). Their actions constitute a willful and/or reckless disregard for the law and a repudiation of commercial standards of good faith and fair dealing and are the result of securities fraud. It is my understanding that these actions of the Defendants are in violation of state and federal law.

1

6. NevWest has a very limited time before it is forced to shut down. If NevWest does not get the relief it presently and respectfully requests, it will be out of business and robbed of its assets due, first to the fraud perpetrated by the TWNK and Mr. Volmer and second, due to SST and DTC's wanton disregard for UCC Article 8. Moreover, nine NevWest employees, each with families, would be out of a job as would all the brokers registered with NevWest. Approximately 1000 customers with securities accounts at NevWest would be forced to liquidate and/or transfer their accounts to another brokerage firm.

7. The following summarizes: (1) the facts and circumstances culminating in this egregious abuse of the financial system and legal process initiated by Volmer and perpetuated by TWNK, SST and DTC and (2) UCC Article 8 and its relation to imminent irreparable harm NevWest is certain to face without relief.

8. On or about June 26, 2003, Brian M. Volmer, an individual who had opened a securities account with NevWest, deposited with NevWest certificate number 1469 dated June 24, 2003 representing 100,000 shares of 20/20 Networks, Inc. (CUSIP No. 90137B 10 2) in the name of Brian Volmer. The certificate was free of any restrictive legend and, as such, constituted good delivery for deposit in a securities account.

9. On July 1, 2003, NevWest forwarded to Wells Fargo-St. Louis a stock power to clear the 100,000 shares of TWNK, Wells Fargo-St. Louis received the stock power on July 2nd and forwarded the stock power to Wells Fargo-Minneapolis Security Processing.

10. On July 1, 2003, Brian Volmer instructed NevWest to journal 5,000 shares of TWNK from Brian Volmer's account to account 052-8758-8217, Wells Capital, which was completed on July 10, 2003.

11. On July 7, 2003, Wells Fargo Investments, LLC ("WFI"), acting in the clearing firm capacity for NevWest, recorded 100,000 shares represented by certificate number 1469 of 20/20 Networks, Inc., ("TWNK") as a fully paid and segregated securities position in the account number 052-8594-3619 in the name of Brian M. Volmer. In accordance with applicable rules and industry standards, WFI forwarded the certificate number 1469 to DTC for further processing. DTC in turn presumptively, on some subsequent date, forwarded same to Signature

2

1  Stock transfer, Inc., TWNK's transfer agent, via DTC for transfer into "street name."

2      12. On July 7, 2003, Brian Volmer instructed NevWest to journal 8,500 shares of TWNK
3  from Brian Volmer's account to account 052-8236-6469, John R. Switzer, which was completed
4  on July 10, 2003.

5      13. On July 8, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to
6  sell 15,000 shares of TWNK from the Brian Volmer account at $0.90 per share. The trade was
7  executed at $0.90 a share.

8      14. On July 8, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to
9  buy 1,000 shares of TWNK for the Brian Volmer account at $1.25 per share. The trade was
10  executed at $1.25 a share.

11      15. On July 8, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to
12  sell 2,500 shares of TWNK from the Brian Volmer account at $1.15 per share. The trade was
13  executed at $1.15 a share.

14      16. On July 9, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to
15  buy 500 shares of TWNK for the Brian Volmer account at $1.20 per share. The trade was
16  executed at $1.19 a share.

17      17. On July 10, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to
18  buy 2,000 shares of TWNK for the Brian Volmer account at $1.20 per share. The trade was
19  executed at $1.20 a share.

20      18. On July 10, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to
21  buy 1,000 shares of TWNK for the Brian Volmer account at $1.20 per share. The trade was
22  executed at $1.20 a share.

23      19. On July 10, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to
24  buy 1,000 shares of TWNK for the Brian Volmer account at $1.30 per share. The trade was
25  executed at $1.30 a share.

26      20. On July 10, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to
27  buy 1,000 shares of TWNK for the Brian Volmer account at $1.30 per share. The trade was
28  executed at $1.30 a share.

3

21. On July 10, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to buy 1,000 shares of TWNK for the Brian Volmer account at $1.30 per share. The trade was executed at $1.30 a share.

22. On July 10, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to buy 500 shares of TWNK for the Brian Volmer account at $1.40 per share. The trade was executed at $1.40 a share.

23. On July 11, 2003, Brian Volmer instructed NevWest to wire all available funds ($4,430.00) to the following bank account:

Bank Name: First Federal Bank of California

Address: 1100 Pacific Coast Highway

City/State: Hermosa Beach, CA 90277

ABA # 322271106

Account # 60270046659

Account Name: Brian Volmer

24. On July 14, 2003, Brian Volmer instructed NevWest to DTC 70,000 shares of TWNK from his personal account, 052-8594-3619 to the following account:

DTC # 0632

Name of Firm: Fiserv Investor Services

Account Name: Titan Group LLC

Account # 567-81310

The DTC was completed on July 14, 2003.

25. On July 17, 2003, Brian Volmer instructed NevWest to enter an unsolicited day order to sell 7,090 shares of TWNK from the Brian Volmer account at $0.35 per share. The trade was executed at $0.35 a share.

26. On August 7, 2003, Brian Volmer instructed NevWest to wire all available funds ($1,645.00) to the following bank account:

Bank Name: First Federal Bank of California

Address: 1100 Pacific Coast Highway

4

City/State: Hermosa Beach, CA 90277

ABA # 322271106

Account # 60270046659

Account Name: Brian Volmer

27. On August 11, 2003 DTC informed WFI of a stop transfer placed on the certificate through the transfer agent by TWNK.

28. On August 13, 2003, WFI informed NevWest of the stop transfer via e-mail and emailed NevWest the stop release letter.

29. On August 20, 2003, WFI informed NevWest via E-Mail that they needed a Stop Release Letter executed by Volmer so as to remedy this matter otherwise WFI would force NevWest to buy in the stock at market prices or otherwise take NevWest's assets on account with WFI for the buy in.

30. On August 25, 2003, Volmer faxed a copy of the Stop Release Letter to WFI. WFI forwarded all paperwork to Signature Stock Transfer via DTC to have the shares cleared.

31. On September 16, 2003, SST refused to accept the stop release letter due to the fact that it was a facsimile copy not an original with original signature(s). On September 16, 2003,NevWest contacted Volmer beseeching him to overnight the original document. Volmer stated he would do so but never did.

32. On September 17, 2003 I personally spoke with Volmer who represented to me that he wished to rectify this matter and that he would immediately send over the stop release via over-night mail. He did not and has not. Since this date, Volmer has been unwilling to communicate with NevWest and will not answer or return any phone calls.

33. On September 18, 2003, NevWest contacted DTC via facsimile letter and telephone calls beseeching it to review this matter and demanding that it comply with the law. DTC refuses to act or discuss this matter.

34. On September 22, 2003 DTC debited WFI for the full 100,000 shares. Since then WFI has indicated that it expects to debit NevWest in turn, forcing NevWest to replace these 100,000 shares by purchasing same in the open market under inflated and fraudulent conditions as a

consequence of overt market manipulation. The fact of the matter is that it would cost NevWest hundreds of thousands of dollars, if not millions of dollars, to acquire this stock due to the market manipulation caused by these individuals and the fact that TWNK is a thinly traded microcap stock of suspect ownership and control.

35. On September 22, 2003, in a final effort to resolve this matter without resorting to litigation, NevWest contacted TWNK via its published telephone number. Claudia Zaman answered. She referred us to Marcus Luna, an individual alleged to represent TWNK as legal counsel. On the same day at 5:00 p.m., Luna met with NevWest at the NevWest offices in Las Vegas, Nevada. In the course of a one hour meeting, NevWest shared all documents in its possession or control related tot his incident. NevWest gave Luna unimpeded access to any files related to this matter. AT the conclusion of this meeting Marcus Luna suggested that I speak to his colleague or associate over coffee that same evening. He then requested that I follow him down to the parking lot so as to meet his colleague. I did so and met Mike Zaman, sitting in a car outside NevWest offices. Mr. Zaman came back up to NevWest as he wished to review our files related to this matter personally. NevWest representatives met with Mike Zaman for close to two hours sharing with him the very same information we gave Marcus Luna. Ultimately, Mr. Zaman and MR. Luna indicated that they would not or could not act in any manner to resolve this issue in a fashion remotely acceptable to NevWest.

36. NevWest and WFI were never apprised of any adverse claim to TWNK Certificate No. 1469 until well after the sales and transfer occurred. At no time prior to the sales and transfer of the TWNK stock did anyone notify NevWest or WFI of any violation of any claimant(s)' right arising from NevWest's and WFI's sale or transfer of the TWNK stock, which sales and transfer occurred at the direction of the customer under a bona fide entitlement order.

37. NevWest now faces imminent, irreparable harm in the form of losing all of our assets, being forced out of business and directly affecting the lives of 9 employees and their families and the securities accounts of close to 1000 customers of the brokerage firm.

38. If the individuals and entities are not compelled to oblige with the injunctive relief requested, the result for the NevWest is a termination of any likelihood that it may continue

6

as a going concern. Such a result implies that any issuer or rogue transfer agent anywhere can rob any shareholder of rightfully purchased stock any time without limitation. The legal and financial system could proffer no protection to innocent shareholders. This implication has profound and disturbing consequences on the very fabric of our capital market system.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

DATED this 24 day of September 2003.



ANTONY MICHEL SANTOS

SUBSCRIBED and SWORN to before me
this 24 day of September, 2003.

NOTARY PUBLIC in and for said
COUNTY and STATE.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
JOYCE FAHL
No: 99-24197-1
My Appointment Expires April 8, 2007

7



EXHIBIT "1"

Copyright 2003 Disclosure Incorporated

EDGARPlus(R)

COMPANY: 20 20 NETWORKS INC

CROSS-REFERENCE: 20 20 WEB DESIGN INC

TICKER: TWNK

EXCHANGE: OTH

FORM-TYPE: S-8

DOCUMENT-DATE: June 24, 2003

FILING-DATE: June 24, 2003

Full text Company info Contents Other Return

Special Printing Instructions for this Document.

* * * * * * * * * * * * * * * * TEXT OF FILING * * * * * * * * * * * * * * * *

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM S-8
REGISTRATION STATEMENT
Under The Securities Act of 1933

20/20 Networks, Inc.

Nevada                                 33-0677140
------                                 ----------
(State or other jurisdiction of          (IRS Employer
incorporation or organization)         Identification Number)

20700 Ventura Blvd. Suite 227, Woodland Hills, CA 91364
-----------------------------------------------------
(Address of principal executive offices)(Zip Code)

Independent Contractor/Consulting Agreement with Brian Vollmer
Independent Contractor/Consulting Agreement with Stacy McBee
Non-Employee Directors, Advisors and Consultants Retainer Stock Plan for 2003
(Full Title of Plan)



Edward Gallagher, President
20/20 Networks, Inc.
20700 Ventura Blvd. Suite 227
Woodland Hills CA 91364
(818) 227-9494
(Name, address and telephone number of agent for service.)
with copies to:
Claudia J. Zaman
Attorney At Law
20700 Ventura Blvd. Suite 227
Woodland Hills, California 91364

## CALCULATION OF REGISTRATION FEE

| Title of Securities to be Registered | Amount of Shares to be Registered | Proposed Maximum Offering Price per Share | Proposed Maximum Aggregate Offering Price | Amount Regis. Fee |
|---|---|---|---|---|
| $.001 par value Common Stock | 640,000 | $2.85 | $1824000 | $147.57 |
| TOTALS | 640,000 | $2.85 | $1824000 | $147.57 |

(1) This calculation is made solely for the purposes of determining the
registration fee pursuant to the provisions of Rule 457(h) under the Securities
Act and is calculated on the basis of the closing bid price per share of the
Registrant's common stock on June 20, 2003 as reported by the OTC Electronic
Bulletin Board.

## PROSPECTUS

20/20 NETWORKS, INC.
20700 Ventura Blvd. Suite 227
Woodland Hills CA 91364
(818) 227-9494

(640,000 Shares of Common Stock)

This Prospectus relates to the offer and sale by 20/20 Networks, Inc., a Nevada
corporation (the "Company" or "20/20") of shares of its $.001 par value per
share common stock (the "Common Stock") to certain consultants, advisors and
non-employee directors of the Company (collectively referred to as the
"Consultants") pursuant to consulting agreements entered into between the
Company and the Consultants for payment of services rendered and to be rendered
as well as pursuant to the Company's Non-Employee Directors, Advisors and
Consultants Retainer Stock Plan for 2003 (the "Plan"). The Company is
registering hereunder and then issuing to the Consultants 640,000 shares of
Common Stock in consideration for services to be performed and for services
already performed under the respective agreements and the Plan.

The Common Stock is not subject to any restriction on transferability.
Recipients of shares other than persons who are "affiliates" of the Company
within the meaning of the Securities Act of 1933 (the "Act") may sell all or
part of the shares in any way permitted by law, including sales in the
over-the-counter market at prices prevailing at the time of such sale. Of the
shares registered hereunder, there are 30,000 shares being registered for
affiliates of the Company. An affiliate is any director, executive officer or
controlling shareholder of the Company or any of its subsidiaries. An
"affiliate" of the Company is subject to Section 16(b) of the Securities
Exchange Act of 1934, as amended (the "Exchange Act"). If a Consultant who is
not now an "affiliate" becomes an "affiliate" of the Company in the future, he
would then be subject to Section 16(b) of the Exchange Act. (See "General
Information - Restrictions on Resales").

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND
EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY
OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The date of this Prospectus is June 23, 2003

2

This Prospectus is part of a Registration Statement which was filed and became
effective under the Securities Act of 1933, as amended (the "Securities Act"),
and does not contain all of the information set forth in the Registration
Statement, certain portions of which have been omitted pursuant to the rules and
regulations promulgated by the U.S. Securities and Exchange Commission (the
"Commission") under the Securities Act. The statements in this Prospectus as to
the contents of any contracts or other documents filed as an exhibit to either
the Registration Statement or other filings by the Company with the Commission
are qualified in their entirety by the reference thereto.

A copy of any document or part thereof incorporated by reference in this
Prospectus but not delivered herewith will be furnished without charge upon
written or oral request. Requests should be addressed to: 20/20 Networks, Inc.,
20700 Ventura Blvd. Suite 227, Woodland Hills CA 91364, (818) 227-9494.

The Company is subject to the reporting requirements of the Exchange Act and in
accordance therewith files reports and other information with the Commission.
These reports, as well as the proxy statements, information statements and other
information filed by the Company under the Exchange Act may be inspected and
copied at the public reference facility maintained by the Commission at 450
Fifth Street, N.W., Washington, D.C. 20549. Copies may be obtained at the
prescribed rates. The Company's stock is traded on the over-the-counter market
and is currently reported by the National Quotation Bureau Electronic Bulletin
Board.

No person has been authorized to give any information or to make any
representation, other than those contained in this Prospectus and, if given or
made, such other information or representation must not be relied upon as having
been authorized by the Company. This prospectus does not constitute an offer or
a solicitation by anyone to any person in any state, territory or possession of
the United States in which such offer or solicitation is not authorized by the
laws thereof, or to any person to whom it is unlawful to make such offer or
solicitation.

Neither the delivery of this Prospectus or any sale made hereunder shall, under any circumstances, create an implication that there has not been a change in the affairs of the Company since the date hereof.

3

## TABLE OF CONTENTS

Information Required in the Section 10(a) Prospectus           5
Item 1. Plan Information                                   5
    General Information                              5
    The Company                                    5
    Purposes                                5
    Common Stock                                5
    The Consultants                             5
    No Restrictions on Transfer                       5
        Tax Treatment to the Consultants                 5
    Tax Treatment to the Company                     6
    Restrictions on Resale                        6
Documents Incorporated by Reference and Additional Information        6
Item 2. Registrant Information and Employee Plan Annual Information      6
    Legal Opinion and Experts                      7
    Indemnification of Officers and Directors             7
Information Required in the Registration Statement             7
Item 3. Incorporation of Documents by Reference              7
Item 4. Description of Securities                    8
Item 5. Interests of Named Experts and Counsel             8
Item 6. Indemnification of Directors and Officers            8
Item 7. Exemption from Registration Claimed               8
Item 8. Exhibits                          9
Item 9. Undertakings                        9
Signatures                          10
Exhibit Index                          12

4

## PART I

## INFORMATION REQUIRED IN THE SECTION 10(a) PROSPECTUS

Item 1. Plan Information

## GENERAL INFORMATION

The Company

The Company has its principal executive offices at 20700 Ventura Blvd. Suite 227, Woodland Hills, CA 91364, where its telephone number is (818) 227-9494.

Purposes

The Common Stock to be issued by the Company to certain Consultants will be

issued pursuant to business consulting and agreements entered into between the Consultants and the Company, which agreements have been approved by the Board of Directors of the Company (the "Board of Directors"). The agreements are intended to provide a method whereby the Company may be stimulated by the personal involvement of the Consultants in the Company's future prosperity, thereby advancing the interests of the Company and all of its shareholders. Copies of the agreements have been filed as exhibits to this Registration Statement. The Company is also issuing shares of its common stocks to certain non-employee directors, advisors and consultants for their past services to the Company under the Company's Non-Employee Directors, Advisors and Consultants Retainer Stock Plan for 2003 (the "Plan").

Common Stock

The Board of Directors has authorized the issuance of up to 640,000 shares of Common Stock to the Consultants and upon effectiveness of this Registration Statement.

The Consultants

The Consultants have agreed to provide their expertise and advice to the Company for the purposes set forth in their agreements with the Company and for the purposes set forth in the Plan.

No Restrictions on Transfer

The Consultants will become the record and beneficial owners of the shares of Common Stock upon issuance and delivery and are entitled to all of the rights of ownership, including the right to vote any shares awarded and to receive ordinary cash dividends on the Common Stock.

Tax Treatment to the Consultants

The Common Stock is not qualified under Section 401(a) of the Internal Revenue Code. The Consultants, therefore, will be required for federal income tax purposes to recognize ordinary income during the taxable year in which the first of the following events occur: (a) the shares become freely transferable, or (b) the shares cease to be subject to a substantial risk of forfeiture. Accordingly, absent a specific contractual provision to the contrary, the Consultants will receive compensation taxable at ordinary rates equal to the fair market value of the shares on the date of receipt since there will be no substantial risk of forfeiture or other restrictions on transfer. The Consultants are urged to

5

consult their own tax advisors on this matter. Further, if any recipient is an "affiliate", Section 16(b) of the Exchange Act is applicable and will affect the issue of taxation.

Tax Treatment to the Company

The amount of income recognized by any recipient hereunder in accordance with the foregoing discussion will be an expense deductible by the Company for federal income tax purposes in the taxable year of the Company during which the recipient recognizes income.

 
Restrictions on Resale

In the event that an affiliate of the Company acquires shares of Common Stock hereunder, the affiliate will be subject to Section 16(b) of the Exchange Act. Further, in the event that any affiliate acquiring shares hereunder sold or sells any shares of Common Stock in the six months preceding or following the receipt of shares hereunder, any so called "profit," as computed under Section 16(b) of the Exchange Act, would be required to be disgorged from the recipient to the Company. Services rendered have been recognized as valid consideration for the "purchase" of shares in connection with the "profit" computation under Section 16(b) of the Exchange Act. The Company has agreed that for the purpose of any "profit" computation under 16(b), the price paid for the Company's common stock issued hereunder to affiliates is equal to the value of services rendered. Shares of the Company's Common Stock acquired hereunder by persons other than affiliates are not subject to Section 16(b) of the Exchange Act.

## DOCUMENTS INCORPORATED BY REFERENCE
### AND
### ADDITIONAL INFORMATION

The Company hereby incorporates by reference (1) its Form 10-KSB for the year ended December 31, 2002, filed pursuant to the Exchange Act; (2) any and all Quarterly Reports and Current Reports on Form 10-Q (or 10-QSB or 8-K) filed under the Securities Exchange Act subsequent to the filing of the Company's Annual Report on Form 10-K (or 10-KSB) for the fiscal year ended December 31, 2002, as well as all other reports filed under Section 13 of the Exchange Act, and (iii) its annual report, if any, to shareholders delivered pursuant to Rule 14a-3 of the Exchange Act. In addition, all further documents filed by the Company pursuant to Section 13, 14, or 15(d) of the Exchange Act prior to termination of this Offering are deemed to be incorporated by reference into this Prospectus and to be a part hereof from the date of the filing. All documents which when together constitute this Prospectus, will be sent or given to participants by the Registrant as specified by Rule 428(b)(1) of the Securities Act.

Item 2. Registrant Information and Employee Plan Annual Information

A copy of any document or part thereof incorporated by reference in this Registration Statement but not delivered with this Prospectus or any document required to be delivered pursuant to Rule 428(b) under the Securities Act will be furnished without charge upon written or oral request. Requests should be addressed to: 20/20 Networks, Inc., 20700 Ventura Blvd. Suite 227, Woodland Hills CA 91364, (818) 227-9494.

6

Legal Opinion and Experts

Other than as set forth below, no named expert or counsel was hired on a contingent basis, will receive a direct or indirect interest in the small business issuer, or was a promoter, underwriter, voting trustee, director, officer or employee of the Registrant.

Claudia J. Zaman has rendered an opinion on the validity of the securities being

Case 2:03-cv-01333-PMP-RJJ    Document 1-2261683    Filed 10/23/03    Page 46 of 194

 
registered. Ms. Zaman is not an "affiliate" of the Company and will be issued shares under the Plan which are being registered hereunder.

The financial statements of 20/20 Networks, Inc. incorporated by reference in this Prospectus for the fiscal year ended December 31, 2002 have been audited by Malone & Bailey, PLLC, certified public accountants, as set forth in their report incorporated herein by reference, and are incorporated herein in reliance upon such report given upon the authority of said firm as experts in auditing and accounting.

Indemnification of Officers and Directors

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers, or persons controlling the Company, the Company has been informed that in the opinion of the Commission, such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than payment by registrant of expenses incurred or paid by a director, officer or controlling person of registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person on connection with the securities being registered, registrant will, unless in the opinion of its counsel that matter has been settled by controlling precedent, submit to a court of competent jurisdiction the question of whether such indemnification is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

### PART II

### INFORMATION REQUIRED IN
### THE REGISTRATION STATEMENT

Item 3. Incorporation of Documents by Reference

Registrant hereby states that (i) all documents set forth in (a) through (c), below, are incorporated by reference in this registration statement, and (ii) all documents subsequently filed by registrant pursuant to Section 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended, prior to the filing of a post-effective amendment which indicates that all securities offered have been sold or which de-registers all securities then remaining unsold, shall be deemed to be incorporated by reference in this registration statement and to be a part hereof from the date of filing of such documents.

(a) Registrant's latest Annual Report, whether filed pursuant to Section 13(a)or 15(d) of the Exchange Act;

(b) All other reports filed pursuant to Section 13(a) or 15(d) of the Exchange Act since the end of the fiscal year covered by the annual report referred to in (a) above; and

(c) The latest prospectus filed pursuant to Rule 424(b) under the Securities Act.

Item 4. Description of Securities

No description of the class of securities (i.e., the $.001 par value common
stock) is required under this item because the Common Stock is registered under
Section 12 of the Exchange Act.
Item 5. Interests of Named Experts and Counsel

Ms. Zaman owns no shares of the Company's common stock but will be issued
certain shares under the Plan which shares are being registered hereunder.

Item 6. Indemnification of Directors and Officers

The Company shall indemnify to the fullest extent permitted by, and in the
manner permissible under the laws of the State of Nevada, any person made, or
threatened to be made, a party to an action or proceeding, whether criminal,
civil, administrative or investigative, by reason of the fact that he is or was
a director or officer of the Company, or served any other enterprise as
director, officer or employee at the request of the Company. The Board of
Directors, in its discretion, shall have the power on behalf of the Company to
indemnify any person, other than a director or officer, made a party to any
action, suit or proceeding by reason of the fact that he/she is or was an
employee of the Company.

Pursuant to the Company's bylaws, the Company shall have the right to indemnify,
to purchase indemnity insurance for, and to pay and advance expenses to,
Directors, Officers and other persons who are eligible for, or entitled to, such
indemnification, payments or advances, in accordance with and subject to the
provisions of Nevada Corporation Law and any amendments thereto, to the extent
such indemnification, payments or advances are either expressly required by such
provisions or are expressly authorized by the Board of Directors within the
scope of such provisions. The right of the Company to indemnify such persons
shall include, but not be limited to, the authority of the Company to enter into
written agreements for indemnification with such persons.

Subject to the provisions of Nevada Revised Statutes and any amendments thereto,
a Director of the Corporation shall not be liable to the Corporation or its
shareholders for monetary damages for an act or omission in the Director's
capacity as a Director, except that this provision does not eliminate or limit
the liability of a Director to the extent the Director is found liable for:

1) a breach of the Director's duty of loyalty to the Corporation or its
shareholders;
2) an act or omission not in good faith that constitutes a breach of duty of the
Director to the Corporation or an act or omission that involves intentional
misconduct or a knowing violation of the law;
3) A transaction from which the Director received an improper benefit, whether
or not the benefit resulted from an action taken within the scope of the
Director's office; or
4) an act or omission for which the liability of a Director is expressly
provided by an applicable statute.
Item 7. Exemption from Registration Claimed

Not Applicable.

8

EDGARPlus(R) FORM-TYPE: S-8 FILING-DATE: June 24, 2003

Item 8. Exhibits
(a) The following exhibits are filed as part of this registration statement
pursuant to Item 601 of Regulation S-B and are specifically incorporated herein
by this reference:

Exhibit
No.     Title
---     -----

5       Opinion of Claudia J. Zaman regarding the legality of the securities
        registered.

10.6    Independent Contractor/Consulting Agreement with Brian Vollmer

10.7    Independent Contractor/Consulting Agreement with Stacy McBee

10.8    20/20 Networks, Inc. Non-Employee Directors, Advisors and Consultants
        Retainer Stock Plan for 2003

23.1    Consent of Claudia J. Zaman, counsel to the registrant, to the use of
        her opinion with respect to the legality of the securities being
        registered hereby and to the references to her in the Prospects filed
        as part hereof.*

23.2    Consent of Malone-Bailey, PLLC, independent auditors of the registrant

* Contained in Exhibit 5.
Item 9. Undertakings

Insofar as indemnification for liabilities arising under the Securities Act of
1933 may be permitted to directors, officers and controlling persons of the
registrant pursuant to the foregoing provisions otherwise, the registrant has
been advised that in the opinion of the Securities and Exchange Commission, such
indemnification is against public policy as expressed in the Act and is,
therefore, unenforceable. In the event that a claim for indemnification against
such liabilities (other than the payment by the registrant of expenses incurred
or paid by a director, officer or controlling person of the registrant in the
successful defense of any action, suit or proceeding) is asserted by such
director, officer or controlling person in connection with the securities being
registered, the registrant will, unless in the opinion of its counsel the matter
has been settled by controlling precedent, submit to a court of appropriate
jurisdiction the question whether such indemnification by it is against public
policy as expressed in the Act and will be governed by the final adjudication of
such issue.

Registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a
post-effective amendment to this Registration Statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act
of 1933;

(ii) To reflect in the prospectus any facts or events arising after the



effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement;

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

provided, however, paragraphs (i) and (ii) shall not apply if the information required to be included in a post-effective amendment by those paragraphs are incorporated by reference from periodic reports filed by the registrant small business issuer under the Exchange Act.

9

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) to deliver or cause to be delivered with the prospectus, to each person to whom the prospectus is sent or given, the latest annual report to security holders that is incorporated by reference in the prospectus and furnished pursuant to and meeting the requirements of Rule 14a-3 or 14e-3 under the Securities Exchange Act of 1934; and where interim financial information required to be presented by Article 3 of Regulation S-X is not set forth in the prospectus, to deliver, or cause to be delivered, to each person to whom the prospectus is sent or given, the latest quarterly report that is specifically incorporated by reference in the prospectus to provide such interim financial information.

Registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the Registrant's annual report pursuant to Section 13(a) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit's plan annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

10

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant certifies that it has reasonable grounds to believe that it meets all the requirements for filing on Form S-8 and has duly caused this registration statement to be signed on its behalf by the undersigned thereunto duly authorized in the City of Woodland Hills, California on June 23, 2003.

 

EDGARPlus(R) FORM-TYPE: S-8 FILING-DATE: June 24, 2003

20/20 Networks, Inc.

By: /s/ Edward Gallagher
-------------------------------
Edward Gallagher, President, CFO

In accordance with the requirements of the Securities Act of 1933, this registration statement was signed by the following persons in the capacities and on the dates stated:

| | |
|---|---|
| June 23, 2003 | /s/ Edward Gallagher |
| | -------------------------- |
| | Edward Gallagher, Director |
| June 23, 2003 | /s/ Werner Greider |
| | -------------------------- |
| | Werner Greider, Director |

11

| | |
|---|---|
| June 23, 2003 | ---------------------------------------- |
| | Charles Smith, Director |
| June 23, 2003 | /s/ Steven Y. Onoue |
| | ---------------------------------------- |
| | Steven Y. Onoue, Director |
| June 23, 2003 | ---------------------------------------- |
| | Merhrad Alborz, Director |

12

## FORM S-8 REGISTRATION STATEMENT

### EXHIBIT INDEX

The following exhibits are filed as part of this registration statement pursuant to Item 601 of Regulation S-B and are specifically incorporated herein by this reference:

| Exhibit Number in Registration Statement | Description | Numbered Page |
|---|---|---|
| --------- | ----------- | ---- |
| 5. | Opinion of Counsel | |
| 10.6 | Independent Contractor/Consultant Agreement with Brian Vollmer | |
| 10.7 | Independent Contractor/Consulting Agreement with Stacy McBee | |

EDGARPlus(R) FORM-TYPE: S-8 FILING-DATE: June 24, 2003

10.8    Non-Employee Directors, Advisors and
        Consultants Retainer Stock Plan for 2003

23.1    Consent of Claudia J. Zaman to Use of Opinion*

23.2    Consent of Malone-Bailey, PLLC

* Contained in Exhibit 5.

13

DCN: 03755702

LOAD-DATE: June 26, 2003

6 of 19 DOCUMENTS

Copyright 2003 Disclosure Incorporated

EDGARPlus(R)

COMPANY: 20 20 NETWORKS INC

CROSS-REFERENCE: 20 20 WEB DESIGN INC

TICKER: TWNK

EXCHANGE: OTH

FORM-TYPE: S-8

Exhibit 10. Material Contracts

FILING-DATE: June 24, 2003

Full text Company info Other Return

Special Printing Instructions for this Document.

* * * * * * * * * * * * * * * * TEXT OF FILING * * * * * * * * * * * * * * * *

Exhibit 10.6

## INDEPENDENT CONTRACTOR/CONSULTING AGREEMENT

This Agreement is made and entered into as June 19, 2003 by and between 20/20 Networks, Inc. hereinafter referred to as the "Company"), with its principal place of business at 20700 Ventura Blvd, Suite 227 Los Angeles, CA 91364 and Brian Vollmer with his place of business at 553 N PCH #276 Redondo Beach CA 90277 hereinafter referred to as "BV".

### RECITALS

A. WHEREAS, the Company is a public company trading on the OTC:BB under the symbol "TWNK"

B WHEREAS, BV is contracted as to all aspects of the Corporate Imaging to help increase marketing and advertising awareness, heighten brand awareness, differentiate products/services and to gain national recognition of the corporate name, and increase product sales revenues. In addition BV will give BV access to its telecommunications and government contacts in Mexico and other foreign countries for the purpose of setting up telecommunications networks.

 

EDGARPlus(R) FORM-TYPE: S-8 FILING-DATE: June 24, 2003

C. WHEREAS, the Company wishes to engage B V on a nonexclusive basis as an independent contractor to the Company. D.WHEREAS, the B V is willing to be so retained on the terms and conditions as set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the promises and the mutual agreements hereinafter set forth, the parties hereto agree as follows: 1.Engagement. The Company hereby retains and engages B V to perform the following consulting services (the "Consulting Services");

1.1 Duties BV. will provide such services and advice to the Company so as to assist the Company with matters relating to the Telecommunications industry.

1.2.Duties Expressly Excluded. This Agreement expressly excludes B V from providing any and all capital formation and/or public relation services to the Company including direct or indirect promotion of the Company's securities; and/or assistance in making of a market in the Company's securities

2. Consideration. The Company and B V agree that B V will receive from the Company's a fee of One Hundred Thousand (150,000) shares of the Company's common stock, in advance, as consideration for the services rendered or to be rendered pursuant to this Agreement. Such shares are to be qualified by the company under an S-8 registration as soon as practical.

3.Term. This Agreement shall be effective for a term of twelve (6) months starting from the date first written above unless sooner terminated upon mutual written agreement of the parties hereto.

4. Expenses. BV shall bear its out-of-pocket costs and expenses incident to performing the Consulting Services, without a right of reimbursement from the Company unless such expenses are pre-approved by the Company.

5.BV's Liability. In the absence of gross negligence or willful misconduct on the part of the B V or the BV's breach of any terms of this Agreement, B V shall not be liable to the Company or to any officer, director, employee, stockholder or creditor of the Company, for any act or omission in the course of or in connection with the rendering or providing of services hereunder. Except in those cases where the gross negligence or willful misconduct of B V or the breach by B V of any terms of this Agreement is alleged and proven, the Company agrees to defend, indemnify, and hold B V harmless from and against any and all reasonable costs, expenses and liability (including reasonable attorney's fees paid in the defense of B V) which may in any way result from services rendered by B V pursuant to or in any connection with this Agreement. This indemnification expressly excludes any and all damages as a result of any actions or statements, on behalf of the Company, made by B V without the prior approval or authorization of the Company.

6. Company's Liability. B V agrees to defend, indemnify, and hold the Company harmless from an against any and all reasonable costs, expenses and liability (including reasonable attorney's fees paid in defense of the Company) which may in any way result pursuant to its gross negligence or willful misconduct or in any connection with any actions taken or statements made, on behalf of the Company, without the prior approval or authorization of the Company or which are otherwise in violation of applicable law.

a. BV's activities and operations fully comply with now and will comply with in the future all applicable state and federal laws and regulations;

b. BV understands that, as a result of its services, it may come to possess material non-public information about the Company, and that it has implemented internal control procedures designed to reasonably to insure that it and none of its employees, agents, BV or affiliates, trade in the securities of GVN companies while in possession of material non-public information;

c. Provided, however, that the divulging of information shall not be a breach of this Agreement to the extent that such information was (i) previously known by the party to which it is divulged, (ii) already in the public domain, all through no fault of the BV, or (iii) required to be disclosed by BV pursuant to judicial or governmental order.

The BV shall also treat all information pertaining to the affairs of the Company's suppliers and customers and prospective customers and suppliers as confidential trade secrets of such customers and suppliers and prospective customers and suppliers, and:

d. BV agrees to notify the Company immediately if, at any time, any of the representations and warranties made by the BV herein are no longer true and correct or if a breach of any of the representations and warranties made by the BV herein occurs,

7. Entire Agreement. This Agreement embodies the entire agreement and understanding between the Company and the BV and supersedes any and all negotiations, prior discussions and preliminary and prior agreements and understandings related to the primary subject matter hereof. This Agreement shall not be modified except by written instrument duly executed by each of the parties hereto.

8. Waiver. No waiver of nay of the provisions of this Agreement shall be deemed, or shall constitute a waiver of any other provisions, nor shall any waiver constitute a continuing wavier. No waiver shall be binding unless executed in writing by the party making the waiver.

9. Assignments and Binding Effect. This Agreement and the rights hereunder may not be assigned by the parties (except by operation of law or merger) and shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives. 10.Notices. Any notice or other communication between the parties hereto shall be sufficiently given if sent by certified or registered mail, postage prepaid, or faxed and confirmed at the following locations:

Company: 20/20 Networks Inc

20700 Ventura Blvd, Suite 227
Los Angeles, CA 91364

Brian Vollmer

553 N PCH #276

Redondo Beach CA 90277

or at such other location as the addressee may have specified in a notice duly given to the sender as provided herein. Such notice or other communication shall be deemed to be given on the date of receipt.

l

11. Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is deemed unlawful or invalid for any reason whatsoever, such unlawfulness or invalidity shall not affect the validity of this Agreement.

12. Governing Law. This Agreement shall be construed and interpreted in accordance with the laws of Nevada, without giving effect to conflicts of laws.

13. Headings. The headings of this Agreement are inserted solely for the convenience of reference and are not part of, and are not intended to govern, limit or aid in the construction of any term or provision hereof.

14. Further Acts. Each party agrees to perform any further acts and execute and deliver any further documents that may be reasonably necessary to carry out the provisions and intent of this Agreement.

15. Acknowledgment Concerning Counsel. Each party acknowledges that it had the opportunity to employ separate and independent counsel of its own choosing in connection with this Agreement.

16. Independent Contractor Status. There is no relationship, partnership, agency, employment, franchise or joint venture between the parties. The parties have no authority to bind the other or incur any obligations on their behalf.

17. Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto duly execute this Agreement as of the date first written above.

BY:     /s/ Brian Vollmer
        -----------------------
        Brian Vollmer BV"

BY:     /s/ Edward Gallagher
        -----------------------
        Edward Gallagher CEO

        20/20 Networks, Inc.

                    2

DCN: 03755702



EDGARPlus(R) FORM-TYPE: S-8 FILING-DATE: June 24, 2003

LOAD-DATE: June 26, 2003



EXHIBIT "2"



U.S. Securities and Exchange Commission

## SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C.

**LITIGATION RELEASE NO. 17552 /June 10, 2002**

**SECURITIES AND EXCHANGE COMMISSION v. BRIAN M. VOLMER, JOHN R. SWITZER, INTERNATIONAL ALLIANCE TRADING, INC., SUN PACIFIC CAPITAL GROUP, INC., Defendants, and LISA NEWMAN VOLMER, Relief Defendant, United States District Court for the Central District of California, No. CV 98-8698-JSL (Mcx)**

**SECURITIES AND EXCHANGE COMMISSION v. BRIAN M. VOLMER, INTERNATIONAL ALLIANCE TRADING, INC., SUN PACIFIC CAPITAL GROUP, INC., Defendants/Appellants, and LISA NEWMAN VOLMER, Relief Defendant/Appellant, United States Court of Appeals for the Ninth Circuit, No. 00-57045**

On May 3, 2002 the U.S. Court of Appeals for the Ninth Circuit, in an unpublished opinion, affirmed a judgment against Brian M. Volmer and two corporate entities he controlled, International Alliance Trading, Inc. ("International Alliance") and Sun Pacific Capital Group, Inc., that was entered by the Hon. J. Spencer Letts of the U.S. District Court for the Central District of California on October 18, 2000. After a bench trial, Judge Letts found Volmer and his two companies liable for touting the stock of two issuers on the internet without disclosing the compensation they received from the issuer for doing so, in violation of the anti-touting provision of the securities laws [Section 17(b) of the Securities Act of 1933 ("Securities Act")]. The District Court also found that in an advertisement they placed in a nationally distributed newspaper Volmer and International Alliance violated the antifraud provisions of the securities laws [Section 17 (a) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder] by misidentifying the author of the ad, misrepresenting the assets of the issuer promoted in the ad, and falsely recommending the stock as a good buy.

The judgment enjoins Volmer and his two companies from further violations of the anti-touting provision and enjoins Volmer and International Alliance from violating the antifraud provisions. It also orders Volmer to disgorge $296,429.13 in illicit proceeds (both his compensation and trading profits), and imposes a civil penalty against him in the same amount. Volmer's wife, Lisa Newman Volmer, who was named in the Commission's complaint as a relief defendant, was ordered to disgorge $106,646 she received from Volmer, if he fails to satisfy the disgorgement judgment. The Court of Appeals affirmed the judgment of the District Court in all respects.

Another defendant in the case, John R. Switzer, previously consented to the entry of a final judgment enjoining him from violating the anti-touting

provision [Section 17(b) of the Securities Act]. The consent judgment against Switzer, which was entered on February 11, 2000, did not impose a civil penalty based upon Switzer's sworn representations concerning his financial condition.

Investors are advised to read the SEC's "Cyberspace" Alert before purchasing any investment promoted on the Internet. The free publication, which alerts investors to the telltale signs of online investment fraud, is available on the Investor Assistance and Complaints link of the SEC's Home Page on the World Wide Web, www.sec.gov/investor/pubs/cyberfraud.htm. It can also be obtained by calling 800-SEC-0330. Investors are encouraged to report suspicious Internet offerings (or other suspicious offerings) via e-mail to enforcement@SEC.gov. A user-friendly form to assist you in making a report is available at the Enforcement Complaint Center on the Enforcement Division link of the SEC Home Page, www.sec.gov. Investors can also mail a report to the SEC Enforcement Complaint Center, 450 Fifth Street, Washington, D.C. 20549-0213.

See also Litigation Release No. 15952 (October 27, 1998).
http://www.sec.gov/litigation/litreleases/lr17552.htm

Home | Previous Page                                            Modified: 06/10/2002



EXHIBIT "3"



NUMBER
14691

PAR VALUE $0.001
COMMON STOCK

## 20/20 NETWORKS, INC.
INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

SHARES

CUSIP NO. 90137B 10 2

THIS CERTIFIES THAT

is the owner of

**BRIAN VOLLMER    3184.    121**

ONE HUNDRED THOUSAND

FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK PAR VALUE OF $0.001 EACH OF

## 20/20 NETWORKS, INC.

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar. Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

PRESIDENT, CFO & SECRETARY

DATED:

06/24/2003

Countersigned and Registered:

SIGNATURE STOCK TRANSFER, INC.
(Reno, Texas) Transfer Agent

By

Authorized Signature

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM (TIC) - as tenants in common
TEN ENT - as tenants by the entireties
JT TEN (J/T) - as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN (TRANS) ACT _____ Custodian _____
(UGMA) (UTMA)                (Cust)              (Minor)
                             under Uniform Gifts (Transfer) to Minors
                             Act _____
                                  (State)

Additional abbreviations may also be used though not in the above list.

### For Value Received _____ *hereby sell, assign and transfer unto*

**PLEASE INSERT SOCIAL SECURITY OR SOME OTHER IDENTIFYING NUMBER OF ASSIGNEE**

_____

_____

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

_____

_____

*Shares*

*of the Capital Stock represented by the within Certificate, and do hereby irrevocably constitute and*

*appoint* _____ *Attorney*

*to transfer the said Stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* _____

X _____

**SIGNATURE GUARANTEE**
(BY BANK, BROKER, CORPORATE OFFICER)

**NOTICE: THE SIGNATURE TO THIS AGREEMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATEVER.**

EXHIBIT "4"

Administrative Proceeding
File No.    3-9737

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

Securities Exchange Act of 1934
Release No.    40494 / September 29, 1998

|  |  |  |
|---|---|---|
| In the Matter of | : | ORDER INSTITUTING PROCEEDING PURSUANT TO SECTION 15(b)(6) OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING SANCTIONS |
| Mike Zaman, | : | |
| Respondent | : | |

I.

The Securities and Exchange Commission (the "Commission") deems it appropriate and in the public interest that a proceeding pursuant to Section 15(b)(6) of the Securities Exchange Act of 1934 (the "Exchange Act") be instituted against Mike Zaman ("Respondent" or "Zaman").

In anticipation of the institution of this proceeding, Respondent has submitted an Offer of Settlement (the "Offer") to the Commission which the Commission has determined to accept. Solely for the purposes of this proceeding and any other proceeding brought by or on behalf of the Commission or to which the Commission is a party, and without admitting or denying the findings contained herein, except as to the entry of the injunction set forth in Section II.B. below and as to the jurisdiction of the Commission over him and the subject matter of the proceeding, which are admitted, Respondent consents to the issuance of this Order Instituting Proceeding Pursuant To Section 15(b)(6) of the Securities Exchange Act of 1934, Making Findings, And Imposing Sanctions ("Order"), the entry of the findings contained herein, and the imposition of the sanction set forth below.

Accordingly, IT IS ORDERED that a proceeding pursuant to Section 15(b)(6) of the Exchange Act be, and hereby is, instituted.

II.

On the basis of this Order and the Offer submitted by Zaman, the Commission finds[1] that:

A.    From late 1994 through May 1996, Zaman was associated with Smith, Benton & Hughes, Inc. ("Smith Benton"), a broker-

dealer registered with the Commission pursuant to Section 15 of the Exchange Act. At all relevant times, Zaman owned, controlled and directed the activities of Smith Benton. He also served as Smith Benton's president and head trader.

B.  On June 29, 1998, a Final Judgment as to Zaman was entered by the United States District Court for the Central District of California in an action styled Securities and Exchange Commission v. Andrew S. Pitt, et al., Civ. Action No. 96-4164 (MRP)(C.D.Cal. filed June 17, 1996), which permanently enjoins Zaman from future violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 15(c)(1)(A) of the Exchange Act and Rules 10b-5, 15c1-2, and 15c1-8 promulgated thereunder.

C.    According to the Findings of Fact and Conclusions of Law (the "Findings") entered on May 26, 1998 by Judge Pfaelzer in SEC v. Pitt, et al., Zaman violated the antifraud provisions of the federal securities laws by engaging in the following conduct. From February 14 through May 28, 1996, Smith Benton generated substantially all of the retail demand for Conectisys Corporation common stock and controlled the supply of Conectisys stock on the market so that demand always exceeded supply. By doing so, Zaman and Smith Benton controlled the number of Conectisys shares available for sale on the market, dictated the prices at which those shares traded and artificially increased the price of stock purchased by retail customers. Zaman manipulated the price of Conectisys stock by engaging in so-called "daisy chain" trading with market participants to fill retail customer orders, inducing broker-dealers to enter arbitrary quotes and frequently "marking the close," that is, orchestrating end-of-day trades that were executed at the highest price of the day. The Findings also state that Smith Benton's retail salesmen solicited retail customers to purchase Conectisys stock through "cold call" sales presentations that omitted to disclose material negative information about Conectisys, and through the dissemination of a business plan containing highly inflated projections of revenue and inflated asset valuations.

**FOOTNOTES**

[1]: The findings herein are not binding on anyone other than Respondent

III.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the following sanction specified in Zaman's Offer.

Accordingly, IT IS ORDERED that Zaman be, and he hereby is, barred from association with any broker, dealer, investment adviser, investment company or municipal securities dealer.

By the Commission.

Jonathan G. Katz
Secretary



EXHIBIT "5"







:: Back to Main
:: About Us
:: Daily Report
:: Profiles
:: Long Trades
:: Short Trades
:: Option Trades
:: Investor/Broker Relations
:: Disclosure
:: Contact Us
:: Current Market

**Join our Mailing List**
**Enter your e-mail address**

| Submit |

Disclosure

**IMPORTANT DISCLAIMER & DISCLOSURE:**

TITAN STOCKS and its employees, managers, members, affiliates or any persons and entities related to the TITAN STOCKS are not registered as investment advisors or broker dealers. TITAN STOCKS, along with its affiliates, directors, officers, representatives and agents, are collectively referred to as TITAN STOCKS and its affiliates. All published statements and expressions are strictly the opinion of TITAN STOCKS and its affiliates. Statements and expressions made are not meant to be solicitations to buy or sell securities.  Maintenance of this website is a service to its customers and visitors for informational purposes only. Some of the companies displayed on this website will have paid for the publication of the materials regarding their respective company or business. By using this website you agree to the following terms of use, which TITAN STOCKS and its affiliates may change at any time.

TITAN STOCKS AND ITS AFFILIATES may act as a consultant to these companies reviewed in this publication. Investors should be aware that companies featured may have provided consideration to TITAN STOCKS AND ITS AFFILIATES and its published "REPORT" and/or its shareholders. TITAN STOCKS and its affiliates, editor or affiliate, agents and/or family members may have equity interests or positions in the equity securities profiled in this publication, some of which may have been acquired prior to the dissemination of any of the reports and TITAN STOCKS and its affiliates may acquire additional shares or sell a portion of, or liquidate the entire position, at any time without giving notice.

**Present Compensation paid to TITAN STOCKS and or its affiliates**

The TITAN STOCKS has been compensated 62,500 shares of free trading RJV Networks  from a third party and will buy and sell without notice. Always research an investment before you decide you buy. We have not verified the technology in this company and cannot assure that the information posted on this site about the company is factual information

The TITAN STOCKS has been compensated 50,500 shares of free trading RPMM  from a third party and will buy and sell without notice. Always research an investment before you decide you buy. We have not verified the technology in this company and cannot assure that the information posted on this site about the company is factual information

No advise or recommendations made by TITAN STOCKS and affiliates will be construed as professional investment advice. The



advertisements and materials relating to TITAN STOCKS and its affiliates are for informational purposes only. The "Report" is not intended to directly or indirectly provide advise as to the value of the securities of the companies described or as to the advisability of investing in, purchasing, holding or selling of such securities. Instead TITAN STOCKS and its affiliates and its "Report" have prepared and paid for this advertising; and the publications are not to be construed as endorsements, recommendations, analysis or advisories of any nature by the publisher. TITAN STOCKS and its affiliates and its "Report" does not endorse any opinions or recommendations regarding the materials advertised, nor does it give tax advise or advocate the purchase or sale of any security or investment.

No representations as to contents of advertisements. In preparing this publication, TITAN STOCKS and its affiliates and its "Report" rely upon information supplied by outside sources and its customers, which it believes to be reliable, however, such reliability cannot be guaranteed. TITAN STOCKS and its affiliates and its "Report" make no representations as to the accuracy, timeliness or completeness of the information contained in any such advertisement and disclaim any and all liabilities relating thereto. TITAN STOCKS and its affiliates and its "Report" are not responsible for any claims made by companies advertised herein. BY ACCESSING THIS WEBSITE, YOU AGREE THAT THE INFORMATION PROVIDED IS "AS IS" AND WITHOUT WARRANTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION; WARRANTIES AS TO THE AVAILABILITY, ACCURACY COMPLETENESS, CURRENTNESS OR RELIABILITY OF THE CONTENT OF THE ADVERTISEMENTS MAINTAINED ON THIS WEBSITE; AND WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT WILL TITAN STOCKS AN ITS AFFILIATES OR ITS REPORT, THE INFORMATION PROVIDERS, OR THE INFORMATION TRANSMITTERS BE LIABLE TO YOU OR ANYONE ELSE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES (INCLUDING BUT NOT LIMITED TO LOST PROFITS, TRADING LOSSES, AND DAMAGES THAT RESULT FROM INCONVENIENCE, DELAY OR LOSS OF SERVICE) EVEN IF TITAN STOCKS AND ITS AFFILIATES, THE INFORMATION PROVIDERS OR THE INFORMATION TRANSMITTERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES. TITAN STOCKS and its affiliates and its "REPORT" shall not be is liable for any damages or costs arising out of or in any way connected with your use of materials or advertisements provided or accessed through this website and/or its "Report".

TITAN STOCKS AND ITS AFFILIATES intend to publish any and all compensations and/or relationships involving companies or company information published on this website. However, there can be no guarantee of the accuracy of the published information on a day-to-day basis, specifically applying to any securities position held by TITAN STOCKS and its affiliates.

No offer of securities. None of the materials or advertisements herein constitutes offers or solicitations to purchase or sell securities of the companies profiled herein and any decision to invest in any such company or other financial decisions should not be made based upon the information provided herein. Instead TITAN STOCKS and its affiliates and its "Report" urge you to conduct a complete and independent investigation of the respective companies and consider of all pertinent risks. TITAN STOCKS and its affiliates and its "Report" do



not offer such advice or analysis, and further urges you to consult your own independent tax, business, financial and investment advisors.

Consideration for services. In consideration for the publication of the advertisements in this website and its "Report" and the promotional services provided by both the TITAN STOCKS and its affiliates website and "Report", the advertised companies may have paid cash or issued stock and/or options to TITAN STOCKS and its affiliates. Brian M. Volmer, the principal of The TITAN STOCKS, has been permanently enjoined from violation sections 17 (a) and (b) of the Security Exchange Act of 1933 and Section 10 (b) of the Securities Exchange Act of 1934 and rule 10b-5 there under in connection with a prior activities unrelated to The TITAN STOCKS. Mr. Volmer, along with another individual and two private entities he was a principal of, International Alliance Trading, Inc and Sun Pacific Capital Group, Inc, were charged with violating the antitouting and the antifraud provisions of the Federal Securities Laws in a Securities and Exchange Commission civil enforcement action central district of the California. The Judgment of permanent injunction against Mr. Volmer includes an order for payment of disgorgement, interest and civil penalty. Mr. Volmer has appealed the judgment and findings against him and his appeal was denied in May 2002 in the ninth circuit court of appeals.

TITAN STOCKS AN ITS AFFILIATES and its published "REPORT" and or Corporate Profiles are not liable for any losses, damages, monetary or otherwise, that may occur due to the content of TITAN STOCKS and its affiliates and its published "REPORT". Except for the historical information contained herein with regards to the past markets or research and development of the company's products, the matters in this report contain forward looking statements as defined in Section 27 (a) of the Securities Act of 1933 and Section 21(e) of the Security Exchange Act of 1934 as amended.

anstoc



EXHIBIT "6"

7 of 7 DOCUMENTS

**DEL DIETRICH, as a proposed representative of himself and others similarly situated, Plaintiff, - against - RICHARD BAUER; GROUPE SCORPION, B.V.; JACK T. DAWSON; GREEN-COHN GROUP; MORTON COHN; VAN D. GREENFIELD; LEONARD SCHWALB; CS FIRST BOSTON; BEAR STEARNS; SMITH, BENTON & HUGHES, INC.; MICHAEL ZAMAN; CLAUDIA ZAMAN; EMMET A. LARKIN & COMPANY; PAINE WEBBER; OPPENHEIMER & CO., INC.; EDWARD FISCH; BARRY WITZ; MARIO V. ANDRADE; WESTFIELD FINANCIAL CORPORATION; IDATA, INC.; ROBERT BOGUTSKI; and KATHLEEN BOGUTSKI, Defendants.**

**95 Civ. 7051 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1996 U.S. Dist. LEXIS 18258; Fed. Sec. L. Rep. (CCH) P99,441**

**December 9, 1996, Decided**
**December 10, 1996, FILED**

**DISPOSITION:** [*1] Defendants' motions granted, with leave to replead consistently with this Memorandum and Order. Plaintiff's state law claims dismissed for lack of supplemental jurisdiction.

**COUNSEL:** For DEL DIETRICH, plaintiff: James W. Johnson, Goodkind Labaton Rudoff & Sucharow LLP, New York, NY.

For JACK T. DAWSON, defendant: Joseph Ryan, Uniondale, NY. For SMITH, BENTON & HUGHES, INC., MICHAEL ZAMAN, CLAUDIA ZAMAN, defendants: Irving M. Einhorn, Einhorn & Edgerton, Los Angeles, CA. For EDWARD FISCH, IDATA, INC., ROBERT BOGUTSKI, KATHLEEN BOGUTSKI, defendants: Herbert M. Jacobi, Esquire, New York, NY. For Oppenheimer & Co. Inc., defendant: Howard O. Godnick, Esq. and Jonathan Taylor, Esq., Schulte Roth & Zabel, L.L.P.

**JUDGES:** LAWRENCE M. McKENNA, U.S.D.J.

**OPINIONBY:** LAWRENCE M. McKENNA

**OPINION:**

MEMORANDUM AND ORDER

McKENNA, D.J.

This proposed class action alleges violations of federal securities law, and other related claims, against corporations and individuals allegedly involved in the public sale and distribution of unregistered Scorpion common stock in the United States. Specifically, Plaintiff alleges violations of sections 12(1) and 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(1) and (2), (the "1933 Act"); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), (the "1934 Act"); Securities [*2] and Exchange Commission ("SEC") Rule 10-b5, 17 C.F.R. § 240.10b-5, promulgated thereunder; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, ("RICO"); Sections 25110, 25130, 25401, 25501, 25503, and 25504.1 of the California Corporations Code; and Section 17200 et seq. of the California Business Professions Code. Plaintiff also brings related claims for common law fraud and negligent misrepresentation. Plaintiff seeks to hold liable Defendants Richard Bauer, Jack T. Dawson, Morton Cohn, Van D. Greenfield, Robert Bogutski, Kathleen Bogutski, Michael Zaman, and Claudia Zaman as controlling persons under Section 20 of the 1934 Act, 15 U.S.C. § 78t(a).

Defendants CS First Boston, Green-Cohn Group, Inc., Morton Cohn, Van D. Greenfield, Leonard

Case 2:03-cv-01333-PMP-RJJ   Document 1-2261683   Filed 10/23/03   Page 73 of 194

Page 2

1996 U.S. Dist. LEXIS 18258, *; Fed. Sec. L. Rep. (CCH) P99,441



Schwalb, Bear Stearns, Paine Webber, and Oppenheimer & Co. move to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), and for failure to plead fraud with particularity as required by Fed. R. Civ. P. 9(b). For the reasons stated below, Defendants' motions are granted, with leave to replead consistently with this Memorandum and Order.

### I. Facts [*3]

### Plan To Evade Regulation S

The Complaint alleges the following facts, which the Court must accept as true for the purposes of this motion. In late 1991 and early 1992, Scorpion Technologies ("Scorpion"), a publicly traded corporation listed on the NASDAQ market under the symbol "SCPNA," sought to register a secondary offering of Class A common stock for public sale. To this end, in November, 1991, Scorpion filed a registration statement with the SEC, and in January, 1992 filed a first amendment to this statement. In February, 1992, the SEC informed Scorpion that it was under SEC investigation. Scorpion's officers believed that the SEC investigation would prevent it from selling stock, and, accordingly, withdrew its registration statement in February, 1992.

At the time the registration statement was withdrawn, Scorpion, through its officers, directors, and others, developed and carried out, between May, 1992, and late 1994, a plan to effectively sell securities by issuing stock ostensibly pursuant to Regulation S, n1 but with the intention of causing the stock to be sold to United States purchasers through securities broker/dealers within the United States, thus avoiding registration [*4] under Section 5 of the 1933 Act. Under this plan, Scorpion transferred Scorpion common stock to foreign entities controlled by Defendants and other participants in the plan. n2 The sole function of these foreign entities was to re-transfer Scorpion common stock to broker/dealers within the United States for sale to the public. Generally, no payment was made by the foreign entities to whom the stock was issued at the time of transfer. The foreign entities to which Scorpion issued Scorpion common stock did not publicly disclose their sale of the stock pursuant to Regulation D of the 1934 Act. Plaintiff claims that the broker/dealers, including Defendants Bear Stearns, Green-Cohn, Emmet Larkin, SB&H, Oppenheimer, Paine Webber, and Westfield Financial, effectively functioned as underwriters and sellers of a secondary public offering.

n1 Presumably, Plaintiff is referring to the SEC rules governing offers and sales made outside the United States without registration

under the Securities Act of 1933, 17 C.F.R. § § 230.901-230.904.

n2 Mayfair Financial, FRM Commodities, Tanaka Capital, Mahsa Poust, Saturn, Wellcome Mason, Osicom Technologies, Inc., Pentasonic, S.A., Gerard Peron, and Unison, J.V., are the alleged foreign entities to whom Scorpion transferred stock. They are not defendants in this action.

[*5]

Each Defendant's alleged involvement in particular transactions is described in greater detail below.

On or about May 13, 1992, Scorpion issued one million shares of Scorpion common stock to Mayfair Financial, and four million shares of Scorpion common stock to FRM commodities. On or about August 1, 1992, Scorpion issued an additional 750,000 shares of Scorpion Common Stock to Mayfair. During the time between May 22, 1992 and October, 1992, Mayfair's 1,750,000 shares were ultimately transferred to, among others, Defendant Green-Cohn, which ultimately sold the stock to buyers in the United States. FRM's four million shares were ultimately transferred to Defendants Green-Cohn, Westfield Financial, or Oppenheimer, who directly or indirectly sold the stock to buyers in the United States. Defendant Bear Stearns served as the clearing broker for Green-Cohn in the above transactions.

In or about August, 1992, Scorpion acquired all of the issued and outstanding shares of Osicom Technologies U.K., Ltd., and twenty-one percent of the issued and outstanding shares of Osicom Technologies, Inc., through Saturn. Scorpion did not pay cash for these shares, but issued ten million shares of Scorpion [*6] common stock to Saturn in exchange for Osicom stock. These ten million shares were transferred to, and later sold by, Green-Cohn, Trisun, Bear Stearns, Paine Webber, Wellcome Mason, and Technica Associados, S.R.L. Bear Stearns served, for a substantial number of sales, as a clearing broker for Green-Cohn in the above transactions.

In December, 1992, Scorpion acquired Pentasonic, S.A., a French company, as a wholly owned subsidiary and retained Gerard Peron, Pentasonic's founder, to oversee Pentasonic's daily operations. On or about December 14, 1992, Scorpion issued 2,318,751 shares of Scorpion common stock to Peron. On or about February 16, 1993, Peron transferred 783,929 shares of this stock to Wellcome Mason. Some of these shares were ultimately transferred to, among others, Defendant Paine Webber, which sold the stock to buyers in the United States during a period from approximately February, 1993 to March, 1993.

1996 U.S. Dist. LEXIS 18258, *; Fed. Sec. L. Rep. (CCH) P99,441

On or about December 7, 1992, Scorpion issued one million shares of Scorpion common stock to Wellcome Mason. These shares were ultimately transferred to, among others, Defendant Paine Webber, which sold the stock to buyers in the United States during a period from approximately [*7] January, 1993 to April, 1993.

On or about December 28, 1992, Scorpion, through IDATA, issued two million shares of Scorpion common stock to Mahsa Poust. Scorpion issued an additional 2.5 million shares to Poust on or about January 28, 1993. Poust transferred all 4.5 million shares to SB&H, which, in turn, sold these shares to buyers in the United States. Defendant Emmet Larkin was allegedly the clearing broker for these transactions.

On or about February 8, 1993, Scorpion, through IDATA, issued two million shares of Scorpion common stock to Group Scorpion, B.V., which, on or about March 25, 1993, transferred these two million shares to Tanaka Capital. Scorpion issued another 500,000 shares of Scorpion common stock to Group Scorpion, B.V., and on April 13, 1993, these shares were also transferred to Tanaka Capital. Tanaka transferred these 2.5 million shares to Defendant SB&H which, from March, 1993 to May, 1993, sold the shares to buyers in the United States. Defendant Emmet Larkin was allegedly the broker for these transactions.

On or about October 18, 1994, Scorpion issued 7,000,000 shares of Scorpion common stock to Unison, J.V. This stock was issued pursuant to Regulation S. [*8] These 7,000,000 shares were ultimately sold to buyers in the United States.

**Artificial Manipulation of Market Price**

**1. Scorpion Market Summary**

Plaintiff alleges that during the week of January 18, 1993, Defendants, including First Boston, Bear Stearns, Green-Cohn, and Paine Webber, planned and carried out a scheme to defraud investors by artificially creating a market demand for Scorpion stock. This the Defendants accomplished through their trading activity, discussed below, and by creating false rumors of institutional interest in Scorpion stock and expected fourth quarter earnings of $ .15/share. The result of these rumors was that Defendants were able to increase the demand for Scorpion common stock, tripling the market price. When the market opened on January 18, 1993, Scorpion stock was trading at a low of $ .75/share. The trading volume for the prior 90 days was 350,000 shares. At approximately 2:30 p.m. EST, Bloomberg's newswire reported a rumor of institutional buying of Scorpion stock. The total volume of trading in Scorpion stock for January 18, 1993, exceeded 5.7 million shares. On January 19, 1993, 4.1 million shares of Scorpion stock

were traded, with an [*9] average price of $ .75/share. On January 20, 1993, the Scorpion stock rose from a low of $ .78/share to $ 1.28/share with a volume of 6.6 million. On this day, a rumor was circulated that Scorpion's expected fourth quarter earnings would be $ .15/share. On January 21, 1993, Mark Leibovit made a buy recommendation of Scorpion stock based on the increase in volume. After Leibovit's recommendation, Scorpion stock rose from $ 1.625/share to $ 1.75/share, with a volume of over 6.6 million. n3 At some time during the day of January 22, 1993, Scorpion stock peaked at over $ 2.00/share with a volume of over 5.5 million. The record does not contain any information concerning Scorpion stock after January 22, 1993.

> n3 Plaintiff does not explain when Scorpion stock rose from $ 1.28 to $ 1.625/share

**2. Defendants' Trading Activity**

From January 18, 1993, to January 22, 1993, Defendants began purchasing Scorpion stock in an attempt to increase demand for this stock. Each Defendant's trading activity is described in [*10] greater detail infra.

In the 90 days prior to January 18, 1993, First Boston's customer accounts were essentially inactive. On January 18, 1993, thirty-two First Boston accounts purchased 917,000 shares of Scorpion stock. By January 22, 107 of First Boston's retail customer accounts purchased over 2.8 million shares of Scorpion stock. n4

> n4 First Boston made the decision to purchase Scorpion stock on fourteen to twenty-six of these accounts. (Compl. at P 87).

On January 18, 1993, Saturn, through Defendants Green-Cohn and others, sold one million shares of Scorpion stock. On January 18 and 19, 1993, Mahsa Poust sold one million and 612,000 shares, respectively, of Scorpion stock. These sales were executed by SB&H and subsequently sold through retail brokers.

From January 19 to 22, 1993, Wellcome Mason sold 915,000 shares of Scorpion stock. These sales were executed by Defendant Paine Webber.

On January 18, 1993, Bear Stearns' accounts for the Green-Cohn Group, including Defendant Greenfield's children's [*11] trusts, purchased approximately 500,000 shares of Scorpion stock at $ .73/share. These shares were later sold at a price greater than $ .73/share.



Page 4

1996 U.S. Dist. LEXIS 18258, *; Fed. Sec. L. Rep. (CCH) P99,441

During this same time period, Defendants, by trading among themselves, were able to increase the reported trading volume of Scorpion's stock. Plaintiff alleges that this was due to wash transactions among Defendants. Specifically, Plaintiff alleges that Defendant SB&H sold over one million shares of Scorpion stock at the same time Defendant First Boston acquired over one million shares of Scorpion stock; and that on January 18, 1993, Saturn sold 470,000 shares of Scorpion stock through Defendant Green-Cohn, while two of Bear Stearns' accounts, beneficially owned by principals at Green-Cohn, purchased 447,000 shares of Scorpion stock.

Plaintiff alleges that the following facts are relevant to show the fraudulent intent of certain Defendants.

Plaintiff alleges that Vincent Nerilino, a broker at Oppenheimer, received an undocumented $ 6,000 interest free loan from Scorpion's president which has never been repaid.

Principals at Green-Cohn maintained at least two personal accounts at Bear Stearns, Chestnut Investors II, Inc. and Greenfield [*12] Children's Trust, which held shares of Scorpion stock. Both accounts purchased Scorpion stock on January 18, 1993, at $ .73/share, and sold those shares under the week after Scorpion's stock price had tripled. Plaintiff claims that the trading activity of these accounts suggests that the principals at Green-Cohn based their trades on insider information.

The brokerage firms involved, including Defendants SB&H, Paine Webber, Green-Cohn, Oppenheimer, and Emmet Larkin made substantial commissions from their personal trading of Scorpion stock.

Some Defendants were given shares of Scorpion stock for little or no consideration as an incentive to participate in the allegedly illegal trading plan.

## II. Standard of Review

### 12(b)(6)

When deciding whether to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted, the Court must accept the facts alleged as true and draw all inferences in favor of the non-moving party. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 765 (2d Cir. 1994), cert. denied, 130 L. Ed. 2d 632, 115 S. Ct. 728 (1995). Plaintiff's Complaint will not be dismissed unless it appears beyond doubt that the Plaintiff can [*13] prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

### 9(b)

Because several of Plaintiff's claims sound in fraud, they are subject to the pleading requirements of Fed. R. Civ. P. 9(b) which requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally." Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 114 (2d Cir. 1982); In re College Bound Consol. Litig., 1994 U.S. Dist. LEXIS 5756, 93 Civ. 2348, 1994 WL 172408 at *3 (S.D.N.Y. May 4, 1994). Rule 9(b) exists not only to provide a defendant with sufficient detail to enable the defendant to prepare a defense, Feinman v. Schulman Berlin & Davis, 677 F. Supp. 168, 172 (S.D.N.Y. 1988), but also to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994); O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991). Rule 9(b) applies to common [*14] law fraud claims, Benenson v. Fleischman, 1995 U.S. Dist. LEXIS 6636, 94 Civ. 5009, 1995 WL 303618 (S.D.N.Y. May 18, 1995), RICO claims, McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir. 1992); Beauford v. Helmsley, 740 F. Supp. 201, 213 (S.D.N.Y. 1990), securities fraud pursuant to section 10(b), Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 61 (2d Cir. 1985), and Rule 10b-5, Shields, 25 F.3d at 1128, including claims alleging market manipulation, Chemical Bank v. Shearson Lehman Bros., Inc., 1992 U.S. Dist. LEXIS 10751, 91 Civ. 4915, 1992 WL 183760 at *1 (S.D.N.Y. July 21, 1992).

To resist a motion to dismiss pursuant to Fed. R. Civ. P. 9(b) the complaint must specify the statements that the plaintiff contends were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. Rule 9(b) is not satisfied where the complaint attributes the alleged fraudulent statements to "defendants." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). In order to satisfy pleading requirements for scienter, Plaintiff must allege facts giving rise to a strong inference of fraudulent [*15] intent. This may be done either by alleging facts to show that defendants had both motive and opportunity to commit fraud, or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268-69 (2d Cir. 1993), cert. denied sub nom., Ross v. ZVI Trading Corp. Employees' Money Purchase Pension Plan and Trust, 128 L. Ed. 2d 70, 114 S. Ct. 1397 (1994). Finally, unless the facts are peculiarly within the opposing party's knowledge, factual allegations of fraud cannot be based on information and belief. DiVittorio v. Equidyne



Page 5

1996 U.S. Dist. LEXIS 18258, *; Fed. Sec. L. Rep. (CCH) P99,441

Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987); Luce v. Edelstein, 802 F.2d 49, 54 n.1 (2d Cir. 1986).

### III. Discussion

#### Section 12(1) and 12(2) of the 1933 Act

Plaintiff's first cause of action alleges that Defendants, acting independently and in concert, sold unregistered securities to the public in the United States using the mails and interstate wire communications in violation section 12(1) of the 1933 Act, 15 U.S.C. § 77l(1) (1981). Plaintiff's second cause of action alleges that the Defendants, acting severally and in concert, used the mails [*16] and interstate wire communications to offer for sale to the United States public securities by means of written and oral communications in violation of Section 12 of the 1933 Act, 15 U.S.C. 77l(2) (1981).

Defendants move to dismiss Plaintiff's first and second causes of action pursuant to Fed. R. Civ. P. 12(b)(6), arguing that 1) Defendants' alleged misrepresentations are not actionable because they were not made in connection with a prospectus; 2) Plaintiff lacks privity with the Defendants; and 3) Plaintiff has not pled compliance with the statutory limitations period, 15 U.S.C. § 77m.

Section 12(1) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." Pinter v. Dahl, 486 U.S. 622, 644 n.21, 100 L. Ed. 2d 658, 108 S. Ct. 2063 (1988). Moreover, under Section 13, Plaintiff must plead facts sufficient to show that his claim was brought "within one year after the violation upon which it is based." 15 U.S.C. § 77m; see In re Chaus Securities Litig., 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992) (dismissing Section 12(2) claim for failure to plead facts sufficient to show that [*17] claim was not barred by statute of limitations under Section 13). Plaintiff merely alleges that he purchased Scorpion stock between May 13, 1992, and December 31, 1994. (Compl. PP 41, 44). He fails to allege when or from whom he purchased the stock. Thus, plaintiff has not satisfied the pleading requirements for a claim under Section 12(1).

Plaintiff's Section 12(2) claims must also be dismissed because they were not made in relation to a prospectus or initial offering. The Supreme Court recently noted that the courts of appeals "agree that the phrase 'oral communication' is restricted to oral communications that relate to a prospectus." Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 115 S. Ct. 1061, 1066, 131 L. Ed. 2d 1 (1995) (citing Pacific Dunlop Holdings Inc. v. Allen & Co. Inc., 993 F.2d 578, 588 (7th Cir. 1993), cert. dismissed, 114 S. Ct. 1146 (1994) and Ballay

v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 688 (3d Cir. 1991), cert. denied, 502 U.S. 820, 116 L. Ed. 2d 52, 112 S. Ct. 79 (1991)). Moreover, a court in this district, relying on Gustafson, held that the phrase "oral communication" was limited to "those public communications that are related to the public written communications, such as a prospectus, that [*18] are encompassed by Section 12(2)." Pollack v. Laidlaw Holdings, Inc., 1995 U.S. Dist. LEXIS 5909, 1995 WL 261518, at *14-15 (S.D.N.Y. 1995).

The reasons for limiting actionable oral communications to those that relate to a prospectus are several. First, the 1933 Act was primarily intended to mandate registration and disclosure of certain information with regard to initial public offerings. Gustafson, 115 S. Ct. at 1068 (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 752, 44 L. Ed. 2d 539, 95 S. Ct. 1917, reh'g denied, 423 U.S. 884, 46 L. Ed. 2d 114, 96 S. Ct. 157 (1975) ("The 1933 Act is . . . chiefly concerned with disclosure and fraud in connection with offerings of securities - primarily . . . initial distributions of newly issued stock from corporate issuers.")). If oral communications are covered under the 1933 Act, they are only covered to the extent necessary to effectuate the purpose of the Act. Holding actionable oral communications made by brokers and other individuals unconnected with the initial offering, in the secondary market, is not necessary to effectuate the purpose of the 1933 Act.

Second, canons of statutory construction support the finding that the terms "oral communication" and "prospectus" in 15 U.S.C. § 77l(2) be read as [*19] related terms. Gustafson, 115 S. Ct. at 1069 (the doctrine of noscitur a sociis provides that a word is known by the company it keeps); accord Ballay, at 925 ("The fact that 'oral representation' keeps company with "prospectus" suggests . . . that the more general term be limited to conform to the more restrictive term consonant with the legislative intent."). The fact that the words "oral communication" in Section 12(2) are directly preceded by the word "prospectus" indicates that the statute should be read so that the word "prospectus" limits the words "oral communication," giving one common reading to the statute rather than multiple antithetical meanings. Gustafson, 115 S. Ct. at 1071; accord Pacific, 993 F.2d at 588 (the words "oral communication" are words of form, not substance; they describe how one communicates a message, not the message communicated). Conversely, the Gustafson Court noted that where the limiting word "prospectus" was not present, as in United States v. Naftalin, 441 U.S. 768, 781-82, 60 L. Ed. 2d 624, 99 S. Ct. 2077 (1979), the Court read the language of § 17(a) of the 1933 Act expansively.

Case 2:03-cv-01333-PMP-RJJ   Document 1-2261683   Filed 10/23/03   Page 77 of 194



Page 6

1996 U.S. Dist. LEXIS 18258, *; Fed. Sec. L. Rep. (CCH) P99,441

Third, the absence in Section 12(2) of the requirement that one prove [*20] reliance or fraud can only be explained by the meticulous care with which public offering documents are drafted and the extensive distribution of those documents. Pollack v. Laidlaw Holdings, Inc., 1995 U.S. Dist. LEXIS 5909, 1995 WL 261518 at *15. Holding actionable oral representations not made in connection with these documents creates liability for buyers and sellers in the secondary market where there are different standards governing disclosure. It is not plausible to infer that Congress created this extensive liability for every casual communication between buyer and seller in the secondary market. Gustafson, 115 S. Ct. at 1071. For these reasons, agreeing with other courts that have considered this issue, the Court holds actionable under § 12(2) only oral statements made in relation to a prospectus.

**B. Rule 10b-5**

Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, as promulgated by the SEC, prohibit fraudulent activities in connection with the purchase or sale of registered or unregistered securities. Rule 10b-5 states that:

> it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate [*21] commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or © to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

To state a cause of action under Section 10(b), one must allege (1) material misstatements or omissions, (2) indicating an intent to deceive or defraud, (3) in connection with the purchase or sale of a security, (4) that the plaintiff relied on the misrepresentation or omission, and (5) suffered a loss as a result. Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031 (2d Cir. 1993); Burke v. Jacoby, 981 F.2d 1372, 1378-79 (2d Cir. 1992), cert. denied, 508 U.S. 909, 124 L. Ed. 2d 249, 113 S. Ct. 2338 (1993); Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 61 (2d Cir. 1985); Brangan v. Omnicorp Ltd., 1995 U.S. Dist. LEXIS 8453, 1995 WL 366301 at *5 (S.D.N.Y. [*22] 1995).

Defendant's alleged Section 10(b) violations fall into two categories: fraudulent sale of securities by means of untrue statements or omissions of material fact, and market manipulation. Defendants move to dismiss these claims, asserting that Plaintiff has failed to: 1) comply with the statute of limitations; 2) plead misrepresentations with particularity; 3) plead fraudulent intent; and 4) adequately allege reliance on Defendants' alleged misrepresentations.

The statute of limitations relevant to Rule 10b claims, 15 U.S.C. § 78i, provides that "no action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." See In re Ames Dep't Stores, Inc. Note Litig., 991 F.2d 968, 979 (2d Cir. 1993). The burden is on the party seeking to establish liability to plead and prove facts demonstrating compliance with this limitations period. Westinghouse v. 21 Int'l Holdings, Inc., 821 F. Supp. 212, 222 (S.D.N.Y. 1993) (quoting, In re Chaus Securities Litig., 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992)). Under 15 U.S.C. § 78i, the [*23] limitations period begins to run when plaintiff knows or is on inquiry notice (in other words, when plaintiff has knowledge sufficient to suggest to a person of ordinary intelligence the probability) that he has been defrauded. Westinghouse, 821 F. Supp. at 222. Once plaintiff is on inquiry notice, the limitations period begins to run unless plaintiff exercises reasonable diligence in investigating his claims, but is unable to discover the fraud. Id. Plaintiff's allegation that "but for Defendants' continued fraudulent misrepresentations and concealment of material facts from 1992 to the present, Defendants' prior fraudulent misrepresentations and concealments made during 1992 and through 1994 would have been discovered earlier . . . ." (Compl. at P 97), without more, is insufficient to invoke the doctrine of equitable tolling. See Finkel v. Stratton Corp., 754 F. Supp. 318, 331 (S.D.N.Y. 1990), aff'd in part, rev. in part, 962 F.2d 169 (2d Cir. 1992).

In order for the Court to determine whether Plaintiff did or did not have constructive knowledge of the alleged fraud more than one year before the complaint was filed, Plaintiff must allege how and when Defendants' [*24] alleged fraud was discovered. Other than the conclusory allegation that plaintiff would have discovered defendants' violations earlier if not for their fraudulent misrepresentations and concealments, Plaintiff has given the Court no information whatsoever about the discovery of Defendants' alleged fraud. Plaintiff does not describe why or when he first became suspicious that he had been defrauded, or what steps, if any, he took to investigate the fraud. Therefore, Defendants' motion to dismiss Plaintiff's third cause of action is granted.

  

Case 2:03-cv-01333-PMP-RJJ    Document 1-2261683    Filed 10/23/03    Page 78 of 194

Page 7

1996 U.S. Dist. LEXIS 18258, *; Fed. Sec. L. Rep. (CCH) P99,441

Plaintiff's Section 10(b) claims must also be dismissed because Plaintiff fails to adequately allege that Plaintiff relied on Defendants' misrepresentation to his detriment. Plaintiff alleges that Defendants, through wash transactions and other means, artificially inflated the trading volume and market price of Scorpion stock, and that Defendants circulated false rumors of institutional interest in Scorpion stock, and expected fourth-quarter earnings, (Compl. at PP 83, 84, 87, 89, 91) and that these activities caused Plaintiff to buy Scorpion stock (Compl. at P 111). Assuming that these allegations state a sufficiently particularized claim of reliance, [*25] there remains a question as to whether Plaintiff has adequately alleged a loss. Defendants claim that Plaintiff has not. Plaintiff disagrees, citing Seagoing Uniform Corp. v. Texaco, Inc., 705 F. Supp. 918, 932 (S.D.N.Y. 1989), Bernstein v. Crazy Eddie, Inc., 702 F. Supp. 962, 979-80 (E.D.N.Y. 1988), vacated in part, sub nom., In re Crazy Eddie, Inc., 714 F. Supp. 1285 (E.D.N.Y. 1989), and Lazzaro, 701 F. Supp. 353, 365 (E.D.N.Y. 1988), for the proposition that one need only allege that he "purchased stock at an artificially inflated price" to make out a legally sufficient claim of injury. (Pl. Br. at 29-30). Lazzaro, however, did not hold that whenever a complaint states that "defendants' misrepresentations, omissions and fraudulent schemes to manipulate the market and artificially inflate the price of the securities at issue caused [plaintiff] actual loss" (Lazzaro, 701 F. Supp. at 365) will always be sufficient to resist a motion to dismiss. To say this would cleave Lazzaro's holding from its facts. In Lazzaro, as well as Bernstein and Seagoing, the Plaintiff had done more than allege that he had purchased stock at an artificially inflated [*26] price. In each case, the plaintiff had alleged that it purchased stock from the Defendants on a certain date, at an artificially inflated price, that subsequent to plaintiff's purchase, the stock became worthless, and that plaintiff suffered an injury as a result. These facts, not plaintiff's generalized allegations, allowed the Lazzaro court to find a sufficient allegation of loss.

In this case, Plaintiff alleges that he purchased Scorpion stock, but he does not say when he purchased the stock, or whether Scorpion's stock continued to climb in value, or fell from its artificially inflated price. Purchase of stock at an artificially inflated market price alone will not suffice as an allegation of injury. See Lazzaro, at 365 (dismissing complaint where plaintiff bought Flo-Rite stock at $ 1.00, and sold it at $ 1.35 - even though stock eventually became worthless - because a plaintiff cannot pursue a 10b-5 action where the challenged conduct yielded pecuniary benefit rather than detriment); Packer v. Yampol, 630 F. Supp. 1237, 1240 (S.D.N.Y. 1986) (complaint dismissed for failure to adequately allege an injury).

Additionally, Plaintiff's Section 10(b) misrepresentation [*27] action must be dismissed to the extent that it is relying on affirmative misrepresentations, because Plaintiff has failed to comply with Fed. R. Civ. P. 9(b). Plaintiff has not sufficiently individualized allegations regarding affirmative misstatements. Plaintiff apparently relies on two affirmative misrepresentations to demonstrate the adequacy of his complaint. Plaintiff alleges that during the week of January 18, 1993, the Defendants placed rumors regarding institutional interest in Scorpion stock and Scorpion's expected fourth-quarter earnings. (Compl. at P 82). An allegation of two rumors collectively originating from over twenty Defendants, including several large corporate Defendants, is insufficient to notify Defendants of the claims against them or the extent of their alleged involvement in a fraudulent scheme and must be dismissed. See Cosmos, 886 F.2d at 11; In re College Bound Consol. Litig., 1994 WL 172408 at *3-6; Amalgamated Bank of New York v. Marsh, 823 F. Supp. 209, 216 (S.D.N.Y. 1993); Stander v. Financial Clearing & Serv. Corp., 718 F. Supp. 1204, 1210 (S.D.N.Y. 1989).

In contrast, Plaintiff's Section 10(b) market manipulation claim, which does [*28] not depend entirely on affirmative misrepresentations, is sufficiently individualized with regard to Defendant's CS First Boston's and Green Cohn's alleged participation in a market manipulation scheme. Plaintiff has alleged that CS First Boston and Green-Cohn engaged in matched sales and/or wash transactions between January 18 and 23, 1993 in order to artificially inflate the price and trading volume of Scorpion stock and make it appealing to investors so that when the Defendants sold Scorpion stock to the public, it could be sold for profit at an artificially inflated price. Compl. at PP 85-90, 93. Whether Defendant CS First Boston and Green-Cohn purchased the stock for legitimate investment purposes, or whether it did so to artificially inflate the price of Scorpion stock is a question of fact that may not be resolved on a motion to dismiss. With regard to CS First Boston, Plaintiff has also pled facts sufficient to give rise to a strong inference of fraudulent intent. Alleging that CS First Boston and Green-Cohn engaged in wash transactions and matched trades also supports the plaintiff's allegation that CS First Boston acted with the requisite intent to defraud. See Schreiber [*29] v. Burlington N., Inc., 472 U.S. 1, 6, 86 L. Ed. 2d 1, 105 S. Ct. 2458 (1985) (the word "manipulative" is almost a term of art, referring to practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity).

With respect to the remaining Defendants, however, Plaintiff has failed to state a claim for market

Case 2:03-cv-01333-PMP-RJJ    Document 1-2261683    Filed 10/23/03    Page 79 of 194



Page 8

1996 U.S. Dist. LEXIS 18258, *; Fed. Sec. L. Rep. (CCH) P99,441

manipulation. Against these Defendants, Plaintiff does not make any particularized allegations of manipulation as he does against CS First Boston, and Green-Cohn. Plaintiff's allegations that Defendants Bear Stearns, Oppenheimer, and Paine Webber sold Scorpion stock on or around January 18 and 19, 1993, (Compl. at PP 91, 92) will not support a claim for market manipulation.

## RICO

Plaintiff's fourth through seventh causes of action allege that Defendants violated substantive portions of the RICO, 18 U.S.C. § § 1962 (a), (c), and (d), thereby subjecting Defendants to civil liability under 18 U.S.C. § 1964(c).

To state a RICO claim, Plaintiff must satisfy two pleading burdens. Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983), cert. denied, 495 U.S. 1025 (1984). First, Plaintiff must allege that the defendants [*30] have violated the substantive RICO statute, 18 U.S.C. § 1962. To do this Plaintiff must allege that Defendants, through the commission of two or more acts, constituting a pattern of racketeering activity, directly or indirectly invest, maintain an interest, or participate in, an enterprise whose activities affect interstate or foreign commerce. Id. Second, Plaintiff must allege that he was "injured in his business or property by reason of a violation of section 1962." Id.

Plaintiff claims that Defendants' alleged actions of securities fraud constitute predicate acts that support a RICO violation. However, for reasons mentioned above, the Court has found that Plaintiff has not adequately pled predicate acts of securities fraud. Therefore, securities fraud cannot qualify as the predicate acts which may support this RICO violation. Moss, 719 F.2d at 19-20. Plaintiff also claims that Defendants have committed the requisite predicate acts by their use of the mails and

wires in furtherance of the alleged securities fraud, in violation of 18 U.S.C. § § 1341, 1343 (mail and wire fraud, respectively.) However, to state a claim for mail or wire fraud, Plaintiff must allege that [*31] Defendants used the mails or wires for the purpose of executing some "scheme or artifice", 18 U.S.C. § § 1341, 1343; See also Center Cadillac v. Bank Leumi Trust Co., 808 F. Supp. 213, 229 (S.D.N.Y. 1992). The only scheme or artifice Defendants are alleged to have engaged in involves Defendants' alleged violations of the securities laws, violations which are inadequately pled.

Therefore, Plaintiff's RICO claims must be dismissed. McLaughlin, 962 F.2d at 191; Sears v. Likens, 912 F.2d 889, 893 (7th Cir. 1990); Official Publications Inc. v. Kable News Co., Inc., 692 F. Supp. 239, 245 (S.D.N.Y. 1988), aff'd in part, rev. in part, 884 F.2d 664 (1989).

Plaintiff's state law claims are dismissed for lack of supplemental jurisdiction. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966).

## Conclusions

For the reasons set forth above, all causes of action are dismissed, with leave to replead (consistently with this Memorandum and Order) within thirty days.

Dated: New York, New York
December 9, 1996

SO ORDERED

LAWRENCE M. McKENNA

U.S.D.J.

**EXHIBIT C**

ORIGINAL

CERT
HAROLD P. GEWERTER, ESQ.
Nevada Bar #499
WENDY E. MILLER
Nevada Bar #6064
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Avenue, Suite 202
Las Vegas, Nevada 89146
Telephone No.: (702) 382-1714
Facsimile No.: (702) 382-1759
Attorneys for Plaintiff

FILED

Oct 16   3 55 PM '03

_Shirley B. Parraginae_
CLERK

DISTRICT COURT

CLARK COUNTY, NEVADA

* * * * *

| | |
|---|---|
| NEVWEST SECURITIES CORPORATION, a Nevada Corporation<br><br>Plaintiff,<br><br>vs.<br><br>BRIAN MICHAEL VOLMER; 20/20 NETWORKS, INC., a Nevada corporation; EDWARD GALLAGHER, individually; WERNER GREIDER, individually; CHARLES SMITH, individually; STEVEN Y. ONOUE, individually; MEHRHAD ALBORZ, individually; CLAUDIA ZAMAN; MICHAEL ZAMAN; SIGNATURE STOCK TRANSFER, INC., a Texas corporation; WELLS FARGO INVESTMENTS, LLC, a Delaware limited liability company; DEPOSITORY TRUST AND CLEARING CORPORATION, a New York Corporation; DOES 1 through X, inclusive; ROE CORPORATIONS XX through XXX, inclusive;<br><br>Defendants. | CASE NO.: A474001<br>DEPT NO.: I<br><br><br>CERTIFICATION OF COUNSEL IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER<br><br><br>Date of Hearing: October 20, 2003<br>Time of Hearing: 9:00 AM |

The undersigned, Harold P. Gewerter, attorney of record for Plaintiff, NevWest Securities Corporation, hereby certifies that the Application for Temporary Restraining Order is presented to the Court on an Ex Parte basis and that no notice was given to any other party because of the extreme emergency nature of this matter. Specifically, if the Court does not grant the Temporary Restraining Order on an ex parte basis it is clear from the moving papers that the

1

COUNTY CLERK   OCT 16 2003   RECEIVED

1  Plaintiff will be subjected to irreparable harm including the real possibility that it may be out of
2  business by the end of the business day today.  Plaintiff, NevWest Securities Corporation, was
3  notified yesterday afternoon that Defendant Wells Fargo Investments, LLC intends to buy in
4  100,000 shares of 20/20 Networks, Inc., stock today and charge Plaintiff's account for the buy-
5  in, an amount believed to be in excess of $200,000, thereby putting the Plaintiff in a net capital
6  violation under the rules and regulations of the NASD.  I have written to the attorneys for
7  Defendants Wells Fargo Investments and the Depository Trust and Clearing Corporation, trying
8  to resolve this matter, but have not succeeded in persuading the parties from proceeding
9  according to their stated intentions.  A copy of my letter to the parties is attached hereto as
10 Exhibit "1."  Additionally, the facts set forth in Plaintiff's Ex Parte Application for Temporary
11 Restraining Order and Motion for Preliminary Injunction; Affidavit of Anthony Michael Santos
12 are hereby incorporated into this Certification of counsel.

13    DATED this _15_ day of October, 2003.

HAROLD P. GEWERTER, ESQ.
Nevada Bar No. 499
5440 West Sahara Avenue, Suite 202
Las Vegas, NV  89146
Attorney for Plaintiff

2

**EXHIBIT "1"**

# LAW OFFICES OF
# HAROLD P. GEWERTER, ESQ., LTD.

Harold P. Gewerter, Esq.
Wendy E. Miller, Esq.*
*Also admitted in California

October 14, 2003

VIA FAX: 1-212-855-3215

Isaac Montal, Esq.
The Depository Trust and Clearing Corporation
Legal Department
55 Water Street, 49th Floor
New York, NY 10041

     RE:   20/20 Networks, Inc.

Dear Mr. Montal:

     As you know, I am an attorney for NevWest Securities Corporation. My client was notified this afternoon by Wells Fargo Investments that DTC has refused to accept deposit of a valid certificate for 100,000 shares of 20/20 Networks, Inc., securities issued in the name of Wells Fargo Investments. This certificate was obtained as a result of an Order of Preliminary Injunction, attached hereto, declaring that the referenced securities are validly issued and were acquired by my client free of any adverse claim. NevWest has also been informed that DTC has again debited WFI for these shares, perpetuating a fictitious short position that will be passed onto my client when WFI commences a buy-in tomorrow.

     If WFI is required to buy-in an additional 100,000 shares of stock because of DTC's refusal to accept deposit of a valid certificate, NevWest and the investing public at large will be victims of a fraudulent scheme. 20/20 Networks, Inc (TWNK), through one or more of its shareholders and TWNK's primary control person, Mike Zaman, intentionally caused to be issued, and then caused a stop-transfer of valid S-8 stock, with the intention of forcing NevWest Securities to buy-in an additional 100,000 shares of TWNK stock, thereby driving up the price. Mike Zaman was the subject of a prior SEC suit for securities fraud and manipulation, resulting in a permanent injunction against Mr. Zaman. Mr. Zaman has admitted to controlling the float of TWNK stock. As a result, if WFI is forced to buy in additional TWNK stock, not only will the TWNK control persons benefit, but the rising stock price may induce innocent investors to purchase this stock at artificially inflated prices.

     I have carefully reviewed the DTC Rules, and nowhere do I see where DTC can arbitrarily refuse to accept deposit of a DTC Eligible Security by a Participant. We respectfully request that you reconsider your position pertaining to the above referenced matter. As you know, the transfer agent, Signature Stock Transfer, Inc. represents the

Re: 20/20 Networks, Inc.
10/14/2003
Page 2 of 2

securities to be valid and free of any restrictions. The original shareholder, Mr. Volmer, indicates that the securities at issue are valid. By any reasonable legal measure, these securities are free of any restrictions, validly issued, in acceptable form, and otherwise eligible. Additionally, under Rule 6, DTC retains the right not to credit the Participant's account until such time as the securities are actually registered in the name of DTC's nominee; therefore, there would be no risk to DTC in accepting the certificate for deposit.

Please notify me in writing by 9:00AM PST as to your intentions regarding this matter. Time is of the essence. If we are not able to resolve this matter amicably, my client will have no choice but to pursue all legal remedies available, including injunctive relief.

Sincerely,

HAROLD P. GEWERTER, ESQ.

HPG/jlf

Enclosure

cc:     Robert Moses, Wells Fargo Legal Department, via fax (212) 805-1065
        Steve Brown, Director of Operations, WFI, via fax (866)397-8367
        client

**EXHIBIT D**

18

IAFD
HAROLD P. GEWERTER, ESQ.
HAROLD P. GEWERTER, ESQ., LTD.
Nevada Bar # 499
5440 W. Sahara Avenue, Suite 202
Las Vegas, NV 89146
(702) 382-1714
Attorney for Plaintiff

FILED

SEP 23   4 08 PM '03

DISTRICT COURT
CLARK COUNTY, NEVADA

NEVWEST SECURITIES
CORPORATION,

             Plaintiff(s),   )

-vs-

BRIAN MICHAEL VOLMER, et al.

            Defendant(s). )

CASE NO.   A474001

DEPT. NO.   I

**INITIAL APPEARANCE FEE DISCLOSURE**
**(NRS CHAPTER 19)**

Pursuant to NRS Chapter 19, as amended by Senate Bill 106, filing fees are submitted for parties appearing in the above entitled action as indicated below:

| | |
|---|---|
| Name of Plaintiff - NevWest Securities | ☑ $ 133.00 or ☐ $86.00 |
| Name of Plaintiff (or Defendant) | $30.00 |
| Name of Plaintiff (or Defendant) | $30.00 |
| Name of Plaintiff (or Defendant) | $30.00 |
| Name of Plaintiff (or Defendant) | $30.00 |
| ☐ Total of Continuation Sheet (attached) | Total from Page 2 |
| TOTAL REMITTED: (Required) | $133.00 |

DATED this __23rd__ day of _____September_____, 200 _3_ .

_____
Signature

Name:     HAROLD P. GEWERTER, ESQ.
Address:   5440 W. Sahara Ave., Suite 202
City/State/Zip: Las Vegas, NV 89146
Telephone:  (702) 382-1714
Attorney for:  Plaintiff

Initial Appearance Fee Disclosure.wpd/February 19, 2003

**EXHIBIT E**

13

# ORIGINAL

HAROLD P. GEWERTER, ESQ.
Nevada Bar #499
WENDY E. MILLER, ESQ.
Nevada Bar #6064
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Avenue, Suite 202
Las Vegas, Nevada 89146
Telephone No.: (702) 382-1714
Facsimile No.: (702) 382-1759
Attorneys for Plaintiff

*FILED*

SEP 25   3 49 PM '03

*signature*
CLERK

## DISTRICT COURT

## CLARK COUNTY, NEVADA

A474001

NEVWEST SECURITIES CORPORATION, a Nevada
Corporation

                    Plaintiff,

vs.

BRIAN MICHAEL VOLMER; 20/20 NETWORKS,
INC., a Nevada corporation; EDWARD GALLAGHER,
individually; WERNER GREIDER, individually;
CHARLES SMITH, individually; STEVEN Y. ONOUE,
individually; MEHRHAD ALBORZ, individually;
SIGNATURE STOCK TRANSFER, INC., a Texas
corporation; DEPOSITORY TRUST AND CLEARING
CORPORATION, a New York Corporation; DOES I
through X, inclusive; ROE CORPORATIONS XX
through XXX, inclusive;

                    Defendants.

CASE NO.: A471001
DEPT NO.: I

NOTICE OF POSTING BOND
CONCERNING TEMPORARY
RESTRAINING ORDER

Date of Hearing:  N/A
Time of Hearing:  N/A

        Plaintiff, by and through its attorney, HAROLD P. GEWERTER, ESQ., of HAROLD P.

GEWRTER, ESQ., LTD., hereby files this Notice of Posting Bond in accordance with THE

Temporary Restraining Order entered September 24, 2003, in the amount $2,500.  A copy of

///

///

1    Receipt No. 196964 dated September 24, 2003, from the Clark County Clerk is attached hereto.

2         Dated this 25 day of September 2003.

3

4                                    HAROLD P. GEWERTER, ESQ.
                                     Nevada Bar # 499
5                                    HAROLD P. GEWERTER, ESQ., LTD.
                                     5440 West Sahara Ave., Suite 202
6                                    Las Vegas, Nevada 89149
                                     Attorney for Plaintiff
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. A474001

**RE** NEWWEST SECURITIES CORP
Plaintiff

**vs.** BRIAN VOLMER
Defendant

196964

**OFFICE OF THE COUNTY CLERK, CLARK COUNTY, NEVADA**

Las Vegas, Nevada                         SEPTEMBER 24, 2003          , 20____

Received of _____ HAROLD P. GEWERTER ESQ. (NEWWEST SECURITIES CORP)

_____ Jury Fees ____ XXXXX ____ Bond _____ Reporter's Transcript _____ Other

Cash _____

Check $2,500.00 _____

SHIRLEY B. PARRAGUIRRE, County Clerk

By _____

KIM MARTIN

Deputy

RECEIPT

**EXHIBIT F**

# DISTRICT COURT
## CLARK COUNTY, NEVADA

NEVWEST SECURITIES CORPORATION, a
Nevada Corporation
        Plaintiff,

vs.

BRIAN MICHAEL VOLMER; 20/20
NETWORKS, INC., a Nevada corporation;
EDWARD GALLAGHER, individually; WERNER
GREIDER, individually; CHARLES SMITH,
individually; STEVEN Y. ONOUE, individually;
MEHRHAD ALBORZ, individually; SIGNATURE
STOCK TRANSFER, INC., a Texas corporation;
DEPOSITORY TRUST AND CLEARING
CORPORATION, a New York Corporation;
        Defendants.

CASE NO.:
DEPT NO.:

FILED

SEP 26  4 10 PM '03

A474001
I

## SUMMONS

**NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU
WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS. READ
THE INFORMATION BELOW.**

**TO THE DEFENDANT:** A civil Complaint has been filed by the plaintiff against you for the relief
set forth in the Complaint.

    1. If you intend to defend this lawsuit, within 20 days after this Summons is served on your
exclusive of the day of service, you must do the following:

        a. File with the Clerk of this Court, whose address is shown below, a formal written
response to the Complaint in accordance with the rules of the Court.

        b. Serve a copy of your response upon the attorney whose name and address is shown
below.

    2. Unless you respond, your default will be entered upon application of the plaintiff and this
Court may enter a judgment against you for the relief demanded in the Complaint, which could result
in the taking of money or property or other relief requested in the Complaint.

    3. If you intent to seek the advice of an attorney in this matter, you should do so promptly
so that your response may be filed on time.

Issued at direction of:

_____
CHAROLD P. GEWERTER, ESQ.
5440 W. Sahara Avenue, Suite 202
Las Vegas, Nevada 89146
(702) 382-1714
Attorney for Plaintiff

SHIRLEY B. PARRAGUIRRE, CLERK OF COURT

By: PEGGY WILCOX DISTRICT SEP 2 3 2003
    **Deputy Clerk**  COURT  Date SEAL
    200 S. Third Street
    Las Vegas, Nevada 89155

NOTE: When service is by publication, add a brief statement of the object of the action.
    See Rule of Civil Procedure, Rule 4(b).

STATE OF NEVADA      )
                           )    ss.    **AFFIDAVIT OF SERVICE**

COUNTY OF ___CLARK___    )

    ___TED CAMPBELL, II___, being duly sworn says: That at all times herein affiant was and is citizen of the United States, over 18 years of age, not a party to or interested in the proceeding in which this affidavit is made. That affiant received ____one___ copy(ies) of the Summons and Complaint, on the ___24__ day of _September___, 2003, and served the same on the __24__ day of _Sept.__, 2003 by:

### (affiant must complete the appropriate paragraph)

1.    delivering and leaving a copy with the defendant _____ at (state address) _____.

2.    serving the defendant _____ by personally delivering and leaving a copy with _____, a person of suitable age and discretion residing at the defendant's usual place of abode located at: (state address) _____.

    (Use paragraph 3 for service upon agent, completing A or B)

3.    serving the defendant _20/20 Networks, Inc.____ by personally delivering and leaving a copy at (state address) _6900 Westcliff, Suite 801, Las Vegas, NV   89145____.

    a.    with ___Lorettco____ as _Resident Agent___, an agent lawfully designated by statute to accept service of process; on behalf of Lorettco
    b.    with _Jackie Marzan  /``, pursuant to NRS 14.020 as a person of suitable age and discretion at the above address, which address is the address of the resident agent as shown on the current certificate of designation filed with the Secretary of State.

4.    personally depositing a copy in the mail box of the United States Post Office, enclosed in a sealed envelope postage prepaid (check appropriate method):
        _____ ordinary mail
        _____ certified mail, return receipt requested
        _____ registered mail, return receipt requested
    addressed to the defendant _____ at the defendant's last known address which is (state address)
*Plaintiff's Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction and Temporary Restraining Order and Certification of Counsel.

Subscribed and Sworn to before me this
_20_ day of _September___, 2003.

Signature of person making service

_____
NOTARY PUBLIC in and for said County and State
My commission expires:
(SEAL)

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
JOYCE FAHL
No. 98-21197-1
My Appointment Expires April 8, 2007

**EXHIBIT G**

# ORIGINAL

FILED
OCT 3  11 05 AM '03
[signature]
CLERK

HAROLD P. GEWERTER, ESQ.
Nevada Bar #499
WENDY E. MILLER, ESQ.
Nevada Bar #6064
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Avenue, Suite 202
Las Vegas, Nevada 89146
Telephone No.: (702) 382-1714
Facsimile No.: (702) 382-1759
Attorneys for Plaintiff

## DISTRICT COURT

## CLARK COUNTY, NEVADA

\* \* \* \* \*

A474001

| | |
|---|---|
| NEVWEST SECURITIES CORPORATION, a Nevada Corporation<br><br>Plaintiff,<br><br>Vs.<br><br>BRIAN MICHAEL VOLMER; 20/20 NETWORKS, INC., a Nevada corporation; EDWARD GALLAGHER, individually; WERNER GREIDER, individually; CHARLES SMITH, individually; STEVEN Y. ONOUE, individually; MEHRHAD ALBORZ, individually; SIGNATURE STOCK TRANSFER, INC., a Texas corporation; DEPOSITORY TRUST AND CLEARING CORPORATION, a New York Corporation; DOES I through X, inclusive; ROE CORPORATIONS XX through XXX, inclusive;<br><br>Defendants. | CASE NO.: ~~A471001~~<br>DEPT NO.: I<br><br>PLAINTIFF'S SUPPLEMENT IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION<br><br>AFFIDAVIT OF BRIAN MICHAEL VOLMER<br><br>Date of Hearing: October 6, 2003<br>Time of Hearing: 9:00 a.m. |

COMES NOW, Plaintiff NEVWEST SECURITIES CORPORATION, a Nevada corporation, by and through its attorneys, HAROLD P. GEWERTER, ESQ., and WENDY E. MILLER, ESQ., and files its Supplement in Support of its Motion for Preliminary Injunction.

## ARGUMENT

As previously argued, Plaintiff, a securities broker/dealer, was the victim of fraudulent transaction perpetrated by a shell corporation, 20/20 Networks Inc., ("TWNK"), its principals, agents, and others. Brian Michael Volmer ("Volmer"), was issued a stock certificate by TWNK

RECEIVED
OCT – 3 2003
COUNTY CLERK

1  in exchange for allegedly performing certain "telecommunications consulting services." Volmer

2  deposited said stock certificate with Plaintiff, and then proceeded to sell and transfer the shares

3  from his account with Plaintiff.   Now, TWNK illegally refuses to release the securities to

4  Plaintiff, which has placed Plaintiff in the untenable position of having to replace these 100,000

5  shares of TWNK stock by buying 100,000 shares on the open market, in a transparent effort by

6  TWNK to further inflate the price of TWNK stock.

7  Plaintiff hereby submits the Affidavit of Defendant Brian Volmer in support of its

8  Motion for Preliminary Injunction. As the Affidavit demonstrates, Defendant TWNK knowingly

9  stopped transfer of the stock certificate in order to force Plaintiff to replace the 100,000 shares by

10  purchasing them on the open market at inflated prices.

11  Brian Volmer's affidavit reinforces Plaintiff's position that Defendant TWNK cannot

12  assert an adverse claim to the securities because it has no legal basis for issuing a stop-transfer

13  order to Defendant Signature Stock Transfer, Inc.  Pursuant to NRS §104.8303, Plaintiff is a

14  protected purchaser of the 100,000 shares of TWNK stock, and is entitled to immediate delivery

15  of the shares.

16  ## CONCLUSION

17  Plaintiff has clearly demonstrated the lack of an adequate remedy at law, a likelihood of

18  prevailing on the merits, and that irreparable injury will result if Plaintiff's Motion for

19  Preliminary injunction is not granted. The amount of any bond, if required of Plaintiff, should be

20  minimal, because Defendants will suffer no loss if the injunction is granted.

21  WHEREFORE, Plaintiff respectfully requests that this honorable Court order Defendants

22  Signature Stock Transfer, Inc., and 20/20 Networks, Inc., to immediately transfer Stock

23  Certificate Number 1469 to Plaintiff.

24  DATED this _3_ day of October, 2003.

25

26  HAROLD P. GEWERTER, ESQ.
   Nevada Bar No. 499

27  5440 West Sahara Avenue, Suite 202
   Las Vegas, NV 89146

28  Attorney for Plaintiff

## CERTIFICATE OF MAILING

I hereby certify that on the _3_ day of October, 2003, I personally served a true copy of the foregoing Plaintiff's Supplement In Support Of Motion For Preliminary Injunction and Affidavit Of Brian Michael Volmer, by placing a true copy thereof in the United States Mail, postage fully prepaid, addressed as follows:

20/20 Network Networks, Inc.                Signature Stock Transfer, Inc.
c/o Lorettco, Resident Agent              c/o Jason M. Bogutski, Resident Agent
6900 Westcliff Dr., #801                   2632 Coachlight Court
Las Vegas, NV 89145                     Plano, TX 75093

_Joyce Tall_

An Agent of HAROLD P. GEWERTER, ESQ., LTD.

# AFFIDAVIT OF BRIAN MICHAEL VOLMER

STATE OF CALIFORNIA )
                      ) ss:
COUNTY OF LOS ANGELES)

I, BRIAN MICHAEL VOLMER, do solemnly swear under penalty of perjury that the assertions of this affidavit are true:

1.      I am a Defendant in a lawsuit currently pending in the State of Nevada, Eighth Judicial District, entitled <u>NevWest Securities, Inc., vs. Brian Michael Volmer et al.</u>, Case Number A474001. I am competent to testify to all matters herein on personal knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true.

2.      I have known Mike Zaman for several years. Mike Zaman is the ex-husband of Claudia Zaman, who is the corporate counsel for 20/20 Networks, Inc. Mike Zaman has admitted to me on several occasions that he personally controls 20/20 Networks, Inc., but due to having filed for bankruptcy protection, Mr. Zaman does not hold the stock of 20/20 Networks, Inc. directly. In early 2003, I approached Mr. Zaman regarding a possible deal whereby I would be hired to perform marketing services for 20/20 Networks, Inc.

3.      On or about June 19, 2003, I entered into a consulting contract with 20/20 Networks, Inc., to assist the company with creating and distributing prepaid phone cards. The period of the contract was to be twelve months. In connection with the contract, I was issued 100,000 shares of free-trading 20/20 Networks, Inc., stock, Certificate No. 1469, which certificate I deposited in my account at NevWest Securities Corporation.

4.      In August, 2003, subsequent to entering into the consulting contract with 20/20 Networks, Inc., I was informed by Ed Gallagher, the CEO of 20/20 Networks, Inc., that Mike Zaman intended to create an artificial demand for 20/20 Networks, Inc., stock by issuing S-8 stock, getting buyers to buy the stock, and then stopping transfer of the securities, thereby forcing an unsuspecting broker/dealer to have to by more stock to cover the stop-transfer. The stock price would be driven up because Mr. Zaman kept a tight control over the amount of stock

1

available for sale.  Upon receiving this information, I immediately reported it to the Securities and Exchange Commission, with whom I am cooperating in their investigation of Mr. Zaman and Mr. Gallagher.  I am informed, and thereupon believe, that Mr. Gallagher and Mr. Zaman have both profited personally from the aforementioned scheme.

5.    I have been informed, and thereupon believe, that Mike Zaman has perpetrated a similar scheme with at least three other corporations, whereby a broker/dealer or clearing company was improperly forced into buying securities to cover a short position created by Mike Zaman.  I have also been informed, and thereupon believe that Mike Zaman, Claudia Zaman, and Signature Stock Transfer, Inc., are, or were at one time, business partners in various business ventures.

6.    At no time prior to Plaintiff's filing of this lawsuit was I ever informed, either verbally or in writing, that 20/20 Networks, Inc., had placed a stop-transfer order on my stock certificate.  Likewise, I have never been informed that my contract with 20/20 Networks, Inc., has been terminated.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

DATED this **2ND** day of October, 2003.

_Brian Michael Volmer_
BRIAN MICHAEL VOLMER

SUBSCRIBED and SWORN to before me
this **2ND** day of October 2003.

_____
NOTARY PUBLIC in and for said
COUNTY and STATE.

WARREN R. WOO
Commission # 1372452
Notary Public - California
Los Angeles County
My Comm. Expires Aug 30, 2006

2

**EXHIBIT H**

1  ORDR
   HAROLD P. GEWERTER, ESQ.
2  Nevada Bar #499
   WENDY E. MILLER, ESQ.
3  Nevada Bar #6064
   HAROLD P. GEWERTER, ESQ., LTD.
4  5440 West Sahara Avenue, Suite 202
   Las Vegas, Nevada 89146
5  Telephone No.: (702) 382-1714
   Facsimile No.: (702) 382-1759
6  Attorneys for Plaintiff

7
                                    DISTRICT COURT
8
                               CLARK COUNTY, NEVADA
9

10                                    * * * * *

11  NEVWEST SECURITIES CORPORATION, a    CASE NO.: A471001
    Nevada Corporation                   DEPT NO.: I
12
               Plaintiff,
13
    Vs.                                  ORDER GRANTING PRELIMINARY
14                                       INJUNCTION

15  BRIAN MICHAEL VOLMER; 20/20
    NETWORKS, INC., a Nevada corporation;  Date of Hearing: October 6, 2003
16  EDWARD GALLAGHER, individually;        Time of Hearing: 9:00 a.m.
    WERNER GREIDER, individually;
17  CHARLES SMITH, individually; STEVEN Y.
    ONOUE, individually; MEHRHAD ALBORZ,
18  individually; SIGNATURE STOCK
    TRANSFER, INC., a Texas corporation;
19  DEPOSITORY TRUST AND CLEARING
    CORPORATION, a New York Corporation;
20  DOES I through X, inclusive; ROE
    CORPORATIONS XX through XXX,
21  inclusive;

22             Defendants.

23         This matter having come on for hearing on Plaintiff's Motion for Preliminary

24  Injunction, the Plaintiff appearing through its attorney, HAROLD P. GEWERTER, ESQ., of

25  HAROLD P. GEWERTER, ESQ., LTD., the Court having reviewed all papers and pleadings on

26  file herein, being fully advised in the premises, and it appearing to the satisfaction of the Court

27  that the parties affected by the Temporary Restraining Order and this Preliminary Injunction

28  have been duly served, and good cause appearing, now therefore,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Court having determined that Plaintiff will suffer irreparable harm if the Preliminary injunction is not granted, Plaintiff's Motion for Preliminary Injunction is hereby granted;

IT IS FURTHER ORDERED ADJUDGED AND DECREED that Plaintiff is a protected purchaser of the 100,000 shares of TWNK stock, Certificate Number 1469, pursuant to NRS 104.8303, as there is no basis in fact or law for the stop transfer order placed by Defendant 20/20 Networks, Inc. to Defendant Signature Stock Transfer, Inc., and possibly others.

IT IS FURTHER ORDERED ADJUDGED AND DECREED that because Certificate Number 1469 has already been released by Signature Stock Transfer, Inc., upon granting of the Temporary Restraining Order entered in this matter, that the bond posted by the Plaintiff in the amount of $2,500 cash with the Clerk of the Court, is hereby exonerated and the Clerk is directed to forthwith release $2,500 to Plaintiff.

IT IS FURTHER ORDERED ADJUDGED AND DECREED that Defendants 20/20 Networks, Inc., Signature Stock Transfer, Inc., their agents, employees, assigns, and representatives are enjoined from placing or honoring any stop-transfer order or otherwise impeding the free tradability of the 20/20 Networks, Inc., securities underlying Certificate No. 1469 consisting of 100,000 shares of TWNK stock.

DATED this _____ day of October, 2003.


GENE T. PORTER
_____
DISTRICT COURT JUDGE

Respectfully Submitted:


_____
HAROLD P. GEWERTER, ESQ.
Nevada Bar No. 499
5440 W. Sahara Avenue, Suite 202
Las Vegas, NV 89146
Attorney for Plaintiff

**EXHIBIT I**

# ORIGINAL



1  NOTC
   HAROLD P. GEWERTER, ESQ.
2  Nevada Bar #499
   WENDY E. MILLER
3  Nevada Bar #6064
   HAROLD P. GEWERTER, ESQ., LTD.
4  5440 West Sahara Avenue, Suite 202
   Las Vegas, Nevada 89146
5  Telephone No.: (702) 382-1714
   Facsimile No.: (702) 382-1759
6  Attorneys for Plaintiff

7                    DISTRICT COURT

8                 CLARK COUNTY, NEVADA

9                      * * * * *

10 NEVWEST SECURITIES CORPORATION, a          CASE NO.: A474001
   Nevada Corporation                         DEPT NO.:  I
11
12         Plaintiff,

13 vs.                                         NOTICE AND JUDGMENT OF
                                               DISMISSAL OF DEFENDANT
14 BRIAN MICHAEL VOLMER; 20/20                 DESPISOTRY TRUST AND CLEARING
   NETWORKS, INC., a Nevada corporation;       CORPORATION
15 EDWARD GALLAGHER, individually;
   WERNER GREIDER, individually; CHARLES       Hearing Date: N/A
16 SMITH, individually; STEVEN Y. ONOUE,       Hearing Time: N/A
   individually; MEHRHAD ALBORZ, individually;
17 SIGNATURE STOCK TRANSFER, INC., a
   Texas corporation; DEPOSITORY TRUST AND
18 CLEARING CORPORATION, a New York
   Corporation; DOES I through X, inclusive; ROE
19 CORPORATIONS XX through XXX, inclusive;
20
           Defendants.
21
22
23         The Defendant DEPOSITORY TRUST AND CLEARING CORPORATION, a
24 New York Corporation, not having filed or served an answer, motion for summary judgment or
25 otherwise having appeared herein; the plaintiff in the above-entitled action as to the Defendant
26 ///
27 ///
28

                              1

1   DEPOSITORY TRUST AND CLEARING CORPORATION requests, authorizes and directs the

2   Clerk of Court to enter a judgment of dismissal as to Defendant DEPOSITORY TRUST AND

3   CLEARING CORPORATION.

4         DATED this _8_ day of October, 2003.

5

6

7                                  HAROLD P. GEWERTER, ESQ.
                                   Nevada Bar No. 499

8                                  5440 W. Sahara Avenue, Suite 202
                                 Las Vegas, NV 89146

9                                  Attorney for Plaintiff

10

11

                          * * * * * *

12

13         On application of the Plaintiff, no answer, motion for summary judgment or other

14   appearance having been filed or served by the Defendant DEPOSITORY TRUST AND

15   CLEARING CORPORAITON, a notice of the dismissal of this action having been duly signed,

16   the above entitled action as to Defendant DEPOSITORY TRUST AND CLEARING

17   CORPORATION is hereby dismissed.        SHIRLEY B. PARRAGUIRRE

18                                CLERK OF COURT

19                                               OCT 0 8 2003

20                     By: _____
                      Deputy Clerk        Date

21                                       LOUELLA MYERS

22

23

24

25

26

27

28

                            2

**EXHIBIT J**

ORIGINAL



1  NOTC
   HAROLD P. GEWERTER, ESQ.
2  Nevada Bar #499
   WENDY E. MILLER, ESQ.
3  Nevada Bar #6064
   HAROLD P. GEWERTER, ESQ., LTD.
4  5440 West Sahara Avenue, Suite 202
   Las Vegas, Nevada 89146
5  Telephone No.: (702) 382-1714
   Facsimile No.: (702) 382-1759
6  Attorneys for Plaintiff

7

8                          DISTRICT COURT

9                       CLARK COUNTY, NEVADA

10                           * * * * *

11 NEVWEST SECURITIES CORPORATION, a      CASE NO.: A474001
   Nevada Corporation                      DEPT NO.: I
12
            Plaintiff,                     **NOTICE OF ENTRY OF ORDER
13                                         GRANTING PRELIMINARY
   Vs.                                     INJUNCTION**
14
   BRIAN MICHAEL VOLMER; 20/20
15 NETWORKS, INC., a Nevada corporation;   Hearing Date: 10/6/03
   EDWARD GALLAGHER, individually;        Hearing Time: 9:00 a.m.
16 WERNER GREIDER, individually; CHARLES
   SMITH, individually; STEVEN Y. ONOUE,
17 individually; MEHRHAD ALBORZ,
   individually; SIGNATURE STOCK TRANSFER,
18 INC., a Texas corporation; DEPOSITORY
   TRUST AND CLEARING CORPORATION, a
19 New York Corporation; DOES I through X,
   inclusive; ROE CORPORATIONS XX through
20 XXX, inclusive;

21          Defendants.

22         Please take notice, an Order Granting Preliminary Injunction was entered on the 8th

23 day of October, 2003.  A true and correct copy of said Order is attached hereto.

24

25         DATED this __9__ day of October, 2003.

26
                                          _____
                                          HAROLD P. GEWERTER, ESQ.
                                          Nevada Bar No. 499
                                          5440 W. Sahara Avenue, Suite 202
                                          Las Vegas, NV 89146
                                          Attorney for Plaintiff

RECEIVED
OCT 1 0 2003
COUNTY CLERK

## CERTIFICATE OF MAILING

I hereby certify that on the _9_ day of October, 2003, I personally served a true copy of the foregoing  Notice of Entry of Order Granting Preliminary Injunction, by placing a true copy thereof in the United States Mail, postage fully prepaid, addressed as follows:

20/20 Network Networks, Inc.          Signature Stock Transfer, Inc.
c/o Lorettco, Resident Agent          c/o Jason M. Bogutski, Resident Agent
6900 Westcliff Dr., #801              2632 Coachlight Court
Las Vegas, NV  89145                  Plano, TX  75093

_Candace Vega_

An Agent of HAROLD P. GEWERTER, ESQ., LTD.

1  ORDR
   HAROLD P. GEWERTER, ESQ.
2  Nevada Bar #499
   WENDY E. MILLER, ESQ.
3  Nevada Bar #6064
   HAROLD P. GEWERTER, ESQ., LTD.
4  5440 West Sahara Avenue, Suite 202
   Las Vegas, Nevada 89146
5  Telephone No.: (702) 382-1714
   Facsimile No.: (702) 382-1759
6  Attorneys for Plaintiff

7

8                        DISTRICT COURT

9                     CLARK COUNTY, NEVADA

10                          * * * * *

11 NEVWEST SECURITIES CORPORATION, a       CASE NO.: A471001
   Nevada Corporation                      DEPT NO.: I

12        Plaintiff,

13 Vs.                                      ORDER GRANTING PRELIMINARY
                                           INJUNCTION
14
   BRIAN MICHAEL VOLMER; 20/20
15 NETWORKS, INC., a Nevada corporation;    Date of Hearing: October 6, 2003
   EDWARD GALLAGHER, individually;          Time of Hearing: 9:00 a.m.
16 WERNER GREIDER, individually;
   CHARLES SMITH, individually; STEVEN Y.
17 ONOUE, individually; MEHRHAD ALBORZ,
   individually; SIGNATURE STOCK
18 TRANSFER, INC., a Texas corporation;
   DEPOSITORY TRUST AND CLEARING
19 CORPORATION, a New York Corporation;
   DOES I through X, inclusive; ROE
20 CORPORATIONS XX through XXX,
   inclusive;
21
          Defendants.
22

23        This matter having come on for hearing on Plaintiff's Motion for Preliminary

24 Injunction, the Plaintiff appearing through its attorney, HAROLD P. GEWERTER, ESQ., of

25 HAROLD P. GEWERTER, ESQ., LTD., the Court having reviewed all papers and pleadings on

26 file herein, being fully advised in the premises, and it appearing to the satisfaction of the Court

27
   that the parties affected by the Temporary Restraining Order and this Preliminary Injunction
28
   have been duly served, and good cause appearing, now therefore,

1    IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Court having

2    determined that Plaintiff will suffer irreparable harm if the Preliminary injunction is not granted,

3    Plaintiff's Motion for Preliminary Injunction is hereby granted;

4    IT IS FURTHER ORDERED ADJUDGED AND DECREED that Plaintiff is a protected

5    purchaser of the 100,000 shares of TWNK stock, Certificate Number 1469, pursuant to NRS

6    104.8303, as there is no basis in fact or law for the stop transfer order placed by Defendant 20/20

7    Networks, Inc. to Defendant Signature Stock Transfer, Inc., and possibly others.

8    IT IS FURTHER ORDERED ADJUDGED AND DECREED that because Certificate

9    Number 1469 has already been released by Signature Stock Transfer, Inc., upon granting of the

10   Temporary Restraining Order entered in this matter, that the bond posted by the Plaintiff in the

11   amount of $2,500 cash with the Clerk of the Court, is hereby exonerated and the Clerk is directed

12   to forthwith release $2,500 to Plaintiff.

13   IT IS FURTHER ORDERED ADJUDGED AND DECREED that Defendants 20/20

14   Networks, Inc., Signature Stock Transfer, Inc., their agents, employees, assigns, and

15   representatives are enjoined from placing or honoring any stop-transfer order or otherwise

16   impeding the free tradability of the 20/20 Networks, Inc., securities underlying Certificate No.

17   1469 consisting of 100,000 shares of TWNK stock.

18   DATED this _____ day of October, 2003.

19

20

21                                              GENE T. PORTER
                                        _____
22                                          DISTRICT COURT JUDGE

22   Respectfully Submitted:

23

24

25   _____
     HAROLD P. GEWERTER, ESQ.
26   Nevada Bar No. 499
     5440 W. Sahara Avenue, Suite 202
27   Las Vegas, NV 89146
     Attorney for Plaintiff

28

**EXHIBIT K**

1  ACOM
HAROLD P. GEWERTER, ESQ.
2  Nevada Bar #499
WENDY E. MILLER, ESQ.
3  Nevada Bar #6064
HAROLD P. GEWERTER, ESQ., LTD.
4  5440 West Sahara Avenue, Suite 202
Las Vegas, Nevada 89146
5  Telephone No.: (702) 382-1714
Facsimile No.: (702) 382-1759
6  Attorneys for Plaintiff

7

FILED

Oct 14  4 ⋮ PM '03

_Linda B. Languine_
CLERK

8                    DISTRICT COURT

9               CLARK COUNTY, NEVADA

10                    * * * * *

11  NEVWEST SECURITIES CORPORATION, a
Nevada Corporation          CASE NO.: A474001
12                              DEPT NO.: I
        Plaintiff,
13
    vs.                         PLAINTIFF'S FIRST AMENDED
14                              COMPLAINT FOR:
BRIAN MICHAEL VOLMER; 20/20
15  NETWORKS, INC., a Nevada corporation;   1.  SECURITIES FRAUD;
EDWARD GALLAGHER, individually;           2.  CONVERSION;
16  WERNER GREIDER, individually;           3.  NEGLIGENCE;
CHARLES SMITH, individually; STEVEN Y.    4.  BREACH OF CONTRACT;
17  ONOUE, individually; MEHRHAD ALBORZ,    5.  DECLARATORY RELIEF;
individually; CLAUDIA ZAMAN; MICHAEL      6.  FRAUD;
18  ZAMAN; SIGNATURE STOCK TRANSFER,       7.  INJUNCTIVE RELIEF
INC., a Texas corporation; WELLS FARGO
19  INVESTMENTS, LLC, a Delaware limited
liability company; DEPOSITORY TRUST      ARBITRATION EXEMPT:
20  AND CLEARING CORPORATION, a New        EXTRAORDINARY RELIEF
York Corporation; DOES I through X,      REQUESTED
21  inclusive; ROE CORPORATIONS XX
through XXX, inclusive;
22
23          Defendants.

24

25      COMES NOW, Plaintiff NEVWEST SECURITIES CORPORATION, a Nevada

26  corporation, by and through its attorneys, HAROLD P. GEWERTER, ESQ., and WENDY E.

27  MILLER, ESQ., and for its Amended Complaint, complains and alleges as follows:

28

                                    1

## GENERAL ALLEGATIONS

1.   Plaintiff NEVWEST SECURITIES CORPORATON is a Nevada corporation doing business in Clark County, Nevada.

2. Defendant BRIAN MICHAEL VOLMER (hereinafter "VOLMER") is a resident of the State of California doing business in Clark County, Nevada.

3. Defendant 20/20 NETWORKS, INC. (hereinafter "TWNK") is a Nevada corporation doing business in Clark County, Nevada.

4. Defendant SIGNATURE STOCK TRANSFER, INC., (hereinafter "SIGNATURE") is a Texas corporation.

5. Upon information and belief, Defendant EDWARD GALLAGHER (hereinafter "GALLAGHER") is a resident of Canada, doing business in Clark County, Nevada.

6. Upon information and belief, Defendant CHARLES SMITH (hereinafter "SMITH") is a resident of the State of Texas, doing business in Clark County, Nevada.

7. Upon information and belief, Defendant WERNER GREIDER (hereinafter "GREIDER") is a resident of the State of California, doing business in Clark County, Nevada.

8. Upon information and belief, Defendant MICHAEL ZAMAN is a resident of the State of California, doing business in Clark County, Nevada.

9. Upon information and belief, Defendant CLAUDIA ZAMAN is a resident of the State of California, doing business in Clark County, Nevada.

10. Upon information and belief, Defendant STEVEN Y. ONOUE (hereinafter "ONOUE") is a resident of the State of California, doing business in Clark County, Nevada.

11. Upon information and belief, Defendant MEHRHAD ALBORZ (hereinafter "ALBORZ") is a resident of the State of California, doing business in Clark County, Nevada.

12. At all times relevant hereto, Defendant WELLS FARGO INVESTMENTS, LLC (hereinafter "WFI") was a Delaware limited liability company doing business in Clark County, Nevada.

2

13. At all times relevant hereto, Defendant DEPOSITORY TRUST AND CLEARING CORPORATION (hereinafter "DTC") was a New York corporation doing business in Clark County, Nevada.

14. The true names of Defendants DOES I through X, inclusive, and ROE CORPORATIONS XX through XXX, inclusive, whether individual, corporate, associate or otherwise are unknown to Plaintiff, who therefore sues such defendants by fictitious names. Plaintiff is informed and thereupon alleges that each of the defendants designated herein as a DOE or ROE CORPORATION is in some way responsible for the damages claimed by Plaintiff herein Plaintiff will ask leave of this Court to amend this Complaint to insert the true names and capacities of Defendants DOES I through X, inclusive and ROE CORPORATIONS XX through XXX, inclusive, when the identities have been ascertained, to formulate appropriate allegations, and to join such Defendants in this action.

15. Plaintiff is a licensed member firm of the National Association of Securities Dealers (NASD). Plaintiff is a broker/dealer headquartered in Las Vegas, Nevada.

16. Upon information and belief, on or about June 19, 2003, Defendant VOLMER and Defendant TWNK entered into an Independent Contractor/Consultant agreement whereby Defendant VOLMER would be issued 100,000 free-trading shares of common stock of Defendant 20/20 in exchange for providing certain consulting services to Defendant TWNK. The shares were registered in an S-8 filing with the Securities and Exchange Commission on June 24, 2003. Upon information and belief, Defendant TWNK, Defendants GALLAGHER, GREIDER, SMITH, ONOUE and ALBORZ, the officers and directors of Defendant TWNK, Defendant CLAUDIA ZAMAN, corporate counsel for Defendant TWNK, and Defendant MICHAEL ZAMAN, a major shareholder of Defendant TWNK, hired Defendant VOLMER, a known stock touter, to pump up the price of Defendant TWNK stock through illegal trades, via an account held with Plaintiff, in violation of applicable securities laws.

17. Plaintiff is informed and believes that at all times relevant hereto, Defendants GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN were shareholders, officers, and directors, and/or control persons, directly or indirectly,

3

1  of Defendant TWNK and treated Defendant TWNK and its finances as a mere shell,
2  instrumentality, and conduit through which each of the Defendants carried on business in name
3  only, exercising control and dominance of such business to such an extent that any individuality
4  or separateness of Defendant TWNK did not exist, and to maintain the fiction of a separate
5  business entity would promote fraud and sanction injustice, such that the Defendant TWNK and
6  Defendants GALLAGHER, GREIDER, SMITH, ONOUE ALBORZ, CLAUDIA ZAMAN and
7  MICHAEL ZAMAN should be treated as the alter egos of one another.

8  18. On or about June 26, 2003, Defendant VOLMER deposited with Plaintiff the certificate
9  number 1469 dated June 24, 2003 representing 100,000 shares of 20/20 Networks, Inc. (CUSIP
10 No. 90137B 10 2) in the name of Defendant VOLMER. The certificate was free of any
11 restrictive legend and, as such, constituted good delivery for deposit in a securities account.

12 19. On July 1, 2003, Plaintiff forwarded to its securities clearing firm, Defendant WFI, at
13 their St. Louis office, a stock power to clear the 100,000 shares of Defendant TWNK; Defendant
14 WFI received the stock power on July 2nd and forwarded the stock power to WFI Minneapolis
15 Security Processing.

16 20. On July 1, 2003, Defendant VOLMER instructed Plaintiff to journal 5,000 shares of
17 Defendant TWNK from Defendant VOLMER's account to account 052-8758-8217, Wells
18 Capital, which was completed on July 10, 2003.

19 21. On July 7, 2003, Defendant WFI, acting in the clearing firm capacity for Plaintiff,
20 received the certificate number 1469 and recorded 100,000 shares of Defendant TWNK as a
21 fully paid and segregated securities position in the account number 052-8594-3619 in the name
22 of Brian M. Volmer. In accordance with applicable rules and industry standards, WFI forwarded
23 the certificate number 1469 to Defendant SIGNATURE, Defendant TWNK's transfer agent, via
24 Defendant DTC for transfer into "street name."

25 22. On July 7, 2003, Defendant VOLMER instructed Plaintiff to journal 8,500 shares of
26 Defendant TWNK from Defendant VOLMER's account to account 052-8236-6469, John R.
27 Switzer, which was completed on July 10, 2003.

28

4

23. On July 8, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to sell 15,000 shares of Defendant TWNK from the Defendant VOLMER account at $0.90 per share. The trade was executed at $0.90 a share.

24. On July 8, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.25 per share. The trade was executed at $1.25 a share.

25. On July 8, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to sell 2,500 shares of Defendant TWNK from the Defendant VOLMER account at $1.15 per share. The trade was executed at $1.15 a share.

26. On July 9, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 500 shares of Defendant TWNK for the Defendant VOLMER account at $1.20 per share. The trade was executed at $1.19 a share.

27. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 2,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.20 per share. The trade was executed at $1.20 a share.

28. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.20 per share. The trade was executed at $1.20 a share.

29. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.30 per share. The trade was executed at $1.30 a share.

30. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.30 per share. The trade was executed at $1.30 a share.

31. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 1,000 shares of Defendant TWNK for the Defendant VOLMER account at $1.30 per share. The trade was executed at $1.30 a share.

32. On July 10, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to buy 500 shares of Defendant TWNK for the Defendant VOLMER account at $1.40 per share. The trade was executed at $1.40 a share.

33. On July 11, 2003, Defendant VOLMER instructed Plaintiff to wire all available funds ($4,430.00) to a bank account in California.

34. On July 14, 2003, Defendant VOLMER instructed Plaintiff to electronically transfer 70,000 shares of Defendant TWNK from his personal account, to an account held by Titan Group, LLC at Fiserv Investor Services.  Plaintiff executed this transfer on the same day.

35. On July 17, 2003, Defendant VOLMER instructed Plaintiff to enter an unsolicited day order to sell 7,090 shares of Defendant TWNK from the Defendant VOLMER account at $0.35 per share. The trade was executed at $0.35 a share.

36. On August 7, 2003, Defendant VOLMER instructed Plaintiff to wire all available funds ($1,645.00) to a bank account held by Defendant VOLMER in California.

37. On August 11, 2003 Defendant DTC, which is Defendant WFI's clearing company, informed Defendant WFI of a stop transfer placed on the certificate through the transfer agent by Defendant TWNK.  This was the first time Defendant WFI was informed of any alleged impropriety pertaining to these securities.

38. On August 13, 2003, WFI first informed Plaintiff of the stop transfer via e-mail and emailed Plaintiff a stop release letter. This was the first time Plaintiff was notified of any alleged impropriety pertaining to these securities.

39. On September 22, 2003 Defendant DTC debited Defendant WFI for the full 100,000 shares.  Defendant WFI has indicated that it expected to debit Plaintiff in turn, forcing Plaintiff to replace these 100,000 shares by purchasing same in the open market under inflated and fraudulent conditions as a consequence of overt market manipulation.

40. At no time, prior to or concurrent with the legitimate and bonafide sales made at the direction of an entitlement order, was Plaintiff or Defendant WFI notified of any adverse claim affecting the Defendant TWNK stock in the Defendant VOLMER account, including but not limited to any claim that Defendant TWNK Certificate no. 1469 presented for deposit by the

6

customer had concerning any impediment on its transferability. Plaintiff and Defendant WFI were never apprised of any adverse claim until well after the sales and transfer occurred. At no time prior to the sales and transfer of the Defendant TWNK stock did anyone notify Plaintiff or Defendant WFI of any violation of any claimant(s)' right arising from Plaintiff's and Defendant WFI's sale or transfer of the TWNK stock which sales and transfer occurred at the direction of the customer under a bonafide entitlement order.

41. On September 22, 2003, Defendant SIGNATURE informed Plaintiff, via fax, that the Stop Transfer order could only be lifted by court order or by the issuer.

42. Plaintiff has demanded that Defendant TWNK lift the stop-transfer order, but Defendant TWNK refused to lift the stop-transfer order.

43. As a result of the above actions, Defendant DTC has debited the account of Defendant WFI for the 100,000 shares of TWNK. If the stop-transfer order were not released immediately, WFI would require Plaintiff to purchase 100,000 shares of Defendant TWNK on the open market to replace the 100,000 shares that have been debited by Defendant DTC. Upon information and belief, Defendant TWNK, and Defendants GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN, the officers and directors, shareholders and corporate counsel of Defendant TWNK, intentionally stopped transfer of the certificate in order to illegally force Plaintiff to buy 100,000 shares of Defendant TWNK on the open market, in order to further drive up the price of TWNK stock.

44. On September 23, 2003, Plaintiff commenced the instant action to enjoin Defendants TWNK and SIGNATURE from stopping transfer of the securities underlying TWNK stock Certificate No. 1469. On October 6, 2003, a hearing was held on Plaintiff's unopposed Motion for Preliminary Injunction, wherein the Court found that Plaintiff was a protected purchaser of TWNK stock Certificate No. 1469, and Defendants TWNK, SIGNATURE, their agents, employees, assigns, and representatives are enjoined from placing or honoring any stop-transfer order or otherwise impeding the free tradability of the 20/20 Networks, Inc., securities underlying Certificate No. 1469 consisting of 100,000 shares of TWNK stock.

45. Subsequently, Defendant WFI obtained a new stock certificate from Defendant

SIGNATURE in the name of WFI, to replace Certificate No. 1469. Defendant WFI then instructed Plaintiff to dismiss Defendant DTC from the instant action or risk liability for Defendant DTC's legal expenses.

46. Upon information and belief, Defendant DTC now refuses, without any legal basis whatsoever, to honor the new stock certificate which Defendant WFI has attempted to deposit with Defendant DTC, thereby reinstating the debit of 100,000 shares of Defendant TWNK stock. Defendant WFI has expressed to Plaintiff its intent to now purchase 100,000 additional shares of TWNK stock on the open market, and charge the purchase price against Plaintiff, which price will likely put Plaintiff out of business.

## FIRST CAUSE OF ACTION

(Securities Fraud- Against Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, MICHAEL ZAMAN and CLAUDIA ZAMAN)

47. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 46, above, as if fully set forth herein.

48. Plaintiff is a purchaser of TWNK securities, pursuant to UCC §8-116 and NRS §104.8116.

49. The Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN, by the use and means of instrumentalities of interstate commerce and of the mails, directly or indirectly and knowingly or with reckless disregard committed the following acts:

a.    employed a device, scheme and artifice to defraud;

b.    obtained money and property by means of untrue statements of material facts and of omission to state material facts necessary in order to make the statements made in light of the circumstances under which they are made, not misleading; and

c.    engaged in transactions, practices and a course of conduct which operated as a fraud and deceit on the Plaintiff, all with reference to the facts, acts and omissions set forth in this Complaint.

8

50. Specifically, Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN Stock Certificate No. 1469 to Defendant VOLMER for the illegal purpose of stock price manipulation. Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN then agreed to deposit Certificate No. 1469 with Plaintiff. Plaintiff reasonably relied on Defendants' false representations that the certificate was a valid certificate for 100,000 shares of free trading TWNK stock. These representations were material to Plaintiff becoming a purchaser of TWNK stock, as set forth in NRS 104.8116. That these representations were false is evidenced by the fact that Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN refused to release transfer of the certificate to Plaintiff, even though Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN have no legal reason to stop transfer of the securities. Defendants made these material misrepresentations in order to induce Plaintiff to deposit Certificate 1469 in Defendant VOLMER's account and permit Defendant VOLMER to transfer the securities evidenced by Certificate 1469.

51. That defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN knew that their representations to Plaintiff were false is also demonstrated by the fact that Defendants MICHAEL ZAMAN and CLAUDIA ZAMAN, who were husband and wife, have previously engaged in the fraudulent issuance of S-8 stock, leading to a permanent injunction by the Securities and Exchange Commission against Defendant MICHAEL ZAMAN from ever participating in any broker-dealer activities.

52. The actions of Defendants constitute violations of NRS §90.570, the Securities Act of 1933, the Securities Exchange Act of 1934, Rule 10b-5 of the General Rules and Regulations as promulgated by the Securities and Exchange Commission, codified at 15 U.S.C. §78j, and the Rules and Regulations of the New York Stock Exchange and the National Association of Securities Dealers. Defendants GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN are "control persons" under section 20(a) of the

Securities Exchange Act, and are therefore liable to Plaintiff for any fraud committed by Defendant TWNK.

53. As a direct and proximate result of the securities fraud as set forth above, Plaintiff has sustained damages in an amount to be shown according to proof at the time of trial. Additionally, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

54. As a further direct and proximate result of the securities fraud as set forth above, Plaintiff has been required to retain the services of an attorney to prosecute this action and is entitled to an award of reasonable attorney's fees and costs incurred herein.

## SECOND CAUSE OF ACTION

### (Conversion—against Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN)

55. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 54, above, as if fully set forth herein.

56. As a result of the acts complained of above, Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, CLAUDIA ZAMAN and MICHAEL ZAMAN have wrongfully converted to their own use more than 100,000 shares of TWNK stock from Plaintiff's account with WFI.

57. As a direct and proximate result of the conversion as set forth above, Plaintiff has sustained damages in a sum in excess of $10,000 in an amount to be shown according to proof at the time of trial. Additionally, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

58. As a further direct and proximate result of Defendants' conversion, as set forth above, Plaintiff has been required to retain the services of an attorney to prosecute this action and is entitled to an award of reasonable attorney's fees and costs incurred herein.

10

## THIRD CAUSE OF ACTION

### (Negligence—Against Defendants SIGNATURE STOCK TRANSFER, INC., TWNK, WFI AND DTC)

59. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 58, above, as if fully set forth herein.

60. Defendants SIGNATURE STOCK TRANSFER, INC., WFI, and DTC are Securities Intermediaries, as defined at NRS §104.8102(1)(n).

61. Plaintiff and Defendant WFI are Entitlement Holders of TWNK Certificate No. 1469, as defined at NRS §104.8102(1)(h).  Plaintiff and Defendant WFI are also Protected Purchasers of Certificate No. 1469, as defined at NRS §104.8033.

62. Defendants DTC and SIGNATURE breached their legal and fiduciary duties to Plaintiff and Defendant WFI when they honored Defendant TWNK's adverse claim to Plaintiff's and Defedant WFI's rights as Protected Purchasers of TWNK Certificate No. 1469.

63. Defendant DTC further breached its legal and fiduciary duties to Plaintiff and Defendant WFI when it refused to honor the replacement certificate for 100,000 shares of free trading TWNK stock obtained by Defendant WFI.

64. Defendant WFI then breached its duty to Plaintiff as a protected purchaser under California UCC §8303 when it informed Plaintiff that it was going to buy in 100,000 shares of TWNK stock and charge the purchase price to Plaintiff's account with Defendant WFI, even though Plaintiff had successfully sued to obtain delivery of the securities underlying TWNK Certficiate No. 1469.

65. Defendant TWNK breached its duty to Plaintiff and Defendant WFI under NRS §104.8401 to register the transfer of Certificate No. 1469 to WFI when the certificate was presented to Plaintiff's transfer agent.

66. Defendants' breaches of their respective legal duties, as set forth above, constitute negligence.  As a result of Defendants' negligence, Plaintiff has incurred damages in excess of $10,000, in an amount to be determined at trial.

67. As a further direct and proximate result of Defendants' negligence, as set forth above,

Plaintiff has been required to retain the services of an attorney to prosecute this action and is entitled to an award of reasonable attorney's fees and costs incurred herein.

## FOURTH CAUSE OF ACTION

### (Breach of Contract—Against Defendant WFI)

68. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 67, above, as if fully set forth herein.

69. The contract between Plaintiff and Defendant WFI provides at Paragraph 9.5 that the Correspondent (Plaintiff) is responsible for obtaining from each Customer such funds or securities as are required to be deposited or maintained in Accounts. Correspondent shall be responsible to the Clearing Firm (Defendant WFI) for delivery of the securities in the Accounts until acceptable deliveries of such securities has been completed. Plaintiff achieved acceptable delivery of the 100,000 shares of TWNK stock underlying TWNK Certificate No. 1469 when it obtained an Order of Preliminary Injunction, against Defendants TWNK and SIGNATURE in this matter, allowing Defendant WFI to obtain a new certificate for 100,000 shares of free trading TWNK stock.

70. Notwithstanding the above, Defendant WFI now intends to buy in 100,000 additional shares of TWNK stock, at Plaintiff's expense, because Defendant DTC refuses to accept deposit of the new TWNK certificate issued in the name of Defendant WFI. This constitutes anticipatory repudiation of the contract between Plaintiff and Defendant WFI, and a violation of Paragraph 11.1.3 of the Contract, which permits a "buy-in" only when the securities have not been delivered in acceptable form.

71. As a result of Defendant WFI's anticipatory repudiation of its contract with Plaintiff, Plaintiff has suffered damages in excess of $10,000 in an amount to be determined at trial.

72. As a further and direct result of Defendant WFI's breach of its contract with Plaintiff, Plaintiff has been required to retain the services of an attorney to prosecute this action and is entitled to an award of reasonable attorney's fees and costs incurred herein.

12

## FIFTH CAUSE OF ACTION

### (Declaratory Relief—Against all Defendants)

73. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 72, above, as if fully set forth herein.

74. Plaintiff brings this claim pursuant to NRCP Rule 57. A case of actual controversy exists between Plaintiff and Defendants.

75. As set forth above, as a result of the wrongful refusal to transfer stock certificate number 1469 to WFI, for the benefit of Plaintiff, Plaintiff's account with WFI will be debited 100,000 shares of Defendant TWNK stock.

76. Plaintiff is entitled to an order from the Court declaring the rights and relationships between Plaintiff and Defendants, and further declaring that Plaintiff is the protected purchaser of Stock certificate number 1469 of Defendant TWNK, and Defendant TWNK had no legal authority to stop transfer of Certificate 1469, and that Defendants SIGNATURE STOCK TRANSFER and DTC, pursuant to UCC Article 8, the DTCC rules, and applicable New York and Federal law, cannot honor any claims adverse to Plaintiff's ownership of TWNK stock Certificate No. 1469.

77. Plaintiff is further entitled to an order of the Court declaring that the obtaining of the Preliminary Injunction against Defendants TWNK and SIGNATURE, allowing Defendant WFI to obtain a new stock certificate for 100,000 free-trading shares of Defendant TWNK stock constitutes "delivery in acceptable form" as set forth in Plaintiff's contract with Defendant WFI.

## SIXTH CAUSE OF ACTION

### (Fraud—Against Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, MICHAEL ZAMAN and CLAUDIA ZAMAN)

78. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 77, above, as if fully set forth herein.

79. As set forth above, Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, MICHAEL ZAMAN and CLAUDIA ZAMAN issued TWNK Stock Certificate No. 1469 to Defendant VOLMER for the illegal purpose of stock price manipulation. Defendants

13

VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, MICHAEL ZAMAN and CLAUDIA ZAMAN then agreed to deposit Certificate No. 1469 with Plaintiff. Plaintiff reasonably relied on Defendants' false representations that the certificate was a valid certificate for 100,000 shares of free trading TWNK stock. These representations were material to Plaintiff becoming a purchaser of TWNK stock, as set forth in NRS 104.8116. That these representations were false is evidenced by the fact that Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, MICHAEL ZAMAN and CLAUDIA ZAMAN refuse to release transfer of the certificate to Plaintiff, even though Defendants TWNK, GALLAGHER, GREIDER, SMITH, ONOUE, ALBORZ, MICHAEL ZAMAN and CLAUDIA ZAMAN have no legal reason to stop transfer of the securities.    Defendants made these material misrepresentations in order to induce Plaintiff to deposit Certificate 1469 in Defendant VOLMER's account and permit Defendant VOLMER to transfer the securities evidenced by Certificate 1469.

80. As a direct and proximate result of the fraud as set forth above, Plaintiff has sustained damages in excess of $10,000, in an amount to be shown according to proof at the time of trial. Additionally, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

81. As a further direct and proximate result of the fraud as set forth above, Plaintiff has been required to retain the services of an attorney to prosecute this action and is entitled to an award of reasonable attorney's fees and costs incurred herein.

## SEVENTH CAUSE OF ACTION

### (Injunctive Relief--- Against all Defendants)

82. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 81, above, as if fully set forth herein.

83. As set forth above, Defendant DTC wrongfully refuses to accept Defendant WFI's deposit of the certificate evidencing 100,000 shares of Defendant TWNK stock. Defendant WFI, rather than insist that Defendant DTC accept the new stock certificate, is going to purchase an additional 100,000 shares of Defendant TWNK stock and charge that purchase to Plaintiff.

1  Plaintiff will be driven out of business if Defendant WFI charges Plaintiff for the buy-in of

2  100,000 shares of TWNK stock.  Plaintiff has no adequate remedy at law for this injury.

3    84. Defendants VOLMER, TWNK, GALLAGHER, GREIDER, SMITH, ONOUE and

4  ALBORZ have conspired to manipulate the price of Defendant TWNK stock such that it

5  presumptively trades at $.80 per share, although because of the lack of shares currently trading,

6  the price could easily rise to more than $4 per share.  This means that to cover this debit

7  wrongfully assigned to Plaintiff, Plaintiff would have to come up with more than $250,000 to

8  cover this debit.  Plaintiff would be in substantial violation of net capital requirements and at the

9  end of that trading day. In order to offset this position, Plaintiff's clearing company, Defendant

10  WFI would abscond with all of Plaintiff's assets held at WFI, effectively putting Plaintiff out of

11  business.

12    85. Plaintiff is entitled to a Court order preventing Defendant TWNK and its control persons

13  from wrongfully stopping transfer of the stock certificate at issue.

14    86. Plaintiff is further entitled to a Court order preventing Defendant DTC from honoring

15  adverse claim to Stock Certificate 1469 from Defendant TWNK and requiring Defendant DTC to

16  accept deposit of the new Certificate obtained by Defendant WFI. Additionally, Plaintiff is

17  entitled to a Court order preventing Defendant DTC from debiting Defendant WFI as to the

18  100,000 free-trading shares of Defendant TWNK deposited by Plaintiff with WFI, or debiting

19  Defendant WFI or otherwise imposing upon Defendant WFI any fees or assessments arising

20  from the transactions which are the subject of this litigation.  Similarly, Defendant WFI should

21  be enjoined from debiting Plaintiff or otherwise imposing any fees or assessments against

22  Plaintiff, or restricting Plaintiffs assets, for any reason related to the transactions which are the

23  subject of this litigation, other than those assets constituting Plaintiff's deposit with Defendant

24 . WFI under the clearing agreement.

25    87. Plaintiff is further entitled to order preventing Defendant WFI from charging Plaintiff for

26  a buy-in of TWNK stock, as Plaintiff has already delivered to Defendant WFI 100,000 shares of

27  Defendant TWNK stock.

28

15

WHEREFORE, Plaintiff prays for judgment against Defendants, for the following:

1. For a decree that Plaintiff is the protected purchaser of TWNK certificate number 1469;

2. For a decree that Defendants TWNK and SIGNATURE STOCK TRANSFER, INC., had no legal authority to stop transfer of TWNK stock certificate 1469, and that Defendant DTC, pursuant to UCC Article 8, the DTCC rules, and applicable New York and Federal law, cannot honor any claims adverse to Plaintiff's ownership of certificate 1469;

3. For an order that Defendant TWNK and its control persons are enjoined from stopping transfer of the stock certificate at issue.

4. For an order that Defendant DTC is enjoined from posting a short position against WFI as to the shares of Defendant TWNK deposited by Plaintiff with WFI, and requiring Defendant DTC to accept the deposit by Defendant WFI of the new certificate obtained by Plaintiff for 100,000 shares of Defendant TWNK stock.

5. For an order further enjoining Defendant DTC from debiting Defendant WFI or otherwise imposing upon Defendant WFI any fees or assessments arising from the transactions which are the subject of this litigation.

6. For an order enjoining preventing Defendant WFI from charging Plaintiff for a buy-in of TWNK stock;

7. For an order further enjoining Defendant WFI from debiting Plaintiff or otherwise imposing any fees or assessments against Plaintiff, or restricting Plaintiffs assets, for any reason related to the transactions which are the subject of this litigation, other than those assets constituting Plaintiff's deposit with Defendant WFI under the clearing agreement.

8. For general damages in excess of ten thousand dollars;

9. For special damages as proven;

10. For punitive damages;

/ / /

/ / /

/ / /

16

1  11. For reasonable attorney fees;

2  12. For costs of suit; and

3  13. For any such other relief as the Court may deem just and proper.

4      DATED this _14_ day of October, 2003.

5

6      HAROLD P. GEWERTER, ESQ.
       Nevada Bar No. 499
7      5440 West Sahara Avenue, Suite 202
       Las Vegas, NV  89146
8      Attorney for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

**EXHIBIT L**

ORIGINAL

1    0009
     HAROLD P. GEWERTER, ESQ.
2    Nevada Bar #499
     WENDY E. MILLER
3    Nevada Bar #6064
     HAROLD P. GEWERTER, ESQ., LTD.
4    5440 West Sahara Avenue, Suite 202
     Las Vegas, Nevada 89146
5    Telephone No.: (702) 382-1714
     Facsimile No.: (702) 382-1759
6    Attorneys for Plaintiff

7                                    DISTRICT COURT

8                                CLARK COUNTY, NEVADA

9                                      * * * * *

10

11   NEVWEST SECURITIES CORPORATION, a    CASE NO.: A474001
     Nevada Corporation                   DEPT NO.:   I
12
               Plaintiff,
13
     vs.                                  PLAINTIFF'S EX PARTE APPLICATION
14                                        FOR TEMPORARY RESTRAINING ORDER
     BRIAN MICHAEL VOLMER; 20/20          AND MOTION FOR PRELIMINARY
15   NETWORKS, INC., a Nevada corporation; INJUNCTION: AFFIDAVIT OF ANTONY
     EDWARD GALLAGHER, individually;      MICHEL SANTOS
16   WERNER GREIDER, individually;
     CHARLES SMITH, individually; STEVEN Y.   Date of Hearing: October 20, 2003
17   ONOUE, individually; MEHRHAD ALBORZ,
     individually; CLAUDIA ZAMAN; MICHAEL     Time of Hearing: 9:00 Am
18   ZAMAN; SIGNATURE STOCK TRANSFER,
     INC., a Texas corporation; WELLS FARGO
19   INVESTMENTS, LLC, a Delaware limited
     liability company; DEPOSITORY TRUST
20   AND CLEARING CORPORATION, a New
     York Corporation; DOES I through X,
21   inclusive; ROE CORPORATIONS XX
     through XXX, inclusive;
22
               Defendants.
23

24

25        COMES NOW, Plaintiff NEVWEST SECURITIES CORPORATION, a Nevada

26   corporation, by and through its attorneys, HAROLD P. GEWERTER, ESQ., and WENDY E.

27   MILLER, ESQ., and files its Ex-Parte Application for Temporary Restraining Order and Motion

28   or Preliminary Injunction. This Motion is based on the pleadings and papers on file herein, the

FILED

2003 OCT 16 P 4 08

CLERK

1

Points and Authorities below, the Affidavit of Antony Michel Santos, and any such oral argument as may be permitted at the time for hearing of this matter.

Dated this _15_ day of October 2003.

HAROLD P. GEWERTER, ESQ.
Nevada Bar # 499
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Ave., Suite 202
Las Vegas, Nevada 89149
Attorney for Plaintiff

## NOTICE OF MOTION

TO: All Parties and Their Counsel of Record:

YOU AND EACH OF YOU WILL PLEASE TAKE NOTICE that the undersigned will bring the above and foregoing Motion for Preliminary Injunction on for hearing before the Court at the Courtroom of the above-entitled Court on the _20th_ day of _October_, 2003, at _9:10_ A.m of said day in Department _I_ of said Court.

Dated this _K_ day of October 2003.

HAROLD P. GEWERTER, ESQ.
Nevada Bar # 499
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Ave., Suite 202
Las Vegas, Nevada 89149
Attorney for Plaintiff

2

## POINTS AND AUTHORITIES

## INTRODUCTION

1

2

3      As previously stated, this lawsuit is the result of Plaintiff, a securities broker/dealer,

4  getting caught in the middle of a devious transaction between a shell corporation, 20/20

5  Networks Inc., ("TWNK"), and a known stock touter, Brian Michael Volmer ("Volmer"), who

6  was issued a stock certificate by TWNK in exchange for performing certain

7  "telecommunications consulting services." Volmer deposited said stock certificate with Plaintiff,

8  and then proceeded to sell and transfer the shares from his account with Plaintiff. Plaintiff has

9  already obtained an injunction from this Court enjoining Defendant TWNK from stopping

10 transfer of the securities deposited by Defendant Volmer to Plaintiff. Plaintiff's clearing

11 company, Defendant Wells Fargo Investments, LLC, ("WFI") then obtained a new certificate for

12 100,000 shares of TWNK stock, but Defendant WFI's own clearing company, Defendant

13 Depository Trust and Clearing Corporation, ("DTC") illegally refuses to accept deposit of this

14 certificate, thereby reinstating the debit of 100,000 shares of TWNK stock. Defendant WFI has

15 informed Plaintiff that it will commence a buy-in of TWNK shares commencing on October 15,

16 2003, and will charge the purchase price to Plaintiff, which will likely drive Plaintiff out of

17 business.

18                                ## STATEMENT OF FACTS

19      Plaintiff NevWest Securities Corporation reincorporates by reference its Previous Motion

20 for Preliminary Injunction and Ex-Parte Application for Temporary Restraining Order. As the

21 Court is aware, on September 24, 2003, Plaintiff obtained a Temporary Restraining Order against

22 Defendants Signature Stock Transfer, Inc., and TWNK from honoring or placing any stop-

23 transfer order on TWNK Certificate No. 1469. The Temporary Restraining Order was then

24 served on the Defendants, who immediately allowed Plaintiff's clearing company, Defendant

25 WFI to obtain a new certificate for 100,000 free-trading TWNK stock. Plaintiff is informed that

26 Defendant DTC refuses to accept this new certificate from Defendant WFI, and will continue to

27 debit Defendant WFI for 100,000 shares of TWNK stock. Defendant WFI, rather than insist that

28 Defendant DTC accept this new certificate, has announced to Plaintiff, that, commencing on

1 October 15, 2003, it will "buy-in" 100,000 shares of TWNK and charge the price to Plaintiff,

2 placing Plaintiff in the exact same position it was in before it obtained the previous Order of

3 Preliminary Injunction.

4 <center>ARGUMENT</center>

5 Plaintiff seeks an order enjoining Defendant DTC from debiting Defendant WFI for

6 100,000 shares of TWNK stock, and requiring Defendant DTC to accept for deposit the new

7 certificate for 100,000 shares of TWNK stock obtained by Defendant WFI as a result of the prior

8 Order of Preliminary Injunction. Plaintiff further seeks an order enjoining Defendant WFI from

9 "buying in" 100,000 shares of TWNK stock and charging the purchase against Plaintiff's

10 account with Defendant WFI, and further enjoining Defendant WFI from debiting Plaintiff or

11 otherwise imposing any fees or assessments against Plaintiff, or restricting Plaintiffs assets, for

12 any reason related to the transactions which are the subject of this litigation, other than those

13 assets constituting Plaintiff's deposit with Defendant WFI under the clearing agreement.

14 . NRCP 65 and N.R.S. 33.010 govern preliminary injunctions. NRCP 65 provides, in part:

15     (a) Preliminary injunction.

16     (1) Notice.

17
18     No preliminary injunction shall be issued without notice to the adverse party.

19     (2) Consolidation of hearing with trial on merits.

20     Before or after the commencement of the hearing of an application for a
       preliminary injunction, the court may order the trial of the action on the merits
21     to be advanced and consolidated with the hearing of the application. Even when
       this consolidation is not ordered, any evidence received upon an application for
22     a preliminary injunction which would be admissible upon the trial on the merits
       becomes part of the record on the trial and need not be repeated upon the trial.
23     This subdivision (a)(2) shall be so construed and applied as to save to the parties
       any rights they may have to trial by jury.
24

25     (b) Temporary restraining order; notice; hearing; duration.

26
       A temporary restraining order may be granted without written or oral notice to
27     the adverse party or his attorney only if (1) it clearly appears from specific facts
       shown by affidavit or by the verified complaint that immediate and irreparable
28     injury, loss, or damage will result to the applicant before the adverse party or his

<center>4</center>

attorney can be heard in opposition, and (2) the applicant's attorney certifies to
the court in writing the efforts, if any, which have been made to give the notice
and the reasons supporting his claim that notice should not be required. Every
temporary restraining order granted without notice shall be indorsed with the
date and hour of issuance; shall be filed forthwith in the clerk's office and
entered of record; shall define the injury and state why it is irreparable and why
the order was granted without notice; and shall expire by its terms within such
time after entry, not to exceed 15 days, as the court fixes, unless within the time
so fixed the order, for good cause shown, is extended for a like period or unless
the party against whom the order is directed consents that it may be extended
for a longer period. The reasons for the extension shall be entered of record. In
case a temporary restraining order is granted without notice, the motion for a
preliminary injunction shall be set down for hearing at the earliest possible time
and takes precedence of all matters except older matters of the same character;
and when the motion comes on for hearing the party who obtained the
temporary restraining order shall proceed with the application for a preliminary
injunction and, if he does not do so, the court shall dissolve the temporary
restraining order. On 2 days' notice to the party who obtained the temporary
restraining order without notice or on such shorter notice to that party as the
court may prescribe, the adverse party may appear and move its dissolution or
modification and in that event the court shall proceed to hear and determine
such motion as expeditiously as the ends of justice require.

(c) Security.

No restraining order or preliminary injunction shall issue except upon the giving
of security by the applicant, in such sum as the court deems proper, for the
payment of such costs and damages as may be incurred or suffered by any party
who is found to have been wrongfully enjoined or restrained. No such security
shall be required of the State or of an officer or agency thereof.

The provisions of Rule 65.1 apply to a surety upon a bond or undertaking under
this rule.

(d) Form and scope of injunction or restraining order.

Every order granting an injunction and every restraining order shall set forth the
reasons for its issuance; shall be specific in terms; shall describe in reasonable
detail, and not by reference to the complaint or other document, the act or acts
sought to be restrained; and is binding only upon the parties to the action, their
officers, agents, servants, employees, and attorneys, and upon those persons in
active concert or participation with them who receive actual notice of the order
by personal service or otherwise.

5

10/16/2003  11:40 FAX  702 362 1159        LAW OFFICES                                      ☒011/052

1   NRS 33.010 states:

2

3                An injunction may be granted in the following cases:

4           1.  When it shall appear by the complaint that the Plaintiff is entitled to the relief
                demanded, and such relief or any part thereof consists in restraining the
5               commission or continuance of the acts complained of either for a limited
                period or perpetually.
6           2.  When it shall appear by the complaint or affidavit that the commission or
                continuance of some act, during the litigation, would produce great or
7               irreparable injury to the Plaintiff.
8           3.  When it shall appear, during the litigation, that the Defendant is doing or
                threatens, or is about to do, or is procuring or suffering to be done, some act in
9               violation of the Plaintiffs' rights respecting the subject of the action, and
                tending to render the judgment ineffectual.
10

11          Nevada Courts require three showings before a preliminary injunction will issue: (1) no

12   complete and adequate remedy at law; (2) a prima facie case sufficient to establish a probability

13   of success on the merits; and (3) immediate and irreparable injury, loss, or damage will result to

14   the plaintiff if the preliminary injunction is not issued. Czipott v. Fleigh, 87 Nev. 496, 498, 489

15   P.2d 681 (1971); Pickett v. Comanche Construction, Inc., 108 Nev. 422, 426, 836 P.2d 42

16   (1992); Thirteen South Ltd. v. Summit Village, Inc., 109 Nev. 1218, 1220, 26 P.2d 257 (1993).

17          Here, Plaintiff is able to establish all three requirements necessary for a preliminary

18   injunction. First, as set forth above, Plaintiff has no adequate remedy at law. If Defendant DTC

19   is not enjoined from debiting Defendant WFI for the 100,000 shares of TWNK stock, and

20   required to accept the new stock certificate; and if Defendant WFI is not enjoined from "buying

21   in" 100,000 shares of TWNK stock on Plaintiff's account, Plaintiff will likely be forced out of

22   business. Money damages are therefore an inadequate remedy. For this reason, Plaintiff has

23   demonstrated that it will suffer irreparable injury if the preliminary injunction is not issued

24   because it will be forced to cover the purchase price of 100,000 shares of TWNK stock on the

25   open market. Because there is no real market for TWNK stock, Defendant WFI will pay a

26   premium for the stock, far in excess of the offering price listed on the OTCBB.

27          The final issue is whether Plaintiff can establish a probability of success on the merits.

28   Plaintiff has delivered 100,000 shares of unrestricted, free-trading TWNK stock to defendant

     WFI.  Because Defendant DTC wrongfully refuses of accept deposit of these shares, it has

                                                    6

1  created an artificial debit in the account of WFI, through no fault of Plaintiff. Defendant WFI

2  has therefore elected to "buy-in" 100,000 shares of TWNK stock to cover the debit, and will

3  charge this buy-in to Plaintiff.

4      Paragraph 11.1.3 of Plaintiff's Clearing Agreement with Defendant WFI, which is

5  attached hereto as Exhibit "1," provides:

6      *Sales.* Correspondent [Plaintiff] shall be responsible for sales (including those on

7      a "when issued" basis), until Clearing Firm has received, in acceptable form, the
   securities involved in the transaction. If Clearing Firm [Defendant WFI] does not

8      receive delivery of securities in an acceptable form, Clearing firm may buy-in all
   or part of the securities.

9

10      The term "delivery of securities in an acceptable form" is not defined in Plaintiff's

11  Clearing Agreement with Defendant WFI; however, the stock certificate obtained by Defendant

12  WFI as a result of the Order of Preliminary Injunction represents 100,000 shares of free-trading,

13  unrestricted TWNK stock. Furthermore, "Delivery" of a security is defined in NRS §104.8301:

14      1. Delivery of a certificated security to a purchaser occurs when:

15      (a) The purchaser acquires possession of the security certificate;

16      (b) Another person, other than a securities intermediary, acquires possession of

17      the security certificate on behalf of the purchaser or, having previously acquired
   possession of the certificate, acknowledges that it holds for the purchaser; or

18

19      (c) A securities intermediary acting on behalf of the purchaser acquires
   possession of the security certificate, only if the certificate is in registered form

20      and is registered in the name of the purchaser, payable to the order of the
   purchaser, or specially endorsed to the purchaser by an effective endorsement

21      and has not been endorsed to the securities intermediary or in blank.

22      As a securities intermediary, Defendant WFI became a purchaser for value of the TWNK

23  stock when it deposited the new certificate in the account of Plaintiff. NRS §104.8116 provides:

24      A securities intermediary that receives a financial asset and establishes a

25      security entitlement to the financial asset in favor of an entitlement holder is a
   purchaser for value of the financial asset. A securities intermediary that acquires a

26      security entitlement to a financial asset from another securities intermediary
   acquires the security entitlement for value if the securities intermediary acquiring

27      the security entitlement establishes a security entitlement to the financial asset in
   favor of an entitlement holder.

28

7

Therefore, Plaintiff has delivered the TWNK securities as a matter of law to Defendant WFI, and pursuant to the Clearing Agreement between Plaintiff and Defendant WFI, Defendant WFI cannot now buy in additional securities on Plaintiff's account.

Defendant DTC is governed by the bylaws and rules promulgated by Defendant DTC. Rule 6 of the Depository Trust Company provides, in relevant part:

> Subject to the provisions of these Rules and Procedures, the Corporation [Defendant DTC], acting in accordance with duly authorized instructions from the Participant [Defendant WFI] or Participants and the Pledgee or Pledgees, if any, having an interest in the transaction, shall: accept Eligible Securities for Deposit with the Corporation...

A copy of the entire Rule 6 is attached hereto as Exhibit "2."

Here, there is no dispute that the TWNK stock is an Eligible Security, as Defendant WFI has been clearing all of Plaintiff's transactions in TWNK stock through Defendant DTC; furthermore, Defendant DTC would not be debiting Defendant for 100,000 shares of TWNK stock if it were not an Eligible Security; therefore, DTC is required by its own rules and contractual relationship with Defendant WFI to accept the TWNK certificate for deposit. Defendant DTC has been notified of the Order of Preliminary Injunction; it is aware that the shares underlying Defendant TWNK Certificate 1469 have been determined to be free of any adverse claims; the only reason to refuse deposit of the new certificate is to drive Plaintiff out of business.

## CONCLUSION

Based on the above, Plaintiff has clearly demonstrated the lack of an adequate remedy at law, a likelihood of prevailing on the merits, and that irreparable injury will result if Plaintiff's Motion for Preliminary injunction is not granted. The amount of any bond required under NRCP 65(c) should be minimal, because Defendants will suffer no harm if the injunction is granted.

WHEREFORE, Plaintiff respectfully requests that this honorable Court enjoin Defendant DTC from debiting Defendant WFI for 100,000 shares of TWNK stock, and require Defendant DTC to accept for deposit the new certificate for 100,000 shares of TWNK stock obtained by Defendant WFI as a result of the prior Order of Preliminary Injunction. Plaintiff further seeks an order enjoining Defendant WFI from "buying in" 100,000 shares of TWNK stock and charging

10/16/2003 17:48 FAX 702 38⁻ ⁻⁻⁹⁹9     LAW OFFICES     ℡014/032

1   the purchase against Plaintiff's account with Defendant WFI, and further enjoining Defendant

2   WFI from debiting Plaintiff or otherwise imposing any fees or assessments against Plaintiff, or

3   restricting Plaintiffs assets, for any reason related to the transactions which are the subject of this

4   litigation, other than those assets constituting Plaintiff's deposit with Defendant WFI under the

5   clearing agreement, pending the outcome of this litigation.

6       DATED this _15_ day of October, 2003.

7

8                                        HAROLD P. GEWERTER, ESQ.
                                         Nevada Bar No. 499
9                                        5440 West Sahara Avenue, Suite 202
                                         Las Vegas, NV 89146
10                                       Attorney for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

# AFFIDAVIT OF ANTONY MICHEL SANTOS

STATE OF NEVADA    )
                       )ss:
COUNTY OF CLARK    )

ANTONY MICHEL SANTOS, being first duly sworn, deposes and says:

1. I am an officer and principal of Plaintiff NevWest Securities Corporation ("NevWest"), a corporation organized under the laws of the State of Nevada.  I am competent to testify to all matters herein on personal knowledge, except as to those matter stated on information and belief, and as to those matters I believe them to be true.  I make this Affidavit in support of Plaintiff's Motion for Preliminary Injunction and Application for Temporary Restraining Order.

2. I hereby reincorporate by reference my prior affidavit submitted in support of Plaintiff's First Motion for Preliminary Injunction and Application for Temporary Restraining Order.

3. Since the Court granted Plaintiff's unopposed Motion for Preliminary Injunction, the following events have transpired:

4. Subsequent to the Temporary Restraining Order being issued, Defendant Signature Stock Transfer, Inc., immediately released the securities underlying 20/20 Networks, Inc. Certificate No. 1469, issuing a new certificate in the name of Plaintiff's clearing company, Defendant Wells Fargo Investments, LLC.

5. On October 14, 2003, Robert Moses, Counsel for Wells Fargo Investments, LLC, ("WFI") which is Plaintiff's clearing company, informed me that Defendant Depository Trust and Clearing Corporation ("DTC"), the clearing company for WFI has refused to accept deposit of the new certificate, and is therefore debiting WFI's account for 100,000 shares of 20/20 Networks, Inc., stock.

6. On that date, I was also informed by Mr. Moses that Wells Fargo intends to commence a buy-in of 20/20 Networks, Inc., stock on October 15, 2003, and charge Plaintiff's account for the buy in.  I asked Mr. Moses if WFI would first seek redress with Defendant DTC, as the stock certificate is valid, but Mr. Moses declined.

7. If Wells Fargo attempts to buy in 100,000 shares of 20/20 Networks, Inc., stock, and charge the cost to Plaintiff, Plaintiff will most likely be out of business by tomorrow.

1

8. I respectfully request that this honorable Court therefore grant Plaintiff's Motion for Preliminary Injunction and Application for Temporary Restraining Order.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

DATED this 15ᵗʰ day of October, 2003.

ANTONY MICHEL SANTOS

SUBSCRIBED and SWORN to before me
this 15 day of October 2003.

NOTARY PUBLIC in and for said
COUNTY and STATE.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
JOYCE FAHL
My Appointment Expires April 8, 2007

2

**EXHIBIT "1"**

## CLEARING AGREEMENT
(Fully Disclosed)

THIS AGREEMENT (the "Agreement") is made and entered into as of November 25, 2002, between Wells Fargo Investments Correspondent Services, a division of Wells Fargo Investments, LLC (the "Clearing Firm") and NevWest Securities Corporation (the "Correspondent").

### Background

A.      Correspondent desires to avail itself of clearing, execution, and other services related to the securities business as more fully set forth in this Agreement; and

B.      Clearing Firm desires to extend the foregoing types of services to the Correspondent.

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties covenant and agree as follows:

### Agreement

1.  **Approval.** This Agreement shall be subject to approval by the New York Stock Exchange, Inc. ("NYSE"). Clearing Firm shall submit this Agreement to the NYSE and Correspondent shall submit the Agreement to any other such organization from which Correspondent is required to obtain approval. In the event of disapproval, the parties shall bargain in good faith to achieve the requisite approval.

2.  **Agreement.** From the date of this Agreement until the termination of this Agreement as provided in Section 34 hereof, Clearing Firm shall carry the cash and margin accounts of the customers of Correspondent introduced by Correspondent to Clearing Firm, and accepted by Clearing Firm, and shall clear transactions on a fully-disclosed basis for such accounts, in the manner and to the extent set forth in this Agreement.

3.  **Allocation of Responsibility.**

    3.1     Responsibilities of the Parties. Pursuant to NYSE Rule 382, responsibility for compliance with all applicable laws, rules, and regulations of the Securities and Exchange Commission ("SEC"), the National Association of Securities Dealers, Inc. ("NASD"), the NYSE, and any other regulatory or self-regulatory agency or organization (collectively the "Applicable Rules") shall be allocated between Clearing Firm and Correspondent as set forth in this Agreement. To the extent that a particular function is allocated to one party under this Agreement, the other party shall supply

"Customers") whose accounts or a portion of whose accounts have been accepted by Clearing Firm (the "Introduced Accounts") will be deemed Customers of Clearing Firm and not Customers of Correspondent.

4.1.5    Correspondent further represents and warrants that, except as set forth in a letter of even date herewith, there is no claim, action, proceeding, investigation or inquiry pending or threatened before any court, tribunal, administrative judge or hearings officer alleging a violation of an Applicable Rule, or seeking suspension or cancellation of its broker or dealer registration with any state or the SEC or its membership in any Exchange or the NASD.

4.1.6    Correspondent further represents and warrants that, except as set forth in a letter of even date herewith, there is no claim, action, proceeding or arbitration pending or threatened in any court or tribunal seeking damages in excess of $ 10,000.

4.2    Notice of Non Compliance.  Correspondent agrees to notify the Clearing Firm promptly if any of the foregoing representations and warranties becomes no longer true and correct in all material respects.

4.3    Notice of Litigation and Claims.  Promptly after Correspondent knows or has reason to believe it is the subject of any claim, action, suit, proceeding, arbitration, investigation or inquiry before any court, tribunal, administrative agency, Exchange, NASD, or private arbitration panel alleging a violation of the Applicable Rules or seeking suspension or cancellation of any registration or license of Correspondent or damages in excess of $10,000, Correspondent shall furnish Clearing Firm with a statement setting forth the material facts and circumstances with respect to such claims, and any other information, including without limitation, a copy of the summons and complaint, if any, which Clearing Firm may request.

4.4    Correspondent will immediately notify Clearing Firm when (i) its aggregate indebtedness ratio reaches or exceeds 10 to 1 or (ii) if it has elected to operate under paragraph (f) of Rule 15c3-1 of the Securities Exchange Act of 1934, as amended, when its net capital is less than the greater of $100,000 or 5% of aggregate debt items computed in accordance with Rule 15c3-3.

4.5    In no event shall Correspondent endeavor to act as a clearing or carrying firm for any other broker/dealer without the express written consent of Clearing Firm.  All Customer accounts introduced to Clearing Firm shall

3

6.1.2   Clearing Firm reserves the right to reject any account which the Correspondent may forward to Clearing Firm as a potential new account. Clearing Firm also reserves the right to terminate any account previously accepted by it as a new account.

6.1.3   At the time of the opening of any new account, Correspondent agrees to obtain sufficient information from its Customer to satisfy itself as to the identify of its Customer and the source of its funds to satisfy itself that opening the account would not violate the provisions of various United States of America Executive Orders and regulations issued thereunder by the Office of Foreign Assets Control ("OFAC"), which enforces economic and trade sanctions against foreign countries and their agents, terrorism sponsoring agencies and organizations, and international narcotics traffickers.

6.2   <u>Maintenance of Account Information.</u>  Clearing Firm may rely without inquiry on the validity of all Customer information furnished to it by Correspondent. Possession of any such documents or information, however provided, concerning Correspondent's Customers does not create a duty on the part of Clearing Firm to review or understand the content of those documents.

7.   **Account Transfers.**  Pursuant to written notification executed by a Customer and forwarded by Correspondent to Clearing Firm, any Customer may choose to transfer its Account to another broker dealer. Upon receipt of such notice, Clearing Firm shall have exclusive responsibility for compliance with Rule 412 of the NYSE and any similar Applicable Rule. Clearing Firm may accept and process directions received directly from the Customer with respect to the transfer of the Account to another broker dealer; Clearing Firm may refuse to accept any other orders or instructions received directly from a Customer except those received on behalf of Customer from Correspondent

8.   **Supervision of Orders and Accounts.**

8.1   <u>Responsibility for Compliance.</u>  Correspondent shall be solely responsible for compliance with suitability, "Know Your Customer" rules, and other requirements of United States of America federal and state law and regulatory and self-regulatory rules and regulations governing transactions and accounts. Possession by Clearing Firm of surveillance records, exception reports, or other similar data shall not obligate Clearing Firm to review or be aware of their contents. Clearing Firm shall not be required to make any investigation into the facts surrounding any transaction that it may execute or clear for Correspondent or any Customer of Correspondent.

securities, account transfers or conversions. The cost of making such
disclosures or obtaining such agreements shall be borne by Correspondent.

9.  **Extension of Credit.**

9.1  Presumption of Cash Account. Clearing Firm may, but is not required to,
permit Customers of Correspondent to purchase securities on margin, but
all transactions for a Customer will be deemed to be cash transactions, and
payment for those transactions will be required in the manner applicable to
cash transactions, unless, on or prior to settlement, Correspondent has
furnished Clearing Firm with an executed margin agreement and consent
to loan of securities.

9.2  Margin Requirements. Margin accounts introduced by Correspondent
shall be subject to Regulation T and Clearing Firm's margin requirements
as in effect from time to time. Clearing Firm reserves the right to refuse to
accept any transaction in a margin account without the actual receipt of the
necessary margin and to impose a higher margin requirement for a
particular account when, in Clearing Firm's discretion, the past history or
nature of the account or other factors or the securities held in it warrant
such action. In all instances, Correspondent may require higher margin
than imposed by Clearing Firm for any particular account, group of
accounts, or all Introduced Accounts.

In any case where Correspondent requests Clearing Firm to extend credit
upon control or restricted securities, pursuant to Rule 144 under the
Securities Act of 1933, as amended, or otherwise; Correspondent shall
submit to Clearing Firm such documentation, agreements and information
as shall be reasonably required by Clearing Firm to decide to extend such
credit. Any extension of credit so approved shall be subject to Clearing
Firm's credit policies as shall be in effect from time to time.

9.3  Margin Maintenance and Compliance with Regulation T and SEC Rule
15c3-3(m).

9.3.1  *Initial Margin.* Correspondent shall be responsible for the initial
margin requirement for any transaction until such initial margin has
been received by Clearing Firm in acceptable form.

9.3.2  *Margin Calls.* After the initial margin for a transaction has been
received, subsequent margin calls may be made by Clearing Firm at its
discretion. Clearing Firm shall calculate the maintenance requirement
and notify Correspondent of any amounts due. Correspondent shall be
responsible for forwarding the margin call to its Customer and
obtaining the amount due directly from Correspondent's Customer. If

respect to any Account as specified by Clearing Firm to enable Clearing Firm promptly and properly to record such remittances and receipts in the Account. Correspondent shall send all securities received by it to Clearing Firm by overnight delivery service on the day of receipt, or as specified by Clearing Firm. Correspondent is responsible for the collection of the initial Margin required pursuant to the Applicable Rules to support each Margin transaction for an Account, the amount of any Margin maintenance requirement pursuant to the Applicable Rules and the timely payment of all Account Debits, interest and other charges incurred in an Account. Correspondent is also responsible to Clearing Firm for the collection of funds or securities required to settle any Transactions. If requested by Clearing Firm, Correspondent shall promptly transmit to Customers all requests for initial and maintenance Margin and for funds or securities to settle Transactions or pay Account Debits. Correspondent shall be liable for any loss, liability, damage, cost or expense (including but not otherwise limited to fees and expenses of legal counsel) incurred or sustained by Correspondent or Clearing Firm, or both, as a result of the failure of any Customer to timely make payments or deposits of securities to satisfy Account Debits, settle Transactions or to comply with any Margin calls. In its sole discretion, at any time, Correspondent may effect a "buy-in" or "sell-out" of a Transaction or liquidate an Account Debit and collect from the Customer any deficiency resulting from the "buy-in" or "sell-out" or liquidation.

10. **Maintenance of Books and Records.**

   10.1   Stock Records. Clearing Firm shall maintain stock records and other prescribed books and records of all transactions executed or cleared through it.

   10.2   Regulatory Reports and Records. Correspondent shall prepare, submit, and maintain copies of all reports, records, and regulatory filings required of Correspondent by any entity that regulates it, including, but not limited to, copies of all account agreements and similar documentation obtained pursuant to Section 6 of this Agreement and any reports and records required to be made or kept under the Currency and Foreign Transactions Reporting Act of 1970, (the "Bank Secrecy Act"), and any rules and regulations promulgated pursuant thereto.

   10.3   Correspondent's Anti-Money Laundering and OFAC Reporting and Recordkeeping and Obligations. Correspondent agrees to comply with, among others, the following anti-money laundering and OFAC legal and regulatory rules, as the same may be amended from time to time and reporting and recordkeeping requirements including:

behalf of the Correspondent, the responsibility for which will be solely that of the Correspondent:

10.3.7.1    Obtaining and maintaining certifications for accounts held by correspondent banks as mandated by the USA Patriot Act and the regulations promulgated thereto, or any similar laws or regulations enacted or adopted hereafter.

10.3.7.2    Drafting, submitting and maintaining Suspicious Activity Reports and supporting documentation pursuant to the Bank Secrecy Act, the USA Patriot Act and the regulations promulgated pursuant thereto, or any similar laws or regulations enacted or adopted hereafter.

10.3.7.3    Maintaining an anti-money laundering program pursuant to the USA Patriot Act and the regulations promulgated thereto, or any similar laws or regulations enacted or adopted hereafter.

## 11. Receipt and Delivery of Funds and Securities.

11.1    Receipt and Delivery of Funds and Securities.

11.1.1    *Cashiering Functions*  Clearing Firm shall perform cashiering functions for Introduced Accounts.  These functions shall include receipt and delivery of securities; receipt and payment of funds owed by or to Customers; and provision of custody for securities and funds. Correspondent shall provide Clearing Firm with the data and documents that are necessary or appropriate to permit Clearing Firm to perform its obligations under this Section, including but not limited to copies of records documenting receipt of Customers' funds and securities received directly by Correspondent.  Such data and documents must be compatible with the requirements of Clearing Firm's data processing systems.

11.1.2    *Purchases.*  Correspondent shall be responsible for purchases (including transactions on a "when issued" basis) made for Customers until actual and complete payment has been received by Clearing Firm.  Correspondent shall not introduce accounts requiring settlement on a "delivery versus payment" or "receive versus payment" basis unless such account utilizes the facilities of a securities depository or qualified vendor as defined in NYSE Rule 387, for all depository eligible transactions.

11.1.5    *Sales.*  Correspondent shall be responsible for sales (including those on a "when issued" basis), until Clearing Firm has received, in acceptable

11



customers on the books of Clearing Firm. Clearing Firm agrees to provide notice of the pending corporate action to Correspondent at its designated locations. Clearing Firm further agrees to collect and submit corporate action requests from Correspondent and submit them to the soliciting party in accordance with the instructions received from the soliciting party. Clearing Firm agrees to use its best efforts to communicate corporate action information to Correspondent and, where applicable, Correspondent's customers, but shall not be liable for i) any delays in the communication of corporate action information or ii) delays in the transmission of collected corporate action requests to the soliciting party unless caused by Clearing Firm's gross negligence. All fees received from the soliciting party will be credited to Correspondent. In consideration of providing this service to Correspondent, Correspondent agrees to indemnify and hold harmless Clearing Firm, its affiliates, officers, agents and employees from all claims, suits, investigations, damages and defense costs (including reasonable attorney's fees) that arise in connection with this section.

12. **Safeguarding of Funds and Securities.** Except as otherwise provided in this Agreement, Clearing Firm shall be responsible for the safekeeping of all money and securities received by it pursuant to this Agreement. However, Clearing Firm will not be responsible for any funds or securities delivered by a Customer to Correspondent until such funds or securities are actually received by Clearing Firm or deposited in bank accounts maintained by Clearing Firm.

13. **Confirmations and Statements.**

13.1    Preparation and Transmission of Confirmations and Statements. Clearing Firm shall prepare confirmations and summary periodic statements and shall, to the extent required, transmit them to Customers and Correspondent in a timely fashion except to the extent Correspondent has agreed to transmit confirmations to Customers. Confirmations and statements shall be prepared on forms disclosing that the account is carried on a fully-disclosed basis for the Correspondent in accordance with applicable rules, regulations, and interpretations. Correspondent will have the ultimate regulatory responsibility for compliance with the prospectus delivery requirements of the Securities Act of 1933, as amended, regardless of its retention of a prospectus fulfillment service to perform delivery of same.

13.2    Examination and Notification of Errors. Correspondent shall examine all confirmations, statements, and other reports in whatever medium provided to Correspondent by Clearing Firm. Correspondent must notify Clearing Firm of any error claimed by Correspondent in any account; as to purchase

13

15.3    During tender period, Clearing Firm will tender only on a trade date basis the number of the shares net long in Correspondent's accounts and Accounts as of either the pro-ration or withdrawal date, and as Correspondent directs on a guarantee basis. Correspondent will be held liable for delivery of shares directed to be tendered, including those guaranteed.

16. **Provision of Reports and Exception Reports.** On or before the effective date of this Agreement, Clearing Firm shall provide to Correspondent, pursuant to NYSE Rule 382(e), a list of all reports (e.g., exception-type reports) it offers to Correspondent. Correspondent shall promptly notify Clearing Firm, in writing, of those specific reports it elects to receive. Clearing Firm and Correspondent each represent that their obligations relative to exception reports, pursuant to NYSE Rule 382(e) have been completed.

17. **Waiver of Procedures.**

17.1    Subject to the Applicable Rules, Correspondent may request Clearing Firm to alter or waive compliance with any one or more of Clearing Firm's practices or policies with respect to one or more Accounts or Transactions. Upon making a request for waiver, Correspondent undertakes to reimburse, indemnify and hold harmless Clearing Firm from any loss of any kind that may result from such waiver and the accommodation of the request by Clearing Firm.

17.2    Correspondent may request that Clearing Firm extend, or continue to extend, credit to an Account in excess of the credit that Clearing Firm would otherwise be willing to extend. In connection with such an extension of credit, Correspondent shall deposit to the Account established solely for this purpose and maintained by Correspondent at Clearing Firm (the "Margin Collateral Account") such Acceptable Securities or Cash as Clearing Firm may request in an amount determined by Clearing Firm from time to time in order to secure such extension of credit. "Cash" means immediately available United States dollars; and "Acceptable Securities" means: (1) any security which is issued or fully guaranteed as to principal and interest by the United States of America; and (2) such other securities acceptable to Clearing Firm in its sole discretion.

17.3    In the event any such deposit into the Margin Collateral Account is not timely made, Clearing Firm may in its sole discretion and regardless of whether the Margin Collateral Account is then in compliance with applicable margin requirements, pledge, re-pledge, hypothecate or re-hypothecate without prior notice any or all securities which Clearing Firm may hold in an account of the Correspondent at Clearing Firm (either individually or jointly with others), separately or in common with other

that it will continue to comply with all applicable legal, regulatory, and self-regulatory requirements, notwithstanding such action, suspension, or restriction and (ii) to comply with any requests, directives, or demands made upon Clearing Firm by any such federal or state agency, stock exchange, or regulatory or self-regulatory organization.

18.3   Provision of Financial Information.  Correspondent shall furnish Clearing Firm copies of FOCUS Reports, financial statements for the current fiscal year, the executed Forms X-17a-5 (Parts I and IIA) filed with the SEC, any amendments to Correspondent's Form BD, and any other regulatory or financial reports Clearing Firm may from time to time require. Correspondent shall provide such reports to Clearing Firm at the time Correspondent files such reports with its primary examining authority. Correspondent shall also notify Clearing Firm in advance of withdrawals of more than 10 percent of its net capital.

19. **Use of Third-Party Services.**  Clearing Firm may, at its reasonable option, and consistent with common industry practice, retain one or more independent data processing or other service bureaus to perform functions (including, but not necessarily limited to, pricing services or proxy mailing services) assigned to Clearing Firm under this Agreement.

20. **Lien on Unpaid Securities.**

20.1   Lien on Unpaid Securities.  Correspondent hereby assigns and transfers to Clearing Firm a general lien and security interest in and to any and all securities now and hereafter held or maintained in each Introduced Account for which Clearing Firm has not received payment, together with any and all payments, dividends, distributions, and proceeds of or on the foregoing, to secure all debits to such Introduced Account for the price of all purchase transactions placed with respect to such Introduced Account ("Unpaid Debits"). Clearing Firm may not pledge, hypothecate or rehypothecate any securities in an Introduced Account. However, as described below, Clearing Firm may liquidate those securities in an Introduced Account for which Clearing Firm has not yet received payment to the extent necessary to satisfy any Unpaid Debits in such Introduced Account. No assets in any Introduced Account shall be deemed to secure Unpaid Debits with respect to any other Introduced Account. At any time that there exists an Unpaid Debit, Clearing Firm may (i) liquidate those securities in the applicable Introduced Account for which Clearing Firm has not received payment to the extent necessary to satisfy such Unpaid Debit; (ii) exercise any rights or remedies available to Clearing Firm as a secured creditor under applicable law; and (iii) take such other actions as Clearing Firm considers necessary or prudent to protect its security

17

Customer, in writing, that Clearing Firm has received the complaint, and
the complaint has been forwarded to Correspondent's DEA (or, if none, to
the appropriate regulatory agency).

23. Payment and Deposit Accounts.

23.1    Payment Account. Upon execution of this Agreement, Clearing Firm shall
establish an Account for Correspondent entitled the "Payment Account".
Clearing Firm shall collect for Correspondent and hold in the Payment
Account all commissions, fees and other charges established by
Correspondent from time to time and paid by the Customers together with
any other income of Correspondent. Clearing Firm shall make payments to
the Correspondent from the Payment Account in accordance with Section
28 of this Agreement.

23.2    Deposit Account. Upon execution of this Agreement, Clearing Firm shall
establish an Account for, and in the name of, Correspondent entitled the
"Deposit Account". Correspondent shall deliver to Clearing Firm for
deposit to the Deposit Account cash and securities which are (a) direct
obligations of, or guaranteed as to the timely payment of principal and
interest by, the United States, (b) acceptable to Clearing Firm, and (c)
registered in the name specified by Clearing Firm or in good deliverable
form and which in the aggregate have a fair market value, as determined
solely in the discretion of Clearing Firm, equal to the Minimum Balance
set forth on the signature page of this Agreement. Clearing Firm shall not
be obligated to perform any of the Services at any time that the aggregate
fair market value of the Deposit Account is less than the Minimum
Balance. Correspondent shall be obligated to deposit additional cash or
securities acceptable to Clearing Firm to cause the fair market value of the
Deposit Account to be maintained in an amount equal to the Minimum
Balance. Clearing Firm, upon 10 days' notice to the Correspondent, may
require the Minimum Balance to equal the aggregate of all claims for
which indemnity may be sought by Clearing Firm pursuant to Section 29.

23.3    Nature of Deposit Account. The Deposit Account is not part of the capital
of Clearing Firm, does not constitute a partnership or equity interest in
Clearing Firm, will not be subordinated to the claims of the creditors of
Clearing Firm, and shall not be deemed to be Margin for any Account,
unless specifically agreed to in writing by the parties. Clearing Firm may
use the funds and securities in the Deposit Account in the course of its
business and shall not be obligated to pay Correspondent any fee or
interest received on or derived from such use, except for interest payable
on the securities therein and interest on the cash balances at the rate set
forth in the attached Fee Schedule.

19

requirements of the SEC No-Action Letter, dated January 25, 1994 (the "SEC No-Action Letter").

24.4    Correspondent shall notify Clearing Firm with respect to each Prime Brokerage Customer for which Correspondent intends to act as an executing broker and Correspondent shall be solely responsible for conducting its own credit review with respect to such Prime Brokerage Customer. Correspondent shall promptly notify Clearing Firm, but in no event later than 3:00 p.m. Eastern Standard Time of trade date, in a mutually acceptable fashion, of such trades in sufficient detail for Clearing Firm to be able to report and transfer any trade executed by Correspondent on behalf of a Prime Brokerage Customer to the relevant prime broker. Correspondent understands and agrees that if the prime broker shall disaffirm or DK any trade executed by Correspondent on behalf of a Prime Brokerage Customer, Correspondent shall, if it has not already done so, open a margin Account for such Prime Brokerage Customer and shall transfer or deliver the trade to such margin Account for the risk and expense of Correspondent to the same extent as for any Account introduced by Correspondent pursuant to this Agreement. Correspondent understands and agrees that for certain Prime Brokerage Customers, Wells Fargo Investments, LLC may act as both Clearing Firm and prime broker (the "Prime Broker"). Wells Fargo Investments as Prime Broker will not disaffirm or DK a transaction for Correspondent's Prime Brokerage Customers but will notify Correspondent that a problem exists and, as permitted under the SEC No-Action Letter, that it is unable to settle the trade. Wells Fargo Investments as Clearing Firm will request that Correspondent open a margin Account for such Prime Brokerage Customer and transfer or deliver the trade to such margin account for the risk and expense of Correspondent to the same extent as for any Account introduced by Correspondent pursuant to this Agreement.

24.5    Correspondent agrees to indemnify and hold harmless Clearing Firm and its controlling persons, officers, directors, agents, servants and employees from and against costs, losses, claims, liabilities, fines, penalties, damages and expenses (including reasonable attorney and accountant fees) arising out of or resulting from Correspondent's activities as an executing broker.

**25. Underwriting; Syndicates**. Correspondent shall provide to Clearing Firm a written list of securities as to which Correspondent intends to act as underwriter, or as to which Correspondent intends to enter into, or join, a syndicate (whether as part of the underwriting or selling group) relating to the issuance or placement of those securities. Clearing Firm shall have the right to limit or prohibit Correspondent's underwriting or syndicate activities with respect to any security. Under no circumstances may Correspondent act as underwriter or join a syndicate

21

28.2    <u>Additional Consideration</u>.  As additional consideration for performing the
Services, Clearing Firm shall be entitled to retain the benefit of utilizing
the funds and securities in the Accounts and of carrying Account Debits.
Except as otherwise agreed by the parties, no interest shall be paid or
credit given for any credit balances which may be left on deposit with
Clearing Firm. Interest income earned through charges on Account Debits
in any Account shall be proprietary to and fully retained by Clearing Firm.
Clearing Firm shall bear the costs of any Margin to effect stock borrows.

## 29. Indemnification.

29.1    <u>Indemnification by Correspondent</u>.  Correspondent agrees to indemnify,
defend, and hold harmless Clearing Firm from and against all claims,
demands, proceedings, suits and actions (individually, a "Claim," and
collectively, "Claims") made or brought against Clearing Firm and all
liabilities, losses, damages, sanctions, judgments, expenses, reasonable
attorneys' fees and costs (collectively, "Losses") of Clearing Firm arising
out of this Agreement, including but not limited to one or more of the
following:

29.1.1    Failure of Correspondent or any of the Customers to make
payment when due for securities purchased for an Introduced
Account.

29.1.2    Failure of Correspondent or any of the Customers to deliver when
due any securities sold for an Introduced Account.

29.1.3    Failure of Correspondent or any of the Customers to meet any
initial or maintenance margin call.

29.1.4    Failure of Correspondent or any of the Customers to make delivery
or payment for securities to Clearing Firm upon exercise of options
in any Introduced Account.

29.1.5    Failure of Correspondent or any of the Customers upon Clearing
Firm's demand to cover any short call or long put option contract.

29.1.6    Any adverse Claims with respect to any Customer securities
transaction executed, delivered, or cleared by Clearing Firm.

29.1.7    Any default or error by any broker-dealer other than Clearing Firm
with whom Correspondent executes a transaction on behalf of
itself or a Customer.

Corporation, the Depository Trust Company, or any other clearing, depository, or self-regulatory organization with respect to transactions self-cleared by Correspondent prior to transfer of such functions to Clearing Firm.

29.1.17    Any failure to exercise due diligence in reviewing checks received from Customers to ensure that same are in proper form, or in the issuance of instructions to Clearing Firm regarding the accounts into which checks are to be deposited.

29.1.18    Any Claim asserted against Clearing Firm alleging the inaccuracy of any information appearing on Correspondent's Customer brokerage account statements with respect to assets not held in the brokerage account, regardless of whether such information was provided by Correspondent, Customer or a third-party.

29.2    Indemnification by Clearing Firm.  Clearing Firm agrees to indemnify, defend, and hold harmless Correspondent from and against all Claims made or brought against Correspondent and all Losses of Correspondent arising out of any dishonest, fraudulent, grossly negligent, or criminal act on the part of any of Clearing Firm's officers, employees, or agents, including any such act committed in any transaction with respect to services provided under this Agreement in which any such officer, employee, or agent is acting as agent or attorney-in-fact for Correspondent pursuant to resolution, powers of attorney, or other authorization by Correspondent.

29.3    Claims not Covered.  Clearing Firm shall not be responsible or liable for any Claim or Losses arising out of or caused, directly or indirectly, by a failure to perform, or delay in performance of any obligations under this Agreement caused by circumstances beyond Clearing Firm's reasonable control, including, without limitation: (i) acts of God; (ii) interruption, delay in, loss (partial or complete) of computer hardware or software, public utility or telecommunication service, (iii) act of civil or military authority; (iv) sabotage, riot, natural emergency, epidemic, war, act of terrorism, government action, civil disturbance, explosion, earthquake, flood, fire or other catastrophe; (v) strike or other labor disturbance; (vi) Exchange, NASD or government order, rule or regulation; (vii) energy or natural resource difficulty or shortage; and (viii) inability to obtain materials, equipment or transportation.

29.4    Damages.  Clearing Firm shall not be liable for special, indirect, incidental, consequential or punitive damages, whether such damages are incurred or experienced as a result of entering into or relying on this Agreement or otherwise, even if Clearing Firm has been advised of the

25



and agrees that it shall identify to Clearing Firm in writing all accounts that are, or from time to time may be, proprietary accounts of Correspondent. The parties shall continue to adhere to the terms of the No-Action Letter, including the Interpretations set forth therein, in all respects.

30.2    Computation. Clearing Firm shall perform a computation for PAIB assets (the "PAIB Reserve Computation") of Correspondent in accordance with the customer reserve computation set forth in Rule 15c3-3 (the "customer reserve formula") with the following modifications:

30.2.1    Any credit (including a credit applied to reduce a debit) that is included in the customer reserve formula may not be included as a credit in the PAIB reserve computation;

30.2.2    Note E(3) to Rule 15c3-3A which reduces debit balances by 1% under the basic method and subparagraph (a)(1)(ii)(A) of the net capital rule which reduces debit balances by 3% under the alternative method shall not apply; and

30.2.3    Neither Note E(1) to Rule 15c-3a nor NYSE Interpretation /04 to Item 10 of Rule 15c3-3a regarding securities concentration charges shall be applicable to the PAIB reserve computation.

The PAIB reserve computation shall include all proprietary accounts of Correspondent. All PAIB assets shall be kept separate and distinct from customer assets under the customer reserve formula in Rule 15c3-3. The PAIB reserve computation shall be prepared within the same time frames as those prescribed by Rule 15c3-3 for the customer reserve formula.

30.3    Creation of Special Reserve Account. Clearing Firm shall establish and maintain a separate "Special Reserve Account for the Exclusive Benefit of Customer" with a bank in conformity with the standards of paragraph (f) of Rule 15c3-3 (the "PAIB Reserve Account"). Cash and/or qualified securities as defined in the customer reserve formula shall be maintained in the PAIB Reserve Account in an amount equal to the PAIB reserve requirement.

30.4    Deposit Requirement. If the PAIB reserve computation results in a deposit requirement, the requirement may be satisfied to the extent of any excess debit in the customer reserve formula of the same date. However, a deposit requirement resulting from the customer reserve formula shall not be satisfied with excess debits from the PAIB reserve computation.

31.2.1.3    Neither Correspondent nor its employees or agents shall offer to or effect transactions for its customers at prices higher than permitted by applicable law;

31.2.1.4    Clearing Firm shall have no oversight of, or rights, responsibilities or obligations relating to, Correspondent's duty to comply with Applicable Rules, including, without limitation, Section 4 of the NASD Rules of Fair Practice and the related NASD Markup Policy in selling to its customers Securities purchased by Correspondent through the Bond System; and

31.2.1.5    Clearing Firm shall have the right to contract with a third party, including another dealer, to provide services similar to those offered through the Bond System.

31.2.2    Clearing Firm understands and agrees that:

31.2.2.1    Subject to the terms and conditions of this Agreement, Clearing Firm will use its best efforts to provide accurate, current and fair information under prevailing market circumstances;

31.2.2.2    Clearing Firm will make the Bond System available to Correspondent during the same hours its is available for other clients of Clearing Firm, subject to market conditions.

31.2.2.3    Correspondent shall have the right to utilize similar services, including those provided by other brokers or third-party vendors, to obtain access to other bond inventories.

32. **Provision of Technology.**

32.1    <u>Execution of Letter Agreements.</u> From time to time, Clearing Firm will make available to Correspondent, at Clearing Firm's sole discretion, one or more data presentment, data processing and related development, implementation, support and other services provided by Clearing Firm and its licensors and other vendors to Correspondent and its customers hereunder, including without limitation, the systems (and software operated in connection with such systems) of Clearing Firm and such licensors and other vendors used to provide such services (the "Technology Services"), the license, uses, fees and scope of which will be governed by the terms of (a) this Agreement and (b) one or more letter agreements (each, a "Letter Agreement") relating specifically to the individual Technology Services purchased from Clearing Firm. Correspondent agrees that it will negotiate in good faith the terms of the specific Technology Services that it elects to purchase from Clearing

further understands and agrees that (a) each such License shall govern its use of the Technology Services relating thereto; (b) Clearing Firm reserves the right in its sole discretion to revoke such License for cause; (c) such vendor(s) may impose conditions or restrictions on the use of such Technology Services by Correspondent, and such conditions or restrictions may substantially limit the scope of, or result in the termination of, Correspondent's ability to use the Technology Services; and (d) it shall assume and be solely responsible for complying with the obligations and responsibilities imposed by such vendor as a condition of the use of the License.

32.3.1 Limitation on License.  Correspondent may use the Technology Services only in its own retail securities brokerage operations.  Other than as specifically authorized by this Agreement, Correspondent may not re-license, sub-license, sell, lease, or in any other manner convey any rights in, grant permission to use, provide access to, or make available to others the Technology Services without Clearing Firm's express written consent.  Correspondent may not use the Technology Services to operate or support the operations of a service bureau.  Correspondent may not publish, disclose, display, provide access to or otherwise make available any part of the Technology Service, or any screens, formats, reports or printouts used, provided, produced or supplied from or in connection therewith, to any person, entity, or third-party, other than an employee, independent contractor, or affiliate of Correspondent without the prior written consent of, and on terms acceptable to, Clearing Firm.  Correspondent further agrees that the License granted by Clearing Firm, and the use of such related Technology Services, shall be subject to payment of the fees determined by Clearing Firm and governed by the terms and conditions of this Agreement.

32.3.2 Modifications to or Rescission of License(s).  Correspondent understands and acknowledges that:  (a) Clearing Firm has licensed one or more of the components of the Technology Services from one or more vendors; (b) such vendors have entered into one or more license agreements with Clearing Firm pursuant to which Clearing Firm is permitted to license such technology to firms with which Clearing Firm has a correspondent clearing relationship, such as Correspondent; and (c) one or more such vendors may, without notice to Clearing Firm or to Correspondent, unilaterally change, modify or rescind the terms of such license agreements with Clearing Firm, with the result that Clearing Firm is no longer permitted to license to Correspondent the Technology Services.  Correspondent further

31

32.8    Equipment and Hardware; Other Services. Correspondent understands and agrees that:

    32.8.1  Clearing Firm has no obligation to modify its hardware, software data base or operating systems, or other systems in providing the Technology Services. Correspondent is solely responsible for obtaining, installing at its premises, and maintaining all equipment and hardware, including telecommunications equipment, that is specified by Clearing Firm for use with the Technology Services from time to time or that is otherwise necessary for using any Technology Services which it acquires or licenses from Clearing Firm

    32.8.2  As part of the Technology Services to be provided under the terms of this Agreement and/or any Letter Agreement, an unaffiliated vendor may require that Correspondent execute one or more separate agreements with such vendor, and that Clearing Firm may or may not be a party to such agreement(s).

32.9    Access and Access Security. Correspondent shall determine whether and which of its customers, employees or agents shall have access to the Technology Services. Correspondent shall be solely responsible for the assignment, distribution, and maintenance of all passwords, codes, and other security measures designed to ensure that access to such Technology Services is granted only to those individuals who are authorized by Correspondent. Nothing in this paragraph shall affect or diminish Clearing Firm's right, in its sole discretion, to refuse to provide any or all Technology Services to Correspondent, its agents, employees, or any customer(s) of Correspondent.

32.10   No Unauthorized Use of Technology Services. Correspondent will not copy, modify, distribute or transfer (by any means), display, sublicense, rent, reverse engineer, decompile or disassemble any software or other technology that is included in the Technology Services.

32.11   Installation and Training. Subject to the terms of a Letter Agreement, Clearing Firm shall provide Correspondent with basic installation assistance and training regarding the Technology Services acquired by Correspondent. Correspondent is responsible for providing physical space and facilities sufficient, in the reasonable judgment of Clearing Firm, for Clearing Firm to install, and for Correspondent to operate, the Technology Services. Correspondent further agrees that it shall pay the costs and travel expenses, if any, incurred by Clearing Firm's personnel in connection with such installation assistance and training provided by Clearing Firm's personnel.

33

10/16/2003 18:00 FAX 702 382 )⁻⁻⁹         LAW OFFICES                        ☐035/052

32.15.2 Correspondent further agrees that it shall not publish, disclose,
display, provide access to or otherwise make available any Technology
Services (including, without limitation, the content, source-code,
object-code embodiments, plans, specifications, and designs of any of
the Technology Services), or products thereof, or any screens, formats,
reports or printouts used, provided, produced or supplied from or in
connection therewith, or any recommendations, strategies,
requirements, discoveries, designs, inventions, computer software,
processes, improvements, developments, methods, formulae, factors
and parameters and values of such factors and parameters used in
formulae; techniques, engineering, know-how, trade secrets, systems,
documentation, drawings, renderings, plans, artwork, descriptions,
specifications, historical or technical or research data, custom-
designed computer codes, proprietary computer codes, and proprietary
information of third parties (regardless of whether any such item is
susceptible to patent, copyright, or any other form of protection), to
any person or entity other than an employee of Correspondent, without
the prior written consent of, and on terms acceptable to, Clearing Firm,
which consent shall not be unreasonably withheld. Notwithstanding
any term or provision in this Agreement to the contrary, Clearing Firm
may use and disclose compiled statistical information for planning and
other purposes, provided that the identity of Correspondent and
Correspondent's customers is not discernible. In addition, Clearing
Firm may disclose information with respect to Correspondent to third
parties in connection with Clearing Firm's development of the
Technology Services, including Correspondent's home page.

32.15.3 Correspondent understands that the unauthorized publication or
disclosure of any of the Technology Services, or any underlying
software or other technology, or the unauthorized use of the
Technology Services, would cause irreparable harm to Clearing Firm
for which there is no adequate remedy at law. Correspondent therefore
agrees that in the event of unauthorized disclosure or use, Clearing
Firm may, at its discretion and at Correspondent's expense, terminate
this Agreement, obtain immediate injunctive relief in a court of
competent jurisdiction, or take such other steps as it deems necessary
to protect its rights. If Clearing Firm, in its reasonable, good faith
judgment, determines that there is a material risk of such unauthorized
disclosure or use, it may demand immediate assurances, satisfactory to
Clearing Firm, that there will be no such unauthorized disclosure or
use. In the absence of such assurance, Clearing Firm may immediately
terminate this Agreement and take such other steps as it deems
necessary. The rights of Clearing Firm hereunder are in addition to
any other remedies provided at law or in equity.

materials in a manner not expressly approved in writing by Clearing Firm; or (vii) actions by Correspondent wherein Correspondent continues activity allegedly infringing on any person's patent, trademark, copyright, or other intellectual property rights after being notified thereof or after being informed in writing of modifications that would have avoided the alleged infringement, Correspondent assumes full responsibility for and shall defend such Claim, action or proceeding and hold harmless Clearing Firm, its officers, agents, employees, assigns, and successors in interest, or any of them, from and against any and all liability, including, without limitation, any tax liability, and pay all damages, costs, losses, claims, demands, attorney's fees and expenses, or any of them, arising out of such action or proceeding and irrespective of whether such Claim is successful. The obligations of Correspondent hereunder shall survive termination of this Agreement.

32.16  DISCLAIMER OF WARRANTIES. EXCEPT AS PROVIDED IN SECTION 32.15.4, CORRESPONDENT EXPRESSLY AGREES THAT CORRESPONDENT'S USE OF ANY OR ALL COMPONENTS OF THE TECHNOLOGY SERVICES OFFERED TO IT BY CLEARING FIRM IS AT CORRESPONDENT'S SOLE RISK. NEITHER CLEARING FIRM NOR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS, AFFILIATES, INFORMATION PROVIDERS, LICENSORS, OR OTHER SUPPLIERS PROVIDING DATA, INFORMATION, SERVICES OR SOFTWARE, INCLUDING, BUT NOT LIMITED TO, THE NEW YORK STOCK EXCHANGE, INC., WARRANTS THAT SUCH SERVICE, TECHNOLOGY OR DATA WILL BE UNINTERRUPTED OR ERROR FREE; NOR DO ANY OF THEM MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM THE USE OF SUCH SERVICE, TECHNOLOGY OR DATA, OR AS TO THE TIMELINESS, SEQUENCE, ACCURACY, COMPLETENESS, RELIABILITY OR CONTENT OF ANY DATA, INFORMATION, SERVICES, OR TRANSACTIONS PROVIDED THROUGH THE TECHNOLOGY SERVICES. THE TECHNOLOGY SERVICES ARE PROVIDED ON AN "AS IS," "AS AVAILABLE" BASIS, WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THOSE OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN THOSE WARRANTIES WHICH ARE IMPLIED BY AND INCAPABLE OF EXCLUSION, RESTRICTION OR MODIFICATION UNDER THE LAWS APPLICABLE TO THIS AGREEMENT.

## 34. Arbitration.

34.1  Arbitration Requirement.  Any dispute between Correspondent and
Clearing Firm that cannot be settled shall be taken to arbitration as set
forth in Section 34.3 below.
        34. 3

34.2  ARBITRATION DISCLOSURE.

o       ARBITRATION IS FINAL AND BINDING ON THE PARTIES.

o       THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK
REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY
TRIAL.

o       PRE-ARBITRATION DISCOVERY IS GENERALLY MORE
LIMITED THAN AND DIFFERENT FROM COURT
PROCEEDINGS.

o       THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE
FACTUAL FINDINGS OR LEGAL REASONING AND ANY
PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF
RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.

o       THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A
MINORITY OF ARBITRATORS WHO WERE OR ARE
AFFILIATED WITH THE SECURITIES INDUSTRY.

34.3  ARBITRATION AGREEMENT.

ANY CONTROVERSY BETWEEN US ARISING OUT OF YOUR
BUSINESS OR THIS AGREEMENT SHALL BE SUBMITTED TO
ARBITRATION CONDUCTED BEFORE THE NEW YORK STOCK
EXCHANGE, INC., OR NASD REGULATION INC., AND IN
ACCORDANCE WITH THE RULES OBTAINING OF THE SELECTED
ORGANIZATION AND SHALL BE CONDUCTED AS A BROKER TO
BROKER OR MEMBER VS MEMBER DISPUTE.  ARBITRATION MUST
BE COMMENCED BY SERVICE UPON THE OTHER PARTY OF A
WRITTEN DEMAND FOR ARBITRATION OR A WRITTEN NOTICE OF
INTENTION TO ARBITRATE, THEREIN ELECTING THE
ARBITRATION TRIBUNAL.

NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS
ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-
DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO

property, including, without limitation, the appointment or authorization of a trustee, receiver or agent under applicable law or under a contract to take charge of its property for the purpose of enforcing a lien against such property or for the purpose of general administration of such property for the benefit of its creditors; (vii) files a petition seeking a reorganization of its financial affairs or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute or files an answer admitting the material allegations of a petition filed against it in any proceeding under any such law or statute; or (viii) takes any corporate action for the purpose of effecting any of the foregoing.

35.2.6    Immediately in the event that the other party is enjoined, disabled, suspended, prohibited, or otherwise becomes unable to engage in the securities business or any part of it by operation of law or as a result of any administrative or judicial proceeding or action by the SEC, any state securities law administrator, or any regulatory or self-regulatory organization having jurisdiction over such party.

35.3    **Termination by Clearing Firm.**  Clearing Firm may terminate this Agreement at any time upon notice to Correspondent in the event Clearing Firm determines, in its sole discretion, that: (i) there has been a material adverse change in the financial condition or results of operations of Correspondent; (ii) there has been a material adverse change in the creditworthiness of Correspondent; or (iii) it has or may have Claims arising out of a breach of the obligations of the Correspondent under this Agreement in excess of ninety percent (90%) of the aggregate balances in the Payment Account and Deposit Account. Should Clearing Firm elect not to terminate this Agreement notwithstanding a default by Correspondent of any provision herein, Clearing Firm may choose to limit the availability of the Services so as to enable Clearing Firm to limit its exposure to any risks posed to Clearing Firm by the Accounts. Such limitations on Services may include, but are not limited to: 1) the refusal by Clearing Firm to accept additional orders for any Accounts or restricting orders to liquidating orders only; 2) the refusal to take or make delivery on one or more Transactions or to finance such Transactions; 3) the termination of Clearing Firm's relationship with any Accounts; or 4) the imposition by Clearing Firm of higher Margin requirements in any or all Accounts.  Any determination by Clearing Firm not to terminate this Agreement pursuant to this Section 34.3 shall not act as a waiver of Clearing Firm's rights hereunder.

transfer or disclose it. Confidential Information specifically includes, without limitation, all Customer names and Customer information ("Customer Confidential Information").

36.2    **Nondisclosure.** Both parties agree to hold the other's Confidential Information in the strictest confidence and not to use or disclose the other's Confidential Information and agree to take all steps necessary to prevent unauthorized use, disclosure, or publication by any of its officers, directors, agents, employees, or representatives. Clearing Firm agrees to disclose Customer Confidential Information only to those of its officers, directors, or employees that need to know such information to perform its obligations under this Agreement or to authorized agents, service providers, or others as contemplated by this Agreement. This obligation will terminate fifteen (15) years after receipt of the relevant Confidential Information and shall survive any termination of this Agreement. Subject to applicable laws and regulations, each party may disclose Confidential Information if required by any request, requirement, or order from any judicial, governmental, or regulatory authority with appropriate jurisdiction; provided that such party will take all reasonable steps to give the other party sufficient prior notice in order to contest such request, requirement, or order.

36.3    Provisions Applicable to "Nonpublic Personal Information". Nothwithstanding anything contained in this Agreement to the contrary, with respect to "Nonpublic Personal Information" regarding "customers" and "consumers" (as those terms are defined in Title V of the Gramm-Leach-Bliley Act and the privacy regulations adopted thereunder) of Correspondent and any of its affiliates, Clearing Firm agrees as follows:

(i)    Except as may be reasonably necessary in the ordinary course of business to carry out the activities to be performed by Clearing Firm under this Agreement or as may be required by law or legal process, it will not disclose any such Nonpublic Personal Information to any third party other than affiliates of Clearing Firm or Correspondent.

(ii)    That it will not use any such Nonpublic Personal Information other than to carry out the purposes for which it was disclosed by Correspondent or its affiliates unless such other use is (a) expressly permitted by a written agreement executed by Correspondent or its affiliate, or (b) required by law or legal process.

(iii)    It will take all reasonable measures, including without limitation such measures as it takes to safeguard its own confidential information, to ensure the security and confidentiality of all such

43

37.8    <u>Modification by Applicable Rule or Law</u>. All transactions which Clearing Firm executes for any Introduced Account shall be subject to any law or rule and Clearing Firm will not be liable to Correspondent or any of Correspondent's Customers as a result of any action taken by Clearing Firm or its agents to comply with any applicable laws or regulations. Whenever any rule or law shall be enacted, prescribed, or promulgated that affects in any manner or is inconsistent with any of the provisions this Agreement, the affected provisions of this Agreement will be deemed modified or superseded, as the case may be, by such applicable law or regulation, and all other provisions of this Agreement and any provisions as modified shall in all respects continue in full force and effect; provided that the basic business arrangement contemplated by this agreement remains intact.

37.9    <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable, the remainder of the Agreement shall nevertheless remain in full force and effect, and if any provision is held invalid or unenforceable with respect to particular circumstances, such provision shall nevertheless remain in full force and effect in all other circumstances; in both cases provided that the basic business arrangement contemplated by this Agreement remains in tact.

37.10   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which taken together shall constitute a single agreement.

37.11   <u>Notices</u>. All notices required or permitted under this Agreement will be in writing and will be deemed given (i) when sent by confirmed facsimile; (ii) two (2) working days after deposit with a commercial overnight carrier, with written verification of receipt; or (iii) upon personal delivery. All communications will be sent to the addresses set forth below or to such other address as may be designated by a party by giving written notice to the other party pursuant to this section:

<u>Correspondent</u>

NevWest Securities Corporation
2654 West Horizon Ridge Parkway
Suite B-3
Henderson, NV 89052
Attn: Thomas Chavez, COO

<u>Clearing Firm</u>

Wells Fargo Investments Correspondent Services

37.16   Cooperation. Each party shall cooperate with the other and provide the other with all appropriate data in its possession pertinent to the proper performance of any function, obligation or Services allocated pursuant to this Agreement. Correspondent shall make available to Clearing Firm, its attorneys, accountants and authorized agents such Account Documents, books and records or other information as necessary to comply with the Applicable Rules or to defend against any allegation of a violation of an Applicable Rule.

37.17   Insurance. Correspondent agrees to maintain, and to provide Clearing Firm with evidence thereof, of a blanket broker's indemnity bond in the amount of at least $100,000 covering any and all acts and omissions of its employees and agents, issued by an insurance company reasonably acceptable to Clearing Firm.

37.18   Clearing Firm will be recording all conversations on those telephone lines identified to correspondents to be used for entry of securities orders through Clearing Firm. You and your personnel consent to the recording of conversations on said telephone lines. This Agreement shall constitute a record of Clearing Firm's announcement and the participants' consent. On reasonable notice, you are entitled to listen to all relevant portions of the recording in the event of a question concerning the terms of an order or other instruction.

## CLEARANCE & EXECUTION
## FEE SCHEDULE



EQUITIES (Ticket charge per transaction):

|  | 0 –500 | 501-1000 | 1,001 – 2,500 | 2,501 and above |
|---|---|---|---|---|
| Listed NYSE and AMEX* | $16.00 | $15.00 | $14.00 | $13.00 |
| Listed Regional* | –$16.00 | $15.00 | $14.00 | $13.00 |
| Listed Other* | $16.00 | $15.00 | $14.00 | $13.00 |
| OTC | $16.00 | $15.00 | $14.00 | $13.00 |
| Foreign Equities | $120.00 | | | |

FIXED INCOME (Ticket charge per transaction):

| | |
|---|---|
| Treasury Bills, Notes & Bonds | $20.00* |
| Government Agencies | $20.00* |
| Municipal Bonds | $20.00* |
| Corporate Bonds* | $20.00* |
| Zero Coupon Bonds | $20.00* |

* plus $8 for any trade executed on BondDesk online system

OPTIONS (Ticket charge per transaction):

| | |
|---|---|
| All Contracts* | $15.00 |
| Assignments | $15.00 |

* See Execution



| | |
|---|---|
| Equity Dealer/Street Side Tickets | $10.00 |
| Fixed Income | $15.00 per ticket |
| Customer Side Tickets | Same as Agency/Customer |



Listed Exchange
| | |
|---|---|
| 0 – 4000 shares | $2.00 |
| 4001 shares and Above | $0.01 per share |

Executed by Broker          $0.01 per share

Average Price Trade         $1.50 per ticket coming out of
                            average price account

Corporate Bonds - Listed    $1.00  per 1,000 face

Options
| | |
|---|---|
| Option premium less than $1.00 | $.75  per contract |
| Option premium $1.00 or greater | $1.25  per contract |
| | $2.00 minimum |



Mutual Funds:

| | |
|---|---|
| Purchases | $15.00 per transaction |
| Liquidations | $10.00 per transaction |
| Exchanges (within Fund Family) | $ 2.50 per transaction |
| Preferred Provider Program | $ 0.00 per transaction |

10/16/2003 18:05 FAX 702 382    9          LAW OFFICES                                     @040/002

## OTHER FEES

████████████████████████████████████████████████████

Accommodation Transfers                    $15.00 plus any additional transfer agent charges

WFI Custodian IRA
    Annual maintenance            $30.00
    Termination fee               $50.00

Lost Certificates
    Accommodation                 After 90 days, $50.00 plus transfer bonding
    Transfer Agent/Bonding        Usually 3% of Market Value

Foreign Securities                         Custodial/Transfer fees charged at cost

Postage & Handling                         $ 3.50
                                  Note:  Correspondent may impose additional P&H fee to customer

Prepayments                                Margin Rate

Returned Checks                            $25.00

Wire Transfers
    Domestic                      $15.00
    International                  $35.00

Transfer of Death
    Application fee               $ 75.00
    Distribution                  $200.00

Inactive Account Fee                       $35.00

Automated Account Transfer (ACAT) Fee      $40.00 (outgoing account only)

████████████████████████████████████████████████████

Cancel & Rebills                           $10.00
Courier/Mail Service:
    U.S. Mail and/or UPS          No charge
    Overnight Delivery            Charged to correspondent at cost

Extensions & Technical Liquidations        $5.00

Supplies, Forms & Subscriptions            Charged to correspondent at cost

12(b) Processing Fee                       No charge

RVP/DVP Bounce/DK                          $15.00
                                           Interest on DK 1% over broker call until item is redlivered.

Clearing Deposit shall be $50,000. Clearing Firm will pay Correspondent interest monthly at current money fund rates on their deposit balance.

# Amendment to agreement dated 11-25-2002

## Fully Disclosed Fee Schedule for Clearing & Execution Services

### for

### *NevWest Securities Corporation*

|  |  |
|---|---|
| Automatic Investments | $ 2.50 per transaction |
| Certificate of Deposit | $15.00 per transaction |
| Unit Investment Trusts | $15.00 per transaction |
| Annuities | $20.00 per transaction |

## REVENUE SHARING

WFICS will charge interest on customer margin debit balances to correspondent's customer margin accounts using our current margin interest schedule. All interest charged to correspondent's customers in excess of broker call plus 50 bps will be shared equally between WFICS and the Correspondent.

WFICS will credit Correspondent each month a rebate based on the average paid on Correspondent's customer free credit balances. The rebate will be based on the following scale:

| Average Free Credit Balance | Basis Points |
|---|---|
| Less than $5 million | 25 basis points |
| $5-$10 million | 30 basis points |
| $10 million and above | 35 basis points |

A monthly rebate will be credited to the correspondent based on the following table:

| Full Name | Sera Code | Minimum Balance | Ticker symbol for ILX lookup | Rebate Under $10 million Basis Points | Rebate Over $10 million Basis Points |
|---|---|---|---|---|---|
| Wells Fargo California Tax Free, Class A | WCT | No minimum | SGCXX | 25 | 30 |
| Wells Fargo Government Fund, Class A | WGA | No minimum | WFGXX | 25 | 30 |
| Wells Fargo Minnesota Fund, Class A | WFM | No minimum | WMNXX | 30 | 35 |
| Wells Fargo Money Market, Class A | WMM | No minimum | STGXX | 30 | 35 |
| Wells Fargo National Tax Free Fund, Class A | WNT | No minimum | NWMXX | 20 | 25 |
| Wells Fargo Treasury Plus Fund | WTP | No minimum | PIVXX | 20 | 25 |
| Wells Fargo 100% Treasury Fund | WTM | No minimum | WFTXX | 20 | 25 |
| Wells Fargo Cash Investments, Service Class | WCI | $100K | NWIXX | 15 | 20 |
| Wells Fargo National Tax Free Inst... Service Class | WNI | $100K | MMIXX | 15 | 20 |
| Wells Fargo Prime Investment Fund, Service Class | WPI | $100K | NWRXX | 15 | 20 |
| Wells Fargo Government Fund, Service Class | WGM | $100K | NWGXX | 15 | 20 |
| Alliance Money Reserve Fund-Retail | AMR | No minimum | | 35 | 40 |
| Alliance Government Reserves-Retail | AGR | No minimum | | 35 | 40 |
| Alliance Treasury Reserves-Retail | ATR | No minimum | | 35 | 40 |
| Alliance Muni Trust Fund-General | AMT | No minimum | | 35 | 40 |
| Wells Fargo US Dollar Reserve Fund Offshore | WUD | No minimum | | 40 | 45 |

se

10/16/2003 15:07 FAX 702 382 ___   LAW OFFICES   @040/052

**FEE SCHEDULES**

**Overland Select Fee Schedule – Equity and Balanced Accounts**

| Account Size | WFICS Fee (basis point) | Suggested Fee Range |
|---|---|---|
| First $500,000 | 100 | 2.50% - 3.00% |
| Next $500,000 | 90 | 1.60% - 2.50% |
| Over $1,000,000 | 85 | 1.45% - 2.25% |

**Overland Select Fee Schedule – Fixed Income Accounts**

| Account Size | WFICS Fee (basis point) | Suggested Fee Range |
|---|---|---|
| First $500,000 | 65 | 1.25% - 1.50% |
| Next $500,000 | 60 | 1.00% - 1.50% |
| Over $1,000,000 | 50 | .75% - 1.00% |

**Overland Select Fee Schedule – Mutual Fund Accounts**

| Account Size | WFICS Fee (basis point) | Suggested Fee Range |
|---|---|---|
| First $500,000 | 40 | 1.25% - 1.50% |
| Next $500,000 | 30 | 1.00% - 1.25% |
| Over $1,000,000 | 20 | .75% - 1.00% |

**Overland Choice Fee Schedule**

| Account Size | WFICS Fee (basis point) | Trade Allotment * | Suggested Fee Range |
|---|---|---|---|
| $0 - $100,000 | 40 ^ | 50 | 1.50% - 2.25% |
| $100,001 - $250,000 | 40 | 75 | 1.25% - 2.00% |
| $250,001 - 500,000 | 30 | 100 | 1.00% - 1.75% |
| $500,001 - $1,000,000 | 25 | 150 | .80% - 1.40% |
| Over $1,000,000 | 15 | 200 | .50% - 1.00% |

*$15 per trade above limits
^ minimum annual fee $300

NevWest Securities Corp.

By _[signature]_   Dated  1/29/2003
Sergey Rumyantsev
Chief Executive Officer

Wells Fargo Investments Correspondent Services

By _[signature] John E. Hickey_   Dated  1-28-03
John E. Hickey
Director

LAW OFFICES

# EXHIBIT "2"

# RULE 6

## SERVICES

Subject to the provisions of these Rules and the Procedures, the Corporation, acting in accordance with duly authorized instructions from the Participant or Participants and the Pledgee or Pledgees, if any, having an interest in the transaction, shall: accept Eligible Securities from Participants for Deposit with the Corporation; credit the Account of a Participant with the Securities it Deposits with the Corporation prior to such time as the registration of the transfer thereof into the name of the Corporation's nominee is effected unless (a) the Corporation rejects the Deposit due to its determination, in its sole discretion, that the Securities Deposited are not in proper form for registration of transfer or (b) the Securities are part of an issue with respect to which the Corporation, by reason of the historical transfer performance of the issuer thereof or the transfer agent therefor, shall have, at least ten Business Days prior to the day of the deposit, given notice to Participants and the SEC that it will not credit the Accounts of Participants which Deposit Securities of that issue until such time as it determines that the registration of the transfer thereof into the name of the Corporation's nominee has been effected, in which event such credit shall be effected upon the Corporation's determination that such registration of transfer has been effected; effect transfers by a Participant of its Deposited Securities to another Participant or Participants; effect Pledges by a Participant of its Deposited Securities to a Pledgee or Pledgees and effect the release of such Pledges, except that if the Corporation has not made a determination that a specific issue of Securities may lawfully be the subject of a Pledge by book-entry or if the Corporation has designated Deposited Securities of such issue as ineligible for Pledge through its facilities, the Corporation shall not be obligated to effect Pledges of such Deposited Securities; Deliver to a Participant or its designee a Participant's Deposited Securities (x) registered in the name of and endorsed by the Corporation's nominee, (y) endorsed to the Corporation's nominee and endorsed by the Corporation's nominee or (z) subject to the availability of transfer services, registered in the name of such Participant or its designee; deliver dividends, distributions, rights, securities, proxy material and other property or documents received by the Corporation with respect to a Participant's Deposited Securities or Pledged Securities, except as provided below in this Rule or in the Procedures; disburse money to, and receive money from, Participants and Pledgees on behalf of other Participants or Pledgees in connection with related Securities transactions; and acting on its own or by appropriate instruction, provide to Participants and Pledgees information and statements of account regarding their business with the Corporation.  Such transactions shall be effected in accordance with the By-Laws, these Rules and the Procedures.

The Corporation may also provide such other services as are consistent with the purposes and powers of the Corporation; provided, however, that the Corporation shall not initiate any change in the nature of, or any service other than, the services specified in the first paragraph of this Rule without first notifying the SEC thereof.

The Corporation may limit certain securities to particular issues of Eligible Securities.

Any or all Deposited Securities or Pledged Securities may be required by the Corporation to be removed from the Account of a Participant or Pledgee by Delivery of such Securities to such Participant or Pledgee outside the facilities of the Corporation when the Corporation in its discretion deems such removal necessary or expedient.

If the Corporation or its nominee is unable to exercise voting rights as contemplated by the Procedures as to all Deposited Securities and Pledged Securities of a given Eligible Security due to limitations imposed by law or the issuer on the exercise of voting rights by the Corporation's nominee, the Corporation shall have no obligation to Participants, Pledgees or others to provide for the exercise of any such voting rights.

In consideration of the Corporation's Delivery to a Participant or its designee of the Participant's Deposited Securities registered in the name of and endorsed by the Corporation's nominee, the Participant shall indemnify the Corporation and its nominee against all loss, liability and expense which they may sustain, without fault on the Corporation's or such nominee's part, as a result of such Securities being registered in the name of such nominee, including (a) assessments, (b) losses, liabilities and expenses arising from claims of third parties and from taxes and other governmental charges, (c) related expenses with respect to any such Securities, (d) the inability of any Person entitled to exercise any rights with respect to such Securities (including, but not limited to, voting rights, dissenters' rights, rights to purchase other Securities or exchange or conversion rights) so to exercise such rights or exercise such rights on a timely basis and (e) the inability of any such Person entitled to dividends or other distributions with respect to such Securities to obtain such dividends or other distributions on a timely basis.

Any instruction given to the Corporation by a Participant or Pledgee or by the Special Representative (as hereinafter defined in this Rule) shall be deemed to be an undertaking to the Corporation by such Participant, the Participant on behalf of which the Special Representative is acting or such Pledgee that it has and shall maintain sufficient Securities balances in its Accounts to support all transactions specified in such instruction.

Any instruction given to the Corporation by the Special Representative on any Business Day to Deliver Securities from the Account of the Special Representative to the Account of a Participant shall not be effective, and any entry made by the Corporation in accordance with such instruction shall not be final, until the "effective time" (as defined in the Rules and Procedures of NSCC) on such Business Day.

The Corporation may accept or rely upon any instruction given to the Corporation by a Participant or Pledgee, including any instruction given by physical delivery or delivery by other means such as wire transmission, facsimile copy, magnetic tape or other recording media, in form acceptable to the Corporation and in accordance with the Procedures, which reasonably is understood by the Corporation to have been given to the Corporation by the Participant or Pledgee, and the Corporation shall have no responsibility or liability for any errors which may occur, without negligence on the Corporation's part, in the course of transmission or recording of any transmissions or which may exist in any document, magnetic tape or other recording media so delivered to the Corporation.

The Corporation may accept and rely upon any instruction given to the Corporation by the Special Representative, including any instruction given by physical delivery or delivery by other means such as wire transmission, facsimile copy, magnetic tape or other recording media, in form acceptable to the Corporation in accordance with the Procedures, which reasonably is understood by the Corporation to have been given to the Corporation by the Special Representative, provided that such instruction relates only to the transfer of Securities from the Account of a Participant to the Account of the Special Representative, and the Corporation shall have no responsibility or liability for any errors which may occur, without fault on the Corporation's part, in the course of transmission or recording of transmission or which may exist in any document, magnetic tape or other recording media so delivered to the Corporation, and the Corporation shall be entitled to act pursuant to any such instruction as though such instruction had been received from the Participant from whose Account the transfer is to be made notwithstanding any information the Corporation may have to the contrary.

Any Participant or Pledgee delivering instructions as provided above, or on whose behalf the Special Representative shall deliver instructions as provided above, shall indemnify the Corporation, and any of its employees, officers, directors, stockholders, agents, Participants and Pledgees who may sustain any loss, liability or expense as a result of (a) any act done in reliance upon the authenticity of any instruction received by the Corporation, (b) the inaccuracy of the information contained therein or (c) effecting transactions in reliance upon such information or instruction against any such loss, liability or expense so long as such transactions are effected in accordance with such information and instructions even though they be inaccurate or not authentic and so long as the Person asserting a right to indemnification shall not have knowledge of such inaccuracy or lack of authenticity at the time of the event or events giving rise to such loss, liability or expense.

Notwithstanding the foregoing, the Corporation shall not act upon any instructions purporting to have been given by the Special Representative, or any instructions purporting to have been given by a Participant or Pledgee or the Special Representative by wire transmission, facsimile copy, magnetic tape or other recording media or any means other than in writing, commencing one Business Day after the Corporation receives notice from the Participant or Pledgee that the Corporation shall not accept such instructions until such time as the Participant or the Pledgee shall withdraw such notice.

In consideration of any action by the Corporation to provide for the exercise of dissenters' rights, appraisal rights or similar rights available to the Corporation's nominee as registered owner of Deposited Securities or Pledged Securities, any Participant or Pledgee seeking to avail itself of such rights, either on its own behalf or on behalf of others, shall indemnify and hold harmless the Corporation and any nominee of the Corporation in whose name such Securities are registered against all loss, liability and expense which they may sustain, without fault or negligence on the Corporation's or such nominee's part, as a result of any action they may take pursuant to the instructions of such Participant in exercising any such rights. The Corporation shall not be obligated to do any act in pursuance of such rights otherwise than pursuant to the reasonable instructions of such Participant and shall not be obligated to determine for itself, or for any other Person, the legal or other requirements to be followed or complied with in regard to the pursuit of such rights.

The term "Special Representative" of a Participant shall be NSCC but only insofar as NSCC acts on behalf of the Participant and (a) the Participant is a member of NSCC or (b) the Participant was a member of NSCC and the Corporation has not received notice that such Participant has ceased to be a member of NSCC.

If the Corporation (a) receives notice that an issuer of an Eligible Security has declared a stock or cash dividend on such Security or has authorized a stock split or combination or a distribution of rights or of other property or any other transaction with respect to such Security (a "Transaction") prior to the record date for the Transaction or (b) receives notice of a proposed meeting of holders of an Eligible Security or other occasion for the exercise of voting rights or the giving of consents ("Voting Rights") prior to the record date for the Voting Rights, the Corporation may (i) assign a cut-off date for the Transaction or Voting Rights or (ii) if such notice is received after the time which the Corporation, in its sole discretion, deems to be the proper cut-off date for such Transaction or Voting Rights, notify Participants that it will not assign a cut-off date for the Transaction or Voting Rights. If the Corporation assigns a cut-off date for the Transaction or Voting Rights and a Participant Deposits a Security subject to the Transaction or Voting Rights after the cut-off date, the Corporation shall not credit the proceeds of the Transaction to the Account of the Participant or provide for the exercise of the Voting Rights by the Participant. In the case of a Transaction, if a quantity of the Securities equivalent to the amount Deposited to the Account of the Participant after the cut-off date does not remain in the Account on the record date for the Transaction, the Corporation shall have the right to deduct from the Account the proceeds of the Transaction with respect to the quantity not remaining in the Account. In the case of Voting Rights, if a quantity of Securities equivalent to the amount Deposited to the Account of the Participant after the cut-off date does not remain in the Account on the record date for the exercise of the Voting Rights, the Corporation shall have the right to claim from the Participant, and the Participant shall be obligated to use its best efforts to obtain for the Corporation, appropriate proxies or Voting Rights from the registered owner of the Securities on the record date with respect to the quantity not remaining in the Account. The Corporation shall use its best efforts to effect the transfer of all certificates held by the Corporation representing such Security into the name of the Corporation's nominee. On or immediately after the record date for the exercise of Voting Rights, the Corporation shall use its best efforts to permit Participants to exercise Voting Rights in accordance with this Rule and the Procedures. The Corporation shall have no responsibility or obligation to Participants or others with respect to the exercise of Voting Rights except to use its best efforts to act in accordance with this Rule and the Procedures. Without limiting the generality of the foregoing, the Corporation shall have no responsibility in the event that (x) the Corporation, without fault on its part, receives insufficient notice of a proposed meeting to permit action in accordance with this paragraph, (y) the Corporation is unable, without fault on its part, to effect transfer of all certificates into the name of the Corporation's nominee prior to the record date or (z) no record date for a Transaction or the exercise of Voting Rights is established by the issuer.

The Corporation shall not have any lien on or other interest in any Segregated Securities. The Collateral Value of Segregated Securities shall not be included in the Collateral Monitor for a Participant.

The Corporation may, as necessary to protect itself and its Participants, in its reasonable judgment, Devalue Securities; any Devaluation shall apply for internal credit and collateralization purposes only and is not intended to prejudice the underlying rights and obligations of the parties to any transaction in those Securities or of Participants generally, subject to applicable law, rules or regulations, or agreements as such rights and obligations may be determined or adjudicated outside the Corporation.  The Corporation may, in its sole discretion, subsequently restore Devalued Securities to their original Collateral Value or any intermediate Collateral Value which the Corporation shall determine is appropriate and in the best interests of the Corporation and its Participants.

**EXHIBIT M**

● **ORIGINAL** ●

*FILED*

2003 OCT 16 I P 2: 51

*Shirley B. Parraguirre*

CLERK

AFFT
HAROLD P. GEWERTER, ESQ.
Nevada Bar #499
WENDY E. MILLER, ESQ.
Nevada Bar #6064
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Avenue, Suite 202
Las Vegas, Nevada 89146
Telephone No.: (702) 382-1714
Facsimile No.: (702) 382-1759
Attorneys for Plaintiff

DISTRICT COURT

CLARK COUNTY, NEVADA

* * * * *

| | |
|---|---|
| NEVWEST SECURITIES CORPORATION, a Nevada Corporation | CASE NO.: A474001<br>DEPT NO.: I |
| Plaintiff, | **AFFIDAVIT OF HAROLD P.** |
| vs. | **GEWERTER, ESQ., IN SUPPORT OF**<br>**ORDER SHORTENING TIME**<br>**CONCERNING MOTION FOR** |
| BRIAN MICHAEL VOLMER; 20/20 NETWORKS, INC., a Nevada corporation; | **TEMPORARY RESTRAINING ORDER** |

BRIAN MICHAEL VOLMER; 20/20
NETWORKS, INC., a Nevada corporation;
EDWARD GALLAGHER, individually;
WERNER GREIDER, individually;
CHARLES SMITH, individually; STEVEN Y.
ONOUE, individually; MEHRHAD ALBORZ,
individually; CLAUDIA ZAMAN; MICHAEL
ZAMAN; SIGNATURE STOCK TRANSFER,
INC., a Texas corporation; WELLS FARGO
INVESTMENTS, LLC, a Delaware limited
liability company; DEPOSITORY TRUST
AND CLEARING CORPORATION, a New
York Corporation; DOES I through X,
inclusive; ROE CORPORATIONS XX
through XXX, inclusive;

        Defendants.

STATE OF NEVADA   )
                  )ss:
COUNTY OF CLARK   )

        HAROLD P. GEWERTER, ESQ., being first duly sworn, deposes and says:

        1.  That I am the attorney for Plaintiff in the above-entitled action, and I make this

1

COUNTY CLERK   RECEIVED OCT 16 2003

affidavit based on personal knowledge and am competent to testify thereto. I make this affidavit in support of Plaintiff's Request for Order Shortening time concerning the Application for Temporary Restraining Order.

2. Affiant hereby files this Affidavit in Support of Order Shortening Time concerning the Application for Temporary Restraining Order. An Order Shortening Time is necessary because of the extreme emergency nature of this matter.

3. Specifically, if the Court does not grant the Order Shortening Time, it is clear from the moving papers that the Plaintiff will be subjected to irreparable harm including the real possibility that it may be out of business within one day.

4. Plaintiff, NevWest Securities Corporation, was notified late on October 14, 2003, that Defendant Wells Fargo Investments, LLC intends to buy in 100,000 shares of 20/20 Networks, Inc., stock immediately and charge Plaintiff's account for the buy-in, an amount believed to be in excess of $200,000, thereby putting the Plaintiff in a net capital violation under the rules and regulations of the NASD.

5. Affiant has written to the attorneys for Defendants Wells Fargo Investments and the Depository Trust and Clearing Corporation, trying to resolve this matter, but have not succeeded in persuading the parties from proceeding according to their stated intentions. A copy of my letter to the parties is attached hereto as Exhibit "1."

6. Additionally, the facts set forth in Plaintiff's Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction; Affidavit of Anthony Michael Santos are hereby incorporated into this Affidavit in Support of Order Shortening Time.

///

2

1    Wherefore, Plaintiff prays that this Honorable Court grant its Order Shortening Time

2  concerning Application for Temporary Restraining Order and set this matter for the first

3  available date.

4

5    FURTHER, YOUR AFFIANT SAYETH NAUGHT.

6    DATED this $\underline{15}$ day of October, 2003.

7

8

9                                              
                                              HAROLD P. GEWERTER, ESQ.

10  SUBSCRIBED and SWORN to before
11  me this $\underline{15}$ day of October, 2003.

12

     NOTARY PUBLIC in and for said
13  COUNTY and STATE.

     NOTARY PUBLIC
     STATE OF NEVADA
     County of Clark
     JOYCE FAHL
     No: 99-44197-1
     My Appointment Expires April 8, 2007

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**EXHIBIT N**

1 | CERT
HAROLD P. GEWERTER, ESQ.
2 | Nevada Bar #499
WENDY E. MILLER
3 | Nevada Bar #6064
HAROLD P. GEWERTER, ESQ., LTD.
4 | 5440 West Sahara Avenue, Suite 202
Las Vegas, Nevada 89146
5 | Telephone No.: (702) 382-1714
Facsimile No.: (702) 382-1759
6 | Attorneys for Plaintiff

7

8

9

10

11

FILED

Sep 24  12 33 PM '03

Shirley B. Paraziune
CLERK

## DISTRICT COURT

## CLARK COUNTY, NEVADA

\* \* \* \* \*

| | |
|---|---|
| NEVWEST SECURITIES CORPORATION, a Nevada Corporation | CASE NO.: A474001<br>DEPT NO.: I |
| Plaintiff, | |
| vs. | CERTIFICATION OF COUNSEL IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION; AFFIDAVIT OF ANTONY MICHEL SANTOS |
| BRIAN MICHAEL VOLMER; 20/20 NETWORKS, INC., a Nevada corporation; EDWARD GALLAGHER, individually; WERNER GREIDER, individually; CHARLES SMITH, individually; STEVEN Y. ONOUE, individually; MEHRHAD ALBORZ, individually; SIGNATURE STOCK TRANSFER, INC., a Texas corporation; DEPOSITORY TRUST AND CLEARING CORPORATION, a New York Corporation; DOES I through X, inclusive; ROE CORPORATIONS XX through XXX, inclusive; | Date of Hearing:<br>Time of Hearing: |
| Defendants. | |

The undersigned, Harold P. Gewerter, attorney of record for Plaintiff, NevWest Securities Corporation, hereby certifies that the Application for Temporary Restraining Order is presented to the Court on an Ex Parte basis and that no notice was given to any other party because of the extreme emergency nature of this matter. Specifically, if the Court does not grant the Temporary Restraining Order on an ex parte basis it is clear from the moving papers that the Plaintiff will be subjected to irreparable harm including the real possibility that it may be out of

1

COUNTY CLERK   SEP 24 2003   RECEIVED

1  business by the end of the business day today.  Plaintiff, NevWest Securities Corporation, was

2  notified on the morning of the date of this filing that it will be compelled to immediately cover

3  the short position of the stock the subject of the litigation in an amount believed to be in excess

4  of $200,000, thereby putting the Plaintiff in a net capital violation under the rules and regulations

5  of the NASD.  Additionally, the facts set forth in Plaintiff's Ex Parte Application for Temporary

6  Restraining Order and Motion for Preliminary Injunction; Affidavit of Anthony Michael Santos

7  are hereby incorporated into this Certification of counsel.

8      DATED this 24 day of September, 2003.

HAROLD P. GEWERTER, ESQ.
Nevada Bar No. 499
5440 West Sahara Avenue, Suite 202
Las Vegas, NV  89146
Attorney for Plaintiff

2

**EXHIBIT O**

10/16/2003 17:42 FAX 702 382 ~~~~8   LAW OFFICES   ☒004/032



HEARING REQUIRED
DATE: October 20, 2003
TIME: 9:00 AM

1  OST
   HAROLD P. GEWERTER, ESQ.
2  Nevada Bar #499
   WENDY R. MILLER, ESQ.
3  Nevada Bar #6064
   HAROLD P. GEWERTER, ESQ., LTD.
4  5440 West Sahara Avenue, Suite 202
   Las Vegas, Nevada 89146
5  Telephone No.: (702) 382-1714
   Facsimile No.: (702) 382-1759
6  Attorneys for Plaintiff

FILED

2003 OCT 16  P 2: 51

[signature]

CLERK

7

8                    DISTRICT COURT

9                CLARK COUNTY, NEVADA

10                      * * * * *

11  NEVWEST SECURITIES CORPORATION, a      CASE NO.: A474001
    Nevada Corporation                     DEPT NO.: I
12
            Plaintiff,
13
    vs.                                    ORDER SHORTENING TIME
14                                         CONCERNING APPLICATION FOR
    BRIAN MICHAEL VOLMER; 20/20            TEMPORARY RESTRAINING ORDER
15  NETWORKS, INC., a Nevada corporation;
    EDWARD GALLAGHER, individually;
16  WERNER GREEDER, individually;
    CHARLES SMITH, individually; STEVEN Y.
17  ONOUE, individually; MEHRHAD ALBORZ,
    individually; CLAUDIA ZAMAN; MICHAEL
18  ZAMAN; SIGNATURE STOCK TRANSFER,
    INC., a Texas corporation; WELLS FARGO
19  INVESTMENTS, LLC, a Delaware limited
    liability company; DEPOSITORY TRUST
20  AND CLEARING CORPORATION, a New
    York Corporation; DOES I through X,
21  inclusive; ROE CORPORATIONS XX
    through XXX, inclusive;
22
23          Defendants.

24
25                 ORDER SHORTENING TIME

26      Upon Application and Affidavit of Harold P. Gewerter, Esq., attorney for Plaintiff, and

        good cause appearing therefore:
27
28      IT IS HEREBY ORDERED that the time for the hearing on Plaintiff's Application for

Temporary Restraining Order is hereby shortened and shall be heard on the 20th day of

                                    1

1   October   , 2003 at 4:00 A.m. in Department I of the above-entitled Court.

2   DATED this ____ day of October, 2003.

3

4                            **GENE T. PORTER**

5                            DISTRICT COURT JUDGE

6   Respectfully Submitted:

7

8

9   HAROLD P. GEWERTER, ESQ.
      Nevada Bar # 499

10   5440 West Sahara Avenue, Suite 202
      Las Vegas, Nevada 89146

11   Attorney for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT P**

88

# ORIGINAL

FILED

Oct 17  3 45 PM '03

*Shirley B. Parraguirre*
CLERK

HAROLD P. GEWERTER, ESQ.
Nevada Bar #499
WENDY E. MILLER, ESQ.
Nevada Bar #6064
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Avenue, Suite 202
Las Vegas, Nevada 89146
Telephone No.: (702) 382-1714
Facsimile No.: (702) 382-1759
Attorneys for Plaintiff

### DISTRICT COURT

### CLARK COUNTY, NEVADA

A 474 001

* * * * *

| | |
|---|---|
| NEVWEST SECURITIES CORPORATION, a Nevada Corporation<br><br>Plaintiff,<br><br>vs.<br><br>BRIAN MICHAEL VOLMER; 20/20 NETWORKS, INC., a Nevada corporation; EDWARD GALLAGHER, individually; WERNER GREIDER, individually; CHARLES SMITH, individually; STEVEN Y. ONOUE, individually; MEHRHAD ALBORZ, individually; CLAUDIA ZAMAN; MICHAEL ZAMAN; SIGNATURE STOCK TRANSFER, INC., a Texas corporation; WELLS FARGO INVESTMENTS, LLC, a Delaware limited liability company; DEPOSITORY TRUST AND CLEARING CORPORATION, a New York Corporation; DOES I through X, inclusive; ROE CORPORATIONS XX through XXX, inclusive;<br><br>Defendants. | CASE NO.: A471001<br>DEPT NO.: I<br><br>CERTIFICATE OF SERVICE BY FAX<br><br>Date of Hearing: October 20, 2003<br>Time of Hearing: 9:00 a.m. |

I hereby certify that on the 16 day of October, 2003, I personally served a true

copy of the foregoing Plaintiff's Application for Temporary Restraining Order and Order

///

///

Shortening Time Concerning Application for Temporary Restraining Order, by sending via

facsimile, addressed as follows:

Wells Fargo Investments
c/o CSC Services of Nevada, Inc., Resident Agent
502 E. John St. #E
Carson City, NV 89706-3078
Fax: (775) 882-3354

An Agent of HAROLD P. GEWERTER, ESQ., LTD.

**EXHIBIT Q**

98

# ORIGINAL

FILED

Oct 17  3 45 PM '03

*Shirley B. Parraguirre*
CLERK

HAROLD P. GEWERTER, ESQ.
Nevada Bar #499
WENDY E. MILLER, ESQ.
Nevada Bar #6064
HAROLD P. GEWERTER, ESQ., LTD.
5440 West Sahara Avenue, Suite 202
Las Vegas, Nevada 89146
Telephone No.: (702) 382-1714
Facsimile No.: (702) 382-1759
Attorneys for Plaintiff

## DISTRICT COURT

## CLARK COUNTY, NEVADA

* * * * *

A 474001

| | |
|---|---|
| NEVWEST SECURITIES CORPORATION, a Nevada Corporation | CASE NO.: A471001 <br> DEPT NO.: I |
| Plaintiff, | CERTIFICATE OF SERVICE BY FAX AND FEDERAL EXPRESS |
| vs. | Date of Hearing: October 20, 2003 <br> Time of Hearing: 9:00 a.m. |
| BRIAN MICHAEL VOLMER; 20/20 NETWORKS, INC., a Nevada corporation; EDWARD GALLAGHER, individually; WERNER GREIDER, individually; CHARLES SMITH, individually; STEVEN Y. ONOUE, individually; MEHRHAD ALBORZ, individually; CLAUDIA ZAMAN; MICHAEL ZAMAN; SIGNATURE STOCK TRANSFER, INC., a Texas corporation; WELLS FARGO INVESTMENTS, LLC, a Delaware limited liability company; DEPOSITORY TRUST AND CLEARING CORPORATION, a New York Corporation; DOES I through X, inclusive; ROE CORPORATIONS XX through XXX, inclusive; | |
| Defendants. | |

I hereby certify that on the __16__ day of October, 2003, I personally served a true

copy of the foregoing Plaintiff's Application for Temporary Restraining Order and Order

///

///

1   Shortening Time Concerning Application for Temporary Restraining Order, by placing a true

2   copy thereof in a Federal Express envelope, and by sending via facsimile, addressed as follows:

3
    The Corporation                              Signature Stock Transfer, Inc.
4   55 Water Street                              c/o Jason M. Bogutski, Resident Agent
    Attention General Counsel                    2632 Coachlight Court
5   New York, NY 10041                           Plano, TX 75093
    FAX: 1-212-908-2350                          FAX: 1-972-612-4122
6   Resident Agent for Depository Trust and
7   Clearing Corporation

8

9   _____

10                  An Agent of HAROLD P. GEWERTER, ESQ., LTD.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28